# EXHIBIT 1

# UNITED STATES DISTRICT COURT

for the

Middle District of Tennessee

| | | |
|---|---|---|
| JOHN DOE, et al.<br>*Plaintiff*<br>v.<br>UNLOCK HEALTH INC., et al.<br>*Defendant* | ) ) ) ) ) ) | Civil Action No. 3:26-cv-0289 |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Ochsner Health
c/o CT Corporation System - 3867 Plaza Tower Dr., Baton Rouge, LA 70816

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

Please see Attachment A.

| Place: STRANCH, JENNINGS & GARVEY, PLLC, 223 Rosa L. Parks Ave., Suite 200, Nashville, TN 37203 | Date and Time: 07/31/2026 5:00 pm |
|---|---|

❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 06/29/2026

*CLERK OF COURT*

OR

/s/J. Gerard Stranch, IV

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Plaintiffs, JOHN DOE, JANE DOE, and JACK DOE, who issues or requests this subpoena, are:

J. Gerard Stranch, IV, STRANCH, JENNINGS & GARVEY, PLLC, 223 Rosa L. Parks Ave., Suite 200, Nashville, TN 37203, gstranch@stranchlaw.com; (615) 254-8801

**Notice to the person who issues or requests this subpoena**

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 3:26-cv-0289

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________

on *(date)* ______________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________________

______________________________________________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________________

______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

## DEFINITIONS

1. "ACTION" means the above-captioned lawsuit entitled, *Doe, et al. v. Unlock Health Inc., et al.,* Case No. 3:26-cv-0289, currently pending in the United States District Court for the Middle District of Tennessee.

2. "DEFENDANTS" refers to Unlock Health Inc. and Medicom Digital, Inc. d/b/a Medicom Health Interactive and Medicom Health including all officers, directors, employees, partners, subsidiaries, and affiliates.

3. "COMMUNICATION" or "COMMUNICATIONS" means every exchange of information of any nature within the scope the Federal Rules of Civil Procedure, whether oral or written, from one person or entity to another, and any evidence of such exchange, INCLUDING any correspondence, memorandum, messages, postings, or comments on ONLINE SERVICES, or other online portals, notes or logs of meetings, diaries, daily calendars, or other records of exchanges between people or entities.

4. "CONCERNING" means directly or indirectly comprising, describing, memorializing, concerning, constituting, containing, discussing, embodying, evidencing, exhibiting, identifying, mentioning, negating, pertaining to, referring to, recording, regarding, reflecting, relating to, showing, supporting, or having any factual or logical connection whatsoever with the subject matter in question.

5. "COMPLAINT" means the operative complaint in the ACTION so affixed as ATTACHMENT B.

6. “DEVICE” or “DEVICES” mean any piece of mechanical or electronic equipment, INCLUDING a cell phone or mobile phone (INCLUDING iPhone, Android, or any other operating system), desktop or laptop computer, iPad or tablet, or smart television.

7. “DOCUMENT” or “DOCUMENTS” means all documents, writings, electronically stored information, or things, INCLUDING the following items: all manners of correspondence; COMMUNICATIONS; memoranda; summaries; statements; records; reports; books; diagrams; photographs; specifications; sketches; contracts; forecasts; plans; appraisals; orders; bills; invoices; checks; statistical statements; books of account; studies; graphs; charts; accounts; indexes; data sheets; data processing cards; analytical records; brochures; lists; periodicals; pamphlets; circulars; trade letters; newspaper clippings; press releases; projections; copies; marginal notations; drawings; tape recordings; calendars; diaries; telegrams; emails; notes; working papers; drafts; reports and/or opinions of consultants; records, reports, summaries and/or minutes of meetings and conferences; records, reports, and/or summaries of interviews; records, reports, and/or summaries of negotiations; records, reports, and/or summaries of telephone conversations; and records, reports, and/or summaries of personal conversations. “DOCUMENT” includes every copy of a DOCUMENT that is not identical to the original, whether because of notes made on or attached to such copy, or otherwise; and all other handwritten, typed, printed, recorded or graphic matter or sound reproductions, however produced or reproduced, and whether copies or originals, as well as any electronically stored documents, recordings, or files (INCLUDING those stored on laptop computers), such as, for example, emails, and other documents stored on audiotape, magnetic tape, computer disks, computer hard-drives, CD-ROMS, videotapes, or other optical or digital forms of storage.

8. "INCLUDE" or "INCLUDING" means "include, but not limited to," or "including, but not limited to."

9. "ONLINE SERVICE(S)" means any internet website, web application, digital application, or other service, product, or tool provided online in any form or by any method, INCLUDING any advertising or analytics tools, web beacons, or cookies.

10. "PERSON(S)" refers to any natural person or any legal entity, INCLUDING any business or governmental entity or association.

11. "PLAINTIFFS" means all Plaintiffs referenced in the COMPLAINT, attached as ATTACHMENT B to this Subpoena, INCLUDING all of PLAINTIFFS' agents, representatives, or other PERSONS acting or purporting to act on their behalf. PLAINTIFFS' names will be provided to YOU at a later date for YOUR investigation.

12. "POLICIES" means any rule, procedure, practice, or course of conduct whether formal or informal, written or unwritten, recorded or unrecorded, that was recognized or followed, explicitly or implicitly.

13. "RELATE TO," "RELATED TO," and "RELATING TO," mean constituting, comprising, pertaining to, in connection with, reflecting, respecting, regarding, referring to, based upon, stating, showing, evidencing, establishing, supporting, negating, contradicting, describing, recording, noting, embodying, memorializing, containing, mentioning, studying, analyzing, discussing, specifying, setting forth, identifying or in any manner logically, factually, indirectly or directly, or in any other way connecting to the matter addressed in the REQUEST, in whole or in part.

14. "REQUEST" or "REQUESTS" refers to the "Requests for Production" below.

15. "YOU" or "YOUR" refers to Ochsner Health and any of its subsidiaries, each and all of its respective managers, members, managing members, shareholders, departments, divisions, joint ventures, officers, directors, representatives, agents, employees, partners, parents, owners, officers, affiliates, assigns, attorneys, accountants, predecessors, successors and all other PERSONS or entities acting or purporting to act on its behalf or under its control.

## INSTRUCTIONS

1. These REQUESTS should be construed as broadly as possible with all doubts resolved in favor of production. The words "all," "any," "each," "and," and "or" shall be construed conjunctively or disjunctively as necessary to make the REQUEST inclusive rather than exclusive. Except as specifically provided in these REQUESTS, words imparting the singular shall include the plural and vice versa, where appropriate. Except as specifically provided in these REQUESTS, words imparting the present tense shall also include the past and future tense and vice versa, where appropriate. The words "discussing," "referring to," "regarding," or any derivative thereof, in addition to their customary and usual meanings, shall mean concerning, containing, identifying, monitoring, constituting, reflecting, discussing, pertaining to, assessing, recording, supporting, negating, refuting, touching upon, and/or summarizing.
2. Any terms left undefined in the REQUEST shall have their common dictionary meanings and shall be construed as necessary to bring within the scope of the REQUEST any information which might otherwise be construed to be outside its scope. If YOU find the meaning of any term in any REQUESTS to be unclear, assume a reasonable meaning, identify YOUR assumed meaning in writing in YOUR response, and respond to the REQUESTS on the basis of YOUR assumed meaning.

3. In responding to these REQUESTS, YOU are required to search for and furnish the original and each non-identical copy of each DOCUMENT, COMMUNICATION, or other tangible thing requested herein within YOUR direct, or indirect, actual or constructive, possession, custody, or control, or known or available to YOU, regardless of whether such DOCUMENTS are possessed directly by YOU or any of YOUR predecessor or successor constituent corporate entities, assigns, and any affiliated entities, agents, limited partners, officers, directors, employees, representatives, consultants, or investigators, or by YOUR attorneys or their agents, employees, representatives, consultants, or investigators.
4. All DOCUMENTS should be produced in the same order as they are kept or maintained by YOU in the ordinary course of business, or the DOCUMENTS should be organized and labeled to correspond to the categories of the DOCUMENTS requested below. If the requested DOCUMENTS are maintained in a file, the file folder is included in the REQUEST.
5. Electronically stored DOCUMENTS, INCLUDING e-mail, web pages, and html files, shall be produced in their native form or forms.
6. If a requested DOCUMENT is withheld in whole or in part on the basis of any claim of privilege, YOU must set forth the information necessary for PLAINTIFF to ascertain whether the privilege properly applies, INCLUDING: the type of document, the date it was prepared, the date it was sent, the date it was received, the date the document bears, the length of the document, the title of the document, each attachment to the document, the name, position, and address of any author(s) or preparer(s), the name, position and address of any recipient(s), the location of the document in YOUR files, and the privilege reason.

7. If any portion of any DOCUMENT responsive to these REQUESTS is withheld under the claim of privilege, any non-privileged portion of such DOCUMENT must be produced with the portion claimed to be privileged redacted and logged in a privilege log.
8. If YOU object to a REQUEST on the ground that it is overly broad, YOU are instructed to produce DOCUMENTS in response as narrowed to conform to YOUR objection and to state in YOUR response (1) how YOU narrowed the REQUEST; and (2) all reason(s) why YOU claim the REQUEST is overly broad.
9. If there are no DOCUMENTS or COMMUNICATIONS responsive to a particular REQUEST, YOU shall so state in writing.
10. All objections to any DOCUMENTS to be produced pursuant to these REQUESTS must be made in a written response served on counsel for PLAINTIFF within the time period for responding to these REQUESTS.
11. PLAINTIFF serves these REQUESTS without prejudice to its right to serve additional REQUESTS.
12. These REQUESTS are continuing in nature. If, after producing any DOCUMENTS or COMMUNICATIONS in response to these REQUESTS, YOU obtain or become aware of additional responsive information, YOU are required to provide such DOCUMENTS or COMMUNICATIONS by way of a supplemental production.
13. If YOUR Google Analytics 4 account is connected to BigQuery, please use the instructions and guide in EXHIBIT 1 to export data in response to the below REQUESTS.
14. If YOUR Google Analytics 4 account is not connect to BigQuery, please use the instructions and guide in EXHIBIT 2 to export data in response to the below REQUESTS.

15. Upon request, PLAINTIFF will share an application that YOU can run that prompts for the directory where the Google Analytics CSV files are located and creates filtered CSV files.

## REQUESTS FOR PRODUCTION

1. Produce DOCUMENTS sufficient to identify all Google Universal Analytics and Google Analytics 4 accounts, properties, views, data streams, tracking IDs, and measurement IDs configured to collect data from or in connection with any Evalia Health, Medicom, or Unlock Health HRA ("Health Risk Assessment").
2. Produce all DOCUMENTS sufficient to show the configuration of the Google Universal Analytics and Google Analytics 4 accounts, properties, views, and data streams identified in response to Request No. 1, including, but not limited to, triggers, rules, variables, events, event parameters, user properties, custom dimensions, custom metrics, enhanced measurement settings, and any mappings or other configuration materials sufficient to show what data was collected from or in connection with any Evalia Health, Medicom, or Unlock Health HRA.
3. Produce all data collected by the Google Universal Analytics and Google Analytics 4 accounts, properties, views, and data streams identified in response to Request No. 1 from or in connection with any Evalia Health, Medicom, or Unlock Health HRA , including, but not limited to, pageviews, screenviews, user engagement events, custom events, event parameters, user properties, custom dimensions, custom metrics, and any captured URL values collected from HRA pages or postback URLs containing HRA result details.

EXHIBIT 1

# Creating HRA Google Analytics 4 Reports

**Step 1: Navigate to https://analytics.google.com/. Log in if your are not already authenticated.**



**Step 2: Click on the left-hand side panel to expand it. Click on Admin at the bottom.**



# Step 3: Click on BigQuery links in the Product links box



**Step 4: Record your project number. If there are no projects, then you Google Analytics account is not linked with BigQuery and you cannot export data using this method.**



**Step 5: Navigate to https://console.cloud.google.com/. Log in if your are not already authenticated.**



**Step 6: Type BigQuery in the search box. Click on BigQuery in the search results.**



**Step 7: Click the triangle next to your project. Click the three dots next to Queries. Click Create SQL query.**



**Step 8: Enter the following query in the Untitled query box:**

```
SELECT
FORMAT_TIMESTAMP('%Y-%m-%d %H:%M:%S', TIMESTAMP_MICROS(event_timestamp)) AS event_time,
user_pseudo_id,
event_name,
ep.key AS parameter_name,
COALESCE(
ep.value.string_value,
CAST(ep.value.int_value AS STRING),
CAST(ep.value.double_value AS STRING),
CAST(ep.value.float_value AS STRING)
) AS parameter_value,
(SELECT value.string_value FROM UNNEST(event_params) WHERE key = 'page_location') AS page_url
FROM
`hra-data-project.analytics_833429647087.events_*`,
UNNEST(event_params) AS ep
WHERE
(
NET.HOST((SELECT value.string_value FROM UNNEST(event_params) WHERE key = 'page_location')) LIKE '%.evaliahealth.com'
OR NET.HOST((SELECT value.string_value FROM UNNEST(event_params) WHERE key = 'page_location')) LIKE '%.unlockhra.com'
OR NET.HOST((SELECT value.string_value FROM UNNEST(event_params) WHERE key = 'page_location')) IN ('evaliahealth.com', 'unlockhra.com')
OR NET.HOST((SELECT value.string_value FROM UNNEST(event_params) WHERE key = 'page_location')) LIKE 'hra.mydomain.com'
OR REGEXP_CONTAINS(event_name, r'^(splash-page-viewed|questions-[1-9].*-page-viewed|contact-page-viewed|cta-1-
viewed|hra_completions|hra_complete|results-page-
viewed|health_risk_assessment_progress|conv_pv_global_std|health_risk_assessment_start|health_risk_assessment_cta_click|health_risk_assessment_submissio
n)$')
)
AND _TABLE_SUFFIX BETWEEN '20200101' AND '20260323'
ORDER BY
event_timestamp DESC, event_name, parameter_name
```

**Step 9: Where the query says hra-data-project.analytics_833429647087, you will replace hra-data-project with your project name found in the middle column and you will replace 833429647087 with the project number you recorded in step 4. You will replace hra.mydomain.com with any custom domain your HRAs where hosted on. You will update the TABLE_SUFFIX to reflect appropriate start and end dates. Click Run when you have finished.**



**Step 10: In the Query results window click Save results and choose CSV. If there is an error or no data is found then we will need to help revise the SQL query.**



EXHIBIT 2

# Creating HRA Google Analytics 4 Reports

**Step 1: Navigate to https://analytics.google.com/. Log in if your are not already authenticated.**



**Step 2: Click on the left-hand side panel to expand it. Click on Explore.**



## Step 3: Click to create a Blank exploration



**Step 4: Click the date on the left-hand column. Click Custom. Set the Start date to the beginning of the class period or as early as it will allow you to set it. Set the End date to the end of the class period.**



**Step 5: Click on the plus sign next to Dimensions.**



**Step 6: Click on the Custom tab at the top. Check any Custom dimensions listed.**



**Step 7: Click on the All tab at the top. Type Event name in the search box. Check Event name in the dimension list.**



**Step 8: Type Date in the search box. Check Date + hour (YYYYMMDDHH) in the dimension list.**



**Step 9: Type Page in the search box. Check Page location and Page title in the dimension list.**



**Step 10: Type hostname in the search box. Check Hostname in the dimension list. Click the Confirm button.**



**Step 11: Click the plus sign next to Metrics.**



**Step 12: Type event count in the search box. Check Event count in the metric list.**



**Step 13: Type total users in the search box. Check Total users in the metric list. Click the Confirm button.**



**Step 14: Drag Date + hour (YYYYMMDDHH), Event name, Page title, Page location and any custom dimensions from the Dimensions column to the Rows section.**



**Step 15: Drag Event count and Total users from the Metrics column to the Values section.**



**Step 16: Drag Hostname from the Dimensions column to the filters section. Choose matches regex from the conditions box. Enter the follow expression: "hra.mydomain.com|^.*\.evaliahealth\.com$|^.*\.unlockhra\.com$" where hra.mydomain.com is any custom domain your HRAs were hosted on. If you had more than one custom domain, separate each with a '|' symbol. Click Apply.**



**Step 17: Click the Export data button. Then click CSV. Save the downloaded file as Hostname_Report.csv.**






**Step 18: Click on the hostname filter and then the X to delete the hostname filter.**



**Step 19: Drag Event name from the Dimensions column to the Filters box. Choose matches regex from the condition box. Enter the following expression: "^(splash-page-viewed|questions-[1-9][0-9]*-page-viewed|contact-page-viewed|cta-1-viewed|hra_completions|hra_complete|results-page-viewed|health_risk_assessment_progress|conv_pv_global_std|health_risk_assessment_start|health_risk_assessment_cta_click|health_risk_assessment_submission)$" Click Apply**



**Step 20: Click the Export data button. Then click CSV. Save the downloaded file as Eventname_Report.csv.**






**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| JOHN DOE, JANE DOE, and JACK DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNLOCK HEALTH INC., MEDICOM DIGITAL, INC. d/b/a MEDICOM HEALTH INTERACTIVE and MEDICOM HEALTH,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs John Doe, Jane Doe, and Jack Doe on behalf of themselves and all others similarly situated, upon personal knowledge as to Plaintiffs' own conduct and upon information and belief as to all other matters based on investigation of counsel, bring this suit against Unlock Health, Inc., Medicom Health Digital, Inc. d/b/a Medicom Health Interactive and Medicom Health, (collectively, "Defendants" or "Unlock Health"), alleging as follows:

**NATURE OF THE ACTION**

1. Plaintiffs, individually and on behalf of all members of the proposed class (the "Class Members") bring this action against Defendants for surreptitiously divulging their health information to Google via Google's online marketing systems, known as Google Analytics, when patients exchanged communications with their healthcare providers via online Health Risk Assessment forms ("Health Risk Assessments" or "HRAs") provided by Defendants. Defendants did all this without patients' knowledge, authorization, or consent.

2. Disclosing patients' Protected Health Information ("PHI") without consent is a crime. without authorization. 42 U.S.C.A. § 1320d-6(a). Disclosing patients' Protected Health Information for "commercial advantage" is an even more serious crime, carrying substantial, enhanced penalties. 42 U.S.C.A. § 1320d-6(a)(b).

3. Defendants are some of the largest providers of health information technology and marketing services in the United States, providing online Health Risk Assessments to millions of patients. Unlock Health, Inc. describes itself as "the nation's premier healthcare marketing agency." These companies are, in turn, owned by hedge funds whose entry into the United States healthcare market has significantly compromised patients' health, safety, and privacy in the pursuit of profit.

4. Unlock Health, Inc. and its subsidiary Medicom Health are healthcare-focused digital marketing agencies who specialize in patient acquisition and engagement. They provide these services to more than a thousand hospitals and healthcare systems across the United States.

5. Defendants' flagship products are Health Risk Assessments that patients and potential patients are encouraged to fill out online. These Health Risk Assessments include online health evaluation forms for many of the most sensitive and private medical conditions imaginable, including HRAs for anxiety, depression, substance abuse, heart health, strokes, lung cancer, and bladder control. Defendants and their healthcare clients encourage patients to fill out these forms, which require patients to enter detailed medical histories and contact information.

6. After completing the HRAs, patients then receive a health "risk" score, which typically evaluates a patients' potential risk for a medical condition such as lung cancer as "high," "medium," or "low." Patients who fill out these forms are subsequently contacted by the marketing

intake departments at hospitals and healthcare systems, who use the risk assessments to encourage individuals to becoming paying customers at their healthcare facilities.

7. As companies providing services to health care systems, Defendants operate as "business associates" under HIPAA, which requires Defendants to maintain patients' Protected Health Information (or "PHI") in a manner consistent with HIPAA regulations.[1] In addition to HIPAA, Defendants obligated to maintain the confidentiality of Protected Health Information under state and federal law.

8. Indeed, Unlock Health expressly promises the public on its website that it "partners" with healthcare providers to ensure "secure handling of data with HIPAA compliance." That representation, however, is false.

9. Despite their legal and ethical obligations, and unbeknownst to patients, Defendants deployed various third-party analytics technologies, including Google digital marketing and automatic rerouting tools, on Health Risk Assessment forms that Defendants offered the public.

10. Via these tools, Defendants purposefully and intentionally disclosed patients' Protected Health Information to third parties who exploited the information and used it for advertising. By using these tools, Defendants took patients' confidential communications and Protected Health Information and automatically sent them to Google and other third parties—an

---

[1] Under HIPAA, "Protected Health Information" means "individually identifiable health information: (1) Except as provided in paragraph (2) of this definition, that is: (i) Transmitted by electronic media; (ii) Maintained in electronic media; or (iii) Transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103. HIPAA defines "Individually Identifiable Health Information" as "information that is a subset of health information, including demographic information collected from an individual, and: (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and (i) That identifies the individual; or (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual."

express violation of patients' reasonable expectations of privacy, their rights as patients, and their rights under federal and state law. Defendants further encouraged and enabled their healthcare clients to similarly deploy surreptitious tracking technologies on HRAs for the express purpose of illegally sharing patients' Protected Health Information with a variety of tech companies, including Facebook, Tik Tok, Google, and LinkedIn. Defendants did all this knowing it constituted a violation of HIPAA and state law, for the purpose of reaping the illicit financial gains from its criminal and tortious disclosures of patients' PHI.

11. For example, Google refuses to sign BAAs with healthcare providers like Defendants. Defendants were aware that it was illegal under HIPAA to share patient data with a third party like Google without a BAA, but Defendants did so anyway by deploying Google Analytics and other Google tracking technologies on their websites and HRA forms for the express purpose of sharing patient's Protected Health Information with Google.

12. Defendants' conduct violates reasonable expectations of patient privacy. Defendants did not provide patients with any warnings that filling out their online Health Risk Assessment forms would result in Defendants and their clients divulging their names, their email addresses, their health conditions, and their health risk scores to tech companies like Facebook and Google, who then exploited that PHI by using it to sell targeted advertising.

13. There is no dispute that Defendants' conduct is unlawful. In December 2022, the Office of Civil Rights at the United States Department of Health and Human Services ("HHS") issued a bulletin ("the Bulletin") reminding both covered entities and business associates alike of their patient privacy obligations "when using online tracking technologies."[2] HHS further clarified

[2] *See* Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

that health information cannot be shared with "tracking technology vendors" unless they have signed a "business associate agreement (BAA)" to ensure that health information is "protected in accordance with HIPAA."[3]

14. Similarly, Google warns entities like Defendants who provide healthcare-related services that Google Analytics should never be deployed on online forms like HRAs or "in any way that implicates Google's access to, or collection of, PHI," expressly warning that entities such as Defendants may only use Google Analytics on pages that are not HIPAA-covered":

> ## Can Google Analytics be used in compliance with HIPAA?
>
> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.
> - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
> - Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages..
> - Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

---

[3] *Id.*

15. Despite Plaintiffs' and Class Members' reasonable expectations that Defendants would not share their Protected Health Information with Google and other third parties via the use of marketing tools, Defendants and their clients routinely divulged patients' information anyway.

16. Unlock Health did so through a multi-step process.

a. First, Unlock Health placed, enabled, or permitted the placement of Google source code on its HRAs.

b. Second, when a patient filled out one of Unlock Health's HRAs, the Google source code that Unlock Health deployed enabled Google cookies to be placed on a patient's communications device that were disguised as "first-party" cookies belonging to Unlock Health or the healthcare provider.

c. Third, the Google source code that Unlock Health deployed in its HRAs both captured patients' communications and commanded patients' computing devices to re-direct and divulge patient and device identifiers and the content of patient communications to Google via its various marketing services.

d. Fourth, Fourth, Unlock Health placed additional JavaScript source code in its HRAs that worked in tandem with Google's source code to collect and disclose additional details of patient communications, including HRA results.

e. Fifth, both Unlock Health, its clients, and Google used this information for marketing purposes.

17. In essence, Unlock Health encouraged patients to use a tapped device, and once the HRA was loaded into a patient's browser, the software-based wiretap was quietly waiting for private communications on the online HRA to trigger the tap, which intercepts those

communications intended only for patients' doctors and transmits those communications to third parties, including Facebook and Google.

18. Defendants did not make any attempt to obtain Plaintiffs' or Class Members' consent for sharing patients' protected PHI with Google, nor did Defendants or their clients have express written consent from any Plaintiff or Class Member to share their Protected Health Information with Google, Facebook, Tik Tok, and other digital advertising and marketing companies.

19. Defendants' unauthorized disclosures violate both state and federal law. Moreover, through their unauthorized disclosures, Defendants breached their fiduciary duties, were unjustly enriched, and committed multiple torts and crimes, including criminal violations of the Electronic Communications Privacy Act ("ECPA"). As courts have found across the country, violating these privacy rights harms patients, as it misappropriates their rights to control how information about them is distributed and exploits the value their health data in the marketplace. *Doe v. Virginia Mason Medical Center*, 2024 WL 3517759 (Wash. Super.) ("If it did not have value, then entire industries that sell and trade this data would not exist").

20. Defendants' conduct caused damage to Plaintiffs and Class Members in, at minimum, the following ways:

a. Sensitive and confidential Protected Health Information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the provider-patient relationship;

c. Plaintiff and Class Members cannot remediate the privacy harms they have suffered without expending many hours and spending hundreds of dollars a year to pay for third-party services to scrub their Protected Health Information from data broker rolls;

d. Defendants took something of value (*i.e.*, personal and private Protected Health Information and other personal data), from Plaintiffs and Class Members and

derived benefit therefrom without Plaintiffs' or Class Members' knowledge, informed consent, or authorization, and without sharing the benefit derived; and

e. Defendants' actions diminished the value of Plaintiffs' and Class Members' Protected Health Information and other personal data.

## PARTIES TO THE ACTION

21. Plaintiff John Doe is a resident of Riverside County, California, who is a long-standing patient of Temecula Valley Hospital. Plaintiff filled out a Heart Health Risk Assessment form that Unlock Health offers to the public in conjunction with Temecula Valley Hospital. Without Plaintiff's knowledge or consent, Unlock Health shared his name, email address, details about the Heart Health Risk Assessment he filled out, and his risk assessment score with Google via tracking technologies that Unlock Health enabled on the Heart Health Risk Assessment form.

22. Plaintiff Jane Doe is a resident of Spotsylvania County, Virginia, who is a patient at Inova Health. Plaintiff Jane Doe filled out a Heart Disease Risk Assessment that Inova Health offers in connection with Inova Health. Without Plaintiff Jane Doe's knowledge or consent, Unlock Health shared her name, email address, details about the Heart Disease Risk Assessment she filled out, and her risk assessment score with Google via tracking technologies that Unlock Health enabled on the Heart Disease Risk Assessment form.

23. Plaintiff Jack Doe is a resident of Jefferson Parish, Louisiana, who is a long-standing patient at Ochsner Health in Louisiana. Plaintiff filled out a Diabetes Health Risk Assessment form that Unlock Health offers to the public in conjunction with Ochsner Health. Without Plaintiff's knowledge or consent, Unlock Health shared his name, his email address, details about the Diabetes Health Risk Assessment he filled out, and cookies linking his PHI to his Google user account with Google via tracking technologies that Unlock Health enabled on the Diabetes Risk Assessment form.

24. Defendant Unlock Health, Inc. is a Delaware corporation with its principal place of business at 209 10th Avenue South, Suite #530, Nashville, Tennessee 37203. Unlock Health, Inc. is healthcare technology and marketing company who specializes in offering in offering digital marketing strategies and products to healthcare companies, including search marketing for hospitals and health systems. Unlock Health, Inc. was formed in 2023 from the merger of two companies, Eruptr, a leading healthcare digital media and Health Risk Assessment firm, and DECODE, a national full-service digital and creative agency specializing in healthcare marketing. Unlock Health's website provides that "Unlock's full-funnel Media capability, with performance media powered by Eruptr, is built for healthcare's complexity."

25. In April 2021, 2023, Unlock Health issued a press release stating that "Unlock Health, a healthcare technology and services growth platform, today announced its formation through the combination of Eruptr, an industry leader in healthcare digital marketing providing proprietary technology-enabled solutions, and DECODE, a national, award-winning, full-service digital and creative agency focused on healthcare. Unlock Health solves healthcare organizations' urgent need for growth while driving long-term, sustainable performance. The platform is backed by Amulet Capital Partners, a middle-market private equity investment firm focused exclusively on the healthcare sector, and Athyrium Capital Management, a specialized asset management company focused on opportunities in the global healthcare sector." On information and belief, Unlock Health acquired all of Eruptr's assets and liabilities at the time of the merger that created Unlock Health, Inc.

26. That same press release stated that "Eruptr is the largest healthcare-focused digital media and Health Risk Assessment (HRA) company in the industry, serving more than 200 provider clients. DECODE is a full-service healthcare digital advertising agency with a strong

strategy and creative offering, ranging from big brand engagements to specialty service line campaigns."

27. At the time of the filing of this complaint, Unlock Health represents to the public on the internet that "Eruptr is now Unlock Health":




28. Defendant Medicom Health Interactive d/b/a Medicom Health and Medicom Digital, Inc. ("Medicom Health") is a subsidiary of Unlock Health. Medicom Health's principal place of business is located at 400 1st Avenue N, Suite 550, Minneapolis, MN 55401.

29. At the time of the filing of this complaint, Medicom Health's LinkedIn profile on the internet states that "Medicom Health" is "an Unlock Health Company" that "was founded in Minneapolis more than twenty years ago and is now the market leader in online health risk assessments.[4] Medicom Health's LinkedIn profile further provides that "[o]ver 1,300 influential

[4] https://www.linkedin.com/company/medicom-health-interactive/

hospitals use our best-in-class tools to convert website & digital visits to revenue and growth generating office visits."[5] Medicom Health further describes its primary HRA product as an "evidence-based HRA platform" that can "collect actionable data to turbo-charge CRMs &

[5] *Id.*

personalize digital outreach, and that data is made available to clients via a powerful back end so marketers can make the most out of every HRA completion."[6]




[6] *Id.*

30. Medicom's primary HRA product is branded as "Evalia," which Medicom describes as a product line of health assessment tools. Based on public filings, Medicom Health was acquired by Eruptr in 2021, and then subsequently integrated into Unlock Health at the time of the merger between Eruptr and DECODE that resulted in the formation on Unlock Health, Inc. On information and belief, Unlock Health acquired all assets and liabilities of Medicom Health at the time of the merger.

31. As of the time of the filing of this complaint, Medicom Health's online client portal located at http://portal.evaliahealth.com redirects clients and visitors to hraconsole.unlockhealthnow.com/users/login as pictured below:




***



## JURISDICTION AND VENUE

32. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because: (a) this is a proposed class action in which there are at least 100 Class Members; (b) the parties are minimally diverse, as at least one member of the proposed Class is domiciled in a different state than at least one Defendant; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, including the Electronic Communications Privacy Act ("ECPA").

33. This Court additionally has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a), because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

34. This Court has personal jurisdiction over Unlock Health and Medicom Health because Unlock Health, Inc. is headquartered in Nashville, Tennessee and, along with its subsidiary, Medicom Health, has sufficient minimum contacts with this District in that they operate and have marketed their services throughout this District, including Evalia-branded HRAs that Unlock Health, Inc. and Medicom Health have offered to citizens of this District in connection with TriStar Health (Anxiety Assessment, Depression Assessment),

35. Venue is also appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

### A. Defendants Systematically and Routinely Disclosed Patients' Protected Health Information to Third Parties, including Google.

36. Unlock Health is the largest purveyor of health risk assessment marketing technologies in the United States. Its health risk assessment products are primarily designed to share patient communications with multiple third parties who then can use the data to market products and services to patients.

37. Unlock Health plays an active role in intercepting and disclosing patients' communications about their Protected Health Information with third parties. As Unlock Health describes its HRA technology to potential healthcare customers, "HRAs provide healthcare organizations with actionable data that drives service-line growth, strengthens brand loyalty, and delivers measurable outcomes."[7] Unlock Health further promises its healthcare customers that "[b]y integrating data sources, applying advanced analytics, and providing real-time insights, we help healthcare organizations make confident, data-driven decisions that fuel growth."[8]

38. What Unlock Health does not publicly disclose to patients is that the actionable "analytics" data that its marketing programs depend on are generated by third-party tech companies such as Google and Facebook.

39. Unlock Health actively operated the technology that resulted in patients' PHI being shared with third parties including Google. It not just hosted the websites that the intercepting technology was deployed on, but it also continued to play an active role in designing and configuring the technology that enabled the illegal interceptions and disclosures.

---

[7] https://unlockhealth.com/capabilities/
[8] https://unlockhealth.com/capabilities/

40. Defendants and their clients, such as Ochsner Health, Inova Health, TriStar Health, and Temecula Valley Hospital, offer online Health Risk Assessments to patients that they describe as “free health quizzes” designed to help patients “understand your potential risks.”




41. Plaintiffs and Class Members are patients who filled out online health risk assessment forms provided to the public by Defendants and their clients.

42. Healthcare providers and their business associates like Unlock Health, Inc. and Medicom Health (collectively “Unlock Health”) have fiduciary, common law, and statutory duties to protect the confidentiality of their patients’ Protected Health Information and to refrain from making unauthorized disclosures to third parties about their patients’ Protected Health Information.

43. Medical patients like Plaintiffs and Class Members have a legal interest in preserving the confidentiality of their communications with healthcare providers.

44. Patients also have reasonable expectations of privacy that their Protected Health Information will not be disclosed to third parties without their express written consent and authorization.

45. Unlock Health provides online health risk assessment forms for more than a 1,000 hospitals and healthcare systems across the United States, including Temecula Valley Hospital in California, Ochsner Health in Louisiana, and TriStar Health in Tennessee.

46. Unlock Health and its clients encourage patients to fill out online HRAs on websites hosted by Unlock Health servers and built with Unlock Health's software. After patients fill out their health risk assessments, they are emailed copies of their HRA "scores." The emails are sent from no-reply@evailiahealth.com.

47. Unlock Health's HRAs are marketing tools, designed for interactive communication with patients. Source code on Unlock Health's HRAs causes these communications to be intercepted and disclosed to Google, Facebook, Tik Tok, LinkedIn, and other third parties.

48. Notwithstanding patients' reasonable expectations of privacy and Unlock Health's legal duties, Unlock Health systematically and routinely disclosed patients' Protected Health Information, including the contents of patients' communications with their healthcare providers, via automatic data collection mechanisms embedded in its HRAs. Unlock Health did this without Plaintiffs' or other patients' knowledge, authorization, or consent. In doing so, Unlock Health continuously and systematically violated the medical privacy rights of Plaintiffs and Class Members by causing the unauthorized disclosure of their communications to third parties like Google, Facebook, and TikTok.


Case 2:26-cv-00289 Document 5-12 Filed 03/18/26 Page 60 of 191 PageID #: 517

49. Unlock also actively encouraged its healthcare clients to deploy their own Google Analytics and other tracking technologies on the online Unlock Health HRAs, with the result that patients who filled out an HRA had their patient status, their health conditions, their names, their email addresses, and other Protected Health Information shared multiple times via those tracking technologies.

50. Unlock Health touts itself as a "strategic partner" to hospitals, claiming that its HRA technologies can "dramatically" lower "customer acquisition costs." Unlock Health describes its HRA forms as "actionable experiences designed to build trust," while at the same providing "healthcare organizations with actionable data that drives service-line growth, strengthens brand loyalty, and delivers measurable outcomes."

51. Unlock Health, however, is far less transparent about the fact that its technologies are predicated on sharing massive volumes of patients' Protected Health Information with tech companies, so that those companies can exploit patients' health information by selling it to the highest bidder for targeted advertising campaigns. Much less does Unlock Health provide any warning to patients that filling out its customizable HRAs will result patients' names, email addresses, and health information ultimately ending up in the hands of hundreds of data brokers around the world.

52. Unlock Health customized its online HRA forms and the underlying source code so that healthcare clients could add their own tracking technologies to the HRA forms. Despite federal law prohibiting the sharing of Protected Health Information for marketing purposes, Unlock Health aggressively and routinely encouraged, abetted, and aided healthcare clients in deploying surreptitious tracking technologies on HRAs with the full knowledge that PHI from these HRAs would be shared with internet marketing companies like Facebook and Google.

53. Plaintiffs and Class Members provided their Protected Health Information through Unlock Health's HRAs with the reasonable understanding that Unlock Health would secure and preserve the confidentiality of that information, consistent with its legal and ethical obligations.

54. The Protected Health Information of Plaintiffs and Class Members has been—and likely will be—further disseminated to additional third parties that utilize the information for targeting advertising.

55. Unlock Health intentionally incorporated numerous analytics tracking tools into its HRA forms, including Google Analytics and Google Double Click, and never disclosed to Plaintiffs and Class Members that its HRA were sharing their Protected Health Information with Google, Facebook, and other third parties. Nor did Unlock Health inform patients that it was permitting Google, Facebook, and other third parties to exploit their Protected Health Information for marketing purposes. As a result, Plaintiffs and Class Members were unaware that their Protected Health Information was being surreptitiously transmitted to Google, Facebook, and other third parties when they filled out Unlock Health's HRAs.

56. The tracking tools that Unlock and its clients use on HRAs are—by design—invisible to patients. Once integrated into a website, the tracking tools are executed in the background, meaning that they operate without ever alerting website users of their presence. Further, because of how these tools are designed, they are able to collect, store, and transmit user data in ways that cannot be blocked by "ad blocker" software or by a user refusing to give their consent to data being collected.

57. By using data collected by analytics tracking tools, Google is able to connect a website user's data to their real-world identity by linking their data to profiles maintained by Google, including users' Google accounts.

58. Once Google connects a user's data to their real-world identity, Google processes, analyzes, and assimilates that data so that it can be sold to online advertisers and funneled back to clients like Unlock Health in the form of aggregated analytics data.

59. Online advertisers—taking advantage of Google's trove of personally identifying data—are able to create marketing campaigns that target their advertisements towards specific users.

60. Unlock did not warn or otherwise disclose to Plaintiffs and Class Members that Unlock Health and its clients bartered their Protected Health Information to Google, Facebook, and other third parties for marketing purposes.

61. Plaintiffs and Class Members never consented, agreed, or otherwise authorized Unlock Health or its clients to disclose their Protected Health Information to advertising companies like Google and Facebook.

62. Upon information and belief, Unlock Health intercepted and disclosed at least the following Protected Health Information to third parties including Google and Facebook:

a. Plaintiffs' and Class Members' status as patients;

b. Plaintiffs' and Class Members' use Unlock Health's HRAs;

c. Plaintiffs' and Class Members' names and email address;

d. Plaintiffs' and Class Members' health conditions; and

e. Information related to Plaintiffs' and Class Members' requests for, receipt of, and communications regarding medical treatment, including their communications with their treating physicians.

63. Unlock Health interfered with Plaintiffs' and Class Members' privacy rights when it implemented technology (including Google Analytics and Google Double Click) that

surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' Protected Health Information to Google, Facebook, and other third parties.

64. Unlock Health also breached its obligations to patients in multiple other ways, including (1) failing to obtain their consent to disclose their Protected Health Information to third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its HRA forms were safe and secure, (3) failing to remove or disengage software code that was known and designed to share Plaintiffs' and Class Members' Protected Health Information with third parties if placed inside Unlock Health's HRAs, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' Protected Health Information to third-party advertising companies like Google and Facebook, (5) failing to warn Plaintiffs and Class Members that Unlock and its clients were routinely bartering their Protected Health Information to Google, Facebook, and other third parties, and (6) otherwise ignoring Unlock Health's common law and statutory obligations to protect the confidentiality of Plaintiffs' and Class Members' Protected Health Information.

65. The transmission of Plaintiffs' and Class Members' Protected Health Information to Google was not necessary for Unlock Health's HRAs and other services or business activities to function. Indeed, the entire publicly stated purpose of those services was to facilitate the provision of healthcare to Plaintiffs and other patients, and as described Unlock Health was under unambiguous legal obligations to ensure that patients' Protected Health Information transmitted in that process remained confidential. Given its legal obligations, Unlock Health did not and could not have had any permissible purpose for deploying tracking technology on its HRAs. Unlock Health's primary, secret, and improper purpose in doing so was, instead, to allow Unlock Health,

its clients, Google, Facebook, and other third parties to exploit patient Protected Health Information and communications for advertising and marketing purposes.

66. Unlock Health's improper disclosure of Plaintiffs' and Class Members' Protected Health Information to Google has been ongoing for years and continues to this day.

**B. Unlock Health Set Up its HRAs to Permit the Surreptitious Capture and Disclosure of Patients' Protected Health Information to Third Parties like Google and Facebook.**

67. Unlock Health's HRAs are used by numerous healthcare providers around the United States and have been throughout the Class Period.

68. Thanks to Unlock Health's technology, the HRA products promoted by hospitals and healthcare systems have been secretly transmitting Protected Health Information to Google and other third parties when patients fill out online health risk assessments.

69. The Unlock Health technology provides patients and healthcare providers:

a. the ability to send and receive electronic communications;

b. computer storage of electronic health record and communications information; and

c. processing services for electronic information.

70. When a patient went to an Unlock Health online HRA, Google source code that Unlock and its clients placed or permitted to be placed on the HRAs will deposit "first-party" cookies named _ga, _gid, _gcl, and _au on the patient's computing device. As "first party" cookies, the _ga, _gid, _gcl, and _au cookies are disguised as belonging to Unlock or its clients, which permits them to be placed on the patient's device. In fact, however, these are Google cookies, not Unlock cookies.

71. By disguising the Google cookies as belonging to Unlock Health instead of Google, Unlock Health circumvented attempts to block such tracking.

72. Unlock Health's software, which includes "Evalia Health"-branded HRAs that were first developed by Medicom Health, permitted the deployment of "custom analytics scripts" within online HRAs, including, for example, Google Analytics, Google Ads, and Google DoubleClick source code (collectively, "Google source code"), through which patient identifiers and communications content were divulged to Google while patients are exchanging communications with their healthcare providers and while the communications content is in electronic storage within Unlock Health's Web Services.

73. Unlock knowingly and secretly deployed Google source code inside its HRAs and encouraged, abetted, and aided its clients in deploying their own tracking technologies within these HRA forms as well.

74. Unlock Health actively encouraged its healthcare clients to deploy Google marketing tools to drive patient engagement.

75. In short, the Google source code that Unlock Health deployed on its HRAs deposited Google cookies on patients' browsers; disguised Google cookies as being associated with Unlock Health rather than Google; and commanded Plaintiffs' and Class Members' browsers to re-direct identifiers and communications content on and inside the Web Services to Google. Further, Unlock Health implemented multiple measures to ensure that Plaintiffs and Class Members would not and could not prevent all this from taking place.

76. The Google source code Unlock Health deployed inside its HRAs intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' Protected Health Information to Google, including at least the following identifiers:

a. Patient names;

b. Patient email addresses;

c. Patient IP addresses;

d. Unique, persistent patient cookie identifiers;

e. Device identifiers;

d. Account numbers;

e. URLs;

f. Other unique identifying numbers, characteristics, or codes; and

g. Browser-fingerprints.

77. The Google source code Unlock Health deployed inside its HRs similarly intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' Protected Health Information to Google, including at least the following communications content:

a. The names of the Health Risk Assessments that patients took;

b. The risk "scores" that were generated when patients completed the Health Risk Assessment;

c. The names of patients' healthcare providers;

d. Patients' progress as they progressed through the pages of the online HRA "quizzes";

e. Individuals' status as patients and prospective patients of specific healthcare systems;

f. The times and dates that patients filled out the HRAs;

g. Plaintiffs' and Class Members' searches for information regarding their health conditions; and

h. Plaintiffs' and Class Members' physical location.

78. The amount of data collected is significant. When patients interacted with its HRAs, Unlock Health disclosed a full-string, detailed URL to Google, typically containing the name of the website, folder, and sub-folders on the webserver; the name of the precise file requested; and the exact contents of the patients' communications. For example, when a patient clicks on a link to begin filling out a Heart Health HRA from a specific hospital, Google is told (1) the name of the HRA form being filled out, (2) the name of the patients' healthcare provider, and (3) the precise page of the form that patient is filling out.

79. Google combines the data it receives from Defendant's HRA websites other identifiers it receives to identify users in what is known as "ID bridging." ID bridging is the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[9] That is, users can be identified and tracked by "bridging" (or linking) their identifiers to other sources, such as email addresses, geolocation, or phone numbers.

[9] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024), https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.




80. Geolocation data, for example, allows a company like Google to identify the specific cities, neighborhoods, and postal codes from which a user is accessing a website.

81. ID bridging "has long been the foundation of programmatic advertising,"[10] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."11 It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID," personal information like geolocation and e-amil address, and "cross-platform linkage."[12]

---

[10] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[11] AMAZON, "Programmatic Advertising," https://advertising.amazon.com/blog/programmatic-advertising#.

[12] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/. Ironically, the example given in this article is a "hashed email," where the email Defendant collected in this example is not hashed.

82. ID bridging is a money-making machine for advertisers. On the advertiser side, ID bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'"[13] In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information. And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

83. Many companies (e.g., data brokers and identity graph providers), publicly advertise their ability to conduct such bridging.

84. While those within the ID bridging industry describe it as privacy-protective, it is anything but. As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them." *Katz-Lacabe v. Oracle Am*., Inc., 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

85. In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services:

> [A] consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is

---

[13] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024), https://www.optable.co/blog/what-is-id-bridging.

> collected through an extensive web of … services, which is difficult, if not impossible to avoid. It is largely collected invisibly and without consumer consent. Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socioeconomics, demographics, "likes", activities and more. It may or may not be associated with a specific user's name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[14]

86. In other words, ID bridging is dangerous because of the sheer expanse of information being compiled by companies like Defendant without the knowledge or consent of users, all of which is being done for pecuniary gain.

87. In addition to the methods described above, which are explicitly designed to track individuals across different devices and apps, Google collects other identifying information that allows it to determine whether the same individual is visiting multiple websites or using multiple apps where technology is called or installed directly.

88. For example, if multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

89. HTTP requests, when intercepted by Google, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the devices being used by a particular person. With every visit, and every subsequent HTTP request, the device information will be identical in each.

90. As a result of the foregoing, Google consistently received throughout the Class Period the precise text of communications that Plaintiffs and Class Members made about specific health conditions, specific treaters, the Health Risk Assessment forms they filled out, their progress

---

[14] GOOGLE'S SHADOW PROFILE: A DOSSIER OF CONSUMERS' ONLINE AND REAL WORLD LIFE at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

through those forms, and the "risk" scores they received, along with information identifying them including their names and email addresses—all of which constitute PHI.

91. The contents of patients' communications with their treating physicians plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Unlock Health's HRAs. 45 C.F.R. § 160.103. Worse, no matter how sensitive the medical condition the HRA addressed—including even mental health and substance abuse—the referral URLs documenting the patients' health conditions and risk profiles were acquired by Google along with other Protected Health Information embedded in patients' interactions with the Unlock Health HRAs.

92. The nature of the collected data is also important. Unlock Health's unauthorized disclosures resulted in Facebook and Google obtaining the detailed medical histories of individual patients, no matter how sensitive their medical condition. Facebook and Google were then able to correlate that history with other known information regarding patients, including their identity, their prior searches, the time of day, and other user actions. Indeed, Patients who filled out multiple Unlock Health HRAs had all of this information collated with user profiles maintained by Facebook and Google. This process resulted in Facebook and Google acquiring a vast repository of personal data about patients that was then used for marketing purposes—all without patients' knowledge, consent, or authorization, or any further action by patients.

93. By design, Google and Facebook received the exact contents of patients' communications while they were in storage in Unlock Health's systems but before the full response from the healthcare providers had been rendered on the screen of patients' devices.


Case 3:26-cv-00282 Document 50-1 Filed 03/11/26 Page 29 of 148 PageID #: 29

94. As of the date of the filing of this Complaint, Unlock Health and its clients continue to deploy analytics tracking technologies on online HRA forms being offered to literally millions of patients across the United States, including in Tennessee, California, and Louisiana.

**C. What Happened When Patients Communicated with Unlock Health's HRAs.**

95. During the Class Period, when patients filled out Unlock Health's HRAs, Unlock Health and its clients re-directed the precise content of the patients' communication and patients' identifiers to Google at various Google domains.

96. Unlock Health further re-directed patients' information to the following Google domain: www.google-analytics.com.

97. The patient identifiers that were re-directed to Google-Analytics included:

a. The patient's IP address;

b. The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device; and

c. Google cookies disguised as Unlock Health's cookies which serve as device identifiers and that Google connects to patients. These cookies include but may not be limited to the _ga and _ga_HK3FDYQCRR cookies.

98. Google will always receive at least the device-identifying NID cookie regardless of whether a person is signed in to a Google Account. Regardless of a person's Google Account holder status, the NID cookie is a device identifier that is considered personally identifiable as a matter of law when the data includes Protected Health Information protected by federal law.

99. Google received patients' communications and addressing information in "real time" without any other actor breaking up the chain of transmission. Indeed, Google received some information before it was even fully transmitted to Unlock Health or its clients.

100. Further if a Google Account holder has signed-in to a Google Account on the device in question and did not formally sign out before sending a separate communication to the Web Services, then Unlock Health will re-direct both the device identifier cookie (IDE) and the Google Account identifying cookie (DSID). By re-directing both cookies at the same time, Unlock Health enables Google to connect the IDE device-identifying cookie to specific Google Account holder such that, once Google has made the connection, it only needs to see the IDE cookie in order to connect a later re-directed communication with the specific Google Account holder.

### D. Unlock Health's Actions Permitted Google to Connect Patients' Data Across Domains.

101. Google publicly states that it connects data that advertisers and publishers (like Unlock Health here) send to it across the different Google Analytics, Google.com, and Doubleclick.net domains.

102. When patients fill out HRAs on Unlock Health's websites, Google's business tools connect the health data from particular patients with their real world identities, which squarely within the ambit of Protected Health Information protected against unauthorized disclosure by federal law.

103. Unlock Health and its clients use the same tools and source code throughout their HRAs. Thus, the types of Google cookies deposited on patient devices and the types of Protected Health Information and communications content disclosed (as explained above) occurred every time a patient filled out an online HRA.

### E. Google's Business Model: Exploiting Consumers' Personal Information for Profit

104. By any measure, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for

web developers (Google Analytics), and web-browser (Chrome). It also operates various ad services that are among the world's most popular in their respective categories, including the advertising services of Google DoubleClick and Google AdWords.

105. Google users are not customers in the ordinary sense, but instead *products* offered to advertisers. Google mines its platform and third-party websites for insights it can use to target and customize advertisements for businesses. User activity provides raw materials that Google analyzes and dissects for its ultimate question: What advertisement, from which company, for user, will have maximum impact?

106. Google sells advertising space by highlighting its ability to target users. To that end, Google maintains profiles on users that include users' real names, locations, email addresses, and communications that Google associates with personal identifiers including IP addresses, cookies, and device identifiers.

107. Much of the information that Google collects on individual users is funneled to Google via a technology known as "Google Analytics." Through this technology, Google intercepts each page a user visits, what buttons they click, and the information users type into website forms. The Google Analytics pixel sends all this information to Google, along with a host of personal identifiers.

108. Google Analytics has massive reach. As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged in."[15]

[15] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401).

109. Google cookies provide personally identifiable data about patients who visit Unlock Health's Web Services to Google. Unlock Health transmits personally identifiable Google cookie data to Google.

110. Google specifically warns developers and advertisers that Google Analytics is not appropriate for HIPAA-covered entities like Unlock Health, publicly stating:[16]

> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.
> - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
> - Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages.
> - Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

[16] Google, *HIPAA and Google Analytics,* https://support.google.com/analytics/answer/13297105?hl=en

111. Google tracks Internet users with IP addresses, cookies, geolocation, and other unique device identifiers.

112. Google cookies are personally identifiable. For example, Google explains the following about certain cookies that it uses:

a. "[C]ookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google account ID and most recent sign-in time."[17]

b. "Most people who use Google services have a preferences cookie called 'NID' in their browsers. When you visit a Google service, the browser sends this cookie with your request for a page. The NID cookie contains a unique ID Google uses to remember your preferences and other information[.]"[18]

c. "We use cookies like NID and SID to help customize ads on Google properties, like Google Search. For example, we use such cookies to remember your most recent searches, your previous interactions with an advertiser's ads or search results, and your visits to an advertiser's website. This helps us to show you customized ads on Google."[19]

d. "We also use one or more cookies for advertising we serve across the web. One of the main advertising cookies on non-Google sites is named 'IDE' and is stored in browsers under the domain doubleclick.net. Another is stored in google.com and is called ANID. We use other cookies with names such as

[17] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210916060858/https:/policies.google.com/technologies/cookies?hl=en-US (archived from September 16, 2021).

[18] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210101020222/https:/policies.google.com/technologies/cookies?hl=en-US (archived from January 1, 2021).

[19] *Id.*

DSID, FLC, AID, TAID, and exchange_uid. Other Google properties, like YouTube, may also use these cookies to show you more relevant ads."[20]

113. Google warns web-developers that Google marketing tools are not appropriate for every type of website or webpage, including health-related webpages and websites.

114. Google also warns developers in its Personalized Advertising policies page that "Health in personalized advertising" is a "Prohibited category" for Google's personalized advertising tools. Specifically, Google's advertising policies page states:[21]

> We take user privacy very seriously, and we also expect advertisers to respect user privacy. These policies define how advertisers are allowed to collect user data and use it for personalized advertising. They apply to advertisers using targeting features, including remarketing, affinity audiences, custom affinity audiences, in-market audiences, similar audiences, demographic and location targeting, and keyword contextual targeting. …
>
> You aren't allowed to do the following:

⊗ Collect information related to sensitive interest categories (see Personalized advertising policy principles below for more about sensitive interest categories)

115. The United States Department of Health and Human Services has made clear that "it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or to de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure."22

---

[20] *Id.*
[21] *Advertising Policies Help, Personalized Advertising*, Google, http://web.archive.org/web/20191031223446/https://support.google.com/adspolicy/answer/143465
[22] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

116. Google refuses to sign business associate agreements ("BAA") with healthcare companies.

117. After Google collects data that is transmitted to it by Google Analytics, Google analyzes and processes that data for use in selling advertising.

118. Google also uses the data that it collects from tracking pixels to provide clients like Unlock Health with analytics data that those clients use to bolster their marketing and advertising strategies. Clients like Unlock Health also use the analytics data that they receive back from Google to optimize their websites. Unlock Health benefited financially from sharing Plaintiffs' and Class Members' Protected Health Information via tracking pixels by receiving, among other things, better and more cost-effective marketing in exchange for patient data.

**F. Unlock Health Shared a Trove of Personally Identifiable Information with Google.**

**IP Addresses Are Personally Identifiable**

119. An IP address is a number that identifies a computer or other device (such as a mobile phone) connected to the Internet.

120. IP addresses are used to identify and route communications on the Internet.

121. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications and target those users with advertising using IP addresses.

122. Under HIPAA, an IP address is considered personally identifiable information. See 45 C.F.R. § 164.514(b)(2)(i)(O).

123. Whenever a patient logged filled out Unlock Health's HRAs, Unlock Health caused the disclosure of the patient's IP addresses to Google, along with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

**Internet Cookies Are Personally Identifiable**

124. In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

125. Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's device when that person's web browser interacts with the server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

126. Cookies are designed to and, in fact, most often do operate as means of identification for Internet users.

127. Cookies are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

128. In general, cookies are categorized by duration and party.

129. There are two types of cookies classified by duration:

a. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

b. "Persistent cookies" are designed to survive beyond a single Internet- browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet



Case 2:26-cv-00289 Document 1-2 Filed 03/18/26 Page 37 of 191 PageID #: 37
Case 2:26-cv-00289 Document 50 Filed 03/11/26 Page 38 of 148 PageID #: 3537

communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

130. Cookies are also classified by the party that uses the collected data:

a. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, log in, and functionality.

b. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits an Unlock Health Web Services will typically also have cookies on their device from third parties, such as Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

131. Data companies like Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications to sell advertising that is customized to that person. To build individual profiles of Internet users, third-party data companies assign each user a unique identifier or set of unique identifiers.

132. Traditionally, first- and third-party cookies were kept separate. An Internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Unlock Health can deploy source code that uses Google third-party cookies to help Google acquire and record the patient's communications, they are not permitted direct access to Google third-party cookie values. The



Case 2:26-cv-00289 Document 1-2 Filed 01/12/26 Page 81 of 191 PageID #: 358

reverse is also true: Google was not provided direct access to the values associated with first-party cookies set by Unlock Health.

133. Google designed a way to circumvent the same-origin policy so that third-party data companies can gain access to first-party cookies—and Unlock Health adopted it.

134. JavaScript source code developed by third-party data companies and placed on a webpage by developers such as Unlock Health can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information they have collected and recorded about a user that is associated with a cookie identification number. The technique can also be used to track an individual who has chosen to use third-party cookie blockers.

135. Cookie syncing is a process that "allow[s] web companies to share (i.e., synchronize) cookies and match the different IDs they assign for the same user while they browse the web."23 This allows entities to circumvent "the restriction that sites can't read each other's cookies, in order to better facilitate targeting and real-time bidding."24

136. Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rdparties have the chance to set their own cookies on the user's browser, in

[23] Panagiotis Papadopoulos *et al.*, *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[24] Gunes Acar *et al.*, *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user. Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) synchronize (i.e., join) two different identities (cookies) of the same user on the web.[25]

[25] Papadopoulos, *supra*, at 1433.




137. Through this process, third-party trackers like Google's and Facebook's are not only able to resolve user identities (e.g., learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though they "do not have any collaboration with" the third party.26

138. On the flip side, "CSync may re-identify web users even after they delete their cookies."27 "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."28 But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state

---

[26] *Id.* at 1434.

[27] *Id.*

[28] *See id.*

erasure. Consequently: (i) users cannot abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link [a] user's history across state resets."29

139. Thus, "syncing userIDs of a given user increases [] user identifiability while browsing, thus reducing their overall anonymity on the Web."30

140. Cookie syncing is precisely what is happening here. Google's trackers sync their unique user identifiers with other third parties on the websites. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit websites.

141. Whenever a patient uses Unlock Health's Web Services, Unlock Health intercepts, uses, and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the Web Services.

142. Unlock Health's cookie disclosures include the deployment of cookie synching techniques through which Unlock Health deposits Google cookies on patient computing devices by disguising the Google cookies as belonging to Unlock Health.

143. Unlock Health then re-directs the disguised Google cookies to Google.

**Advertising IDs Are Personally Identifiable**

144. An advertising ID is a unique identifier used by advertisers to track user activity and serve personal advertisements on mobile phones. Advertising IDs allow advertisers to understand user behavior, measure ad performance, and tailor advertisements based on user

---

[29] *Id.*

[30] *Id.* at 1441.

interests. Examples include the Google Advertising ID (GAID) for Android and the IDFA Advertising ID for iOS devices.

145. Each Android device has a unique GAID advertising ID. Whenever an Android device connects to Google services, it is automatically assigned a GAID. Advertisers can use the GAID to target users with advertisements. Likewise, Google can use the GAID ID to link users with their individual Google accounts.

146. Mobile marketers use advertising IDs like the Google Advertising ID to understand which ads, creatives, and channels are most effective. In android advertising, ad networks utilize the GAID to get an idea of a user's behaviors and interests. Meanwhile, advertisers use the GAID to monitor ad engagement and conversions. Advertisers and developers can see views and clicks of ads, as well as when a user subsequently installs an app, makes a purchase, or signs up for a subscription or other service.

147. Together, this data allows mobile app marketers to deliver targeted and retargeted ads to app users using precision segmentation for highly personalized experiences. Creating these personalized ads provides advertisers an efficient tool for targeting specific users to show specific advertisements directed to specific interests based on browsing history and other data that the advertising ID allows companies like Google to obtain.

**Browser-Fingerprints Are Personally Identifiable**

148. Browser-fingerprints are information collected about a computing device that can be used to identify the device.

149. Browser-fingerprints can be used to identify devices when the devices' IP addresses are hidden, and cookies are blocked.

150. The Electronic Frontier Foundation has explained:

> When a site you visit uses browser fingerprinting, it can learn enough information about your browser to uniquely distinguish you from all the other visitors to that site. Browser fingerprinting can be used to track users just as cookies do, but using much more subtle and hard-to-control techniques. In a paper EFF released in 2010, we found that a majority of users' browsers were uniquely identifiable given existing fingerprinting techniques. Those techniques have only gotten more complex and obscure in the intervening years. By using browser fingerprinting to piece together information about your browser and your actions online, trackers can covertly identify users over time, track them across websites, and building an advertising profile of them.[31]

151. In 2017, researchers showed that browser fingerprinting techniques can successfully identify 99.24 percent of Internet users.32

152. Browser-fingerprints are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

153. Whenever patients use Unlock Health Web Services, Unlock Health intercepts, uses and causes disclosures of data sufficient to form browser fingerprints with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

154. Each of the individual data elements described above is personally identifiable on its own. However, Unlock Health's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Google and Facebook that expressly state that they use such

[31] Katarzyna Szymielewicz and Bill Dudington, *The GDPR and Browser Fingerprinting: How It Changes the Game for the Sneakiest Web Trackers*, Electronic Frontier Foundation (June 19, 2018) (available at https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers).

[32] Yinzhi Cao, Song Li and Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, Proceedings of the Network and Distributed Security Symposium (March 2017) (available at https://yinzhicao.org/TrackingFree/crossbrowsertracking_NDSS17.pdf).

data elements to identify individuals and have developed sophisticated algorithms and infrastructure for doing so.

155. Unlock Health knowingly discloses information that allows Google, Facebook, and other advertisers to link Plaintiffs' and Class Members' Protected Health Information to their private identities and target them with advertising. Unlock Health and its clients intentionally shared the Protected Health Information of Plaintiffs and Class Members with Google and Facebook in order to gain access to the benefits of Google Analytics and the Meta Pixel.

156. Unlock Health is actively engaged in the interception and disclosure of Patients' Protected Health Information to unauthorized third parties like Google via its manufacture, design, and marketing of HRAs and HRA websites hosted on Unlock Health websites that specifically designed to capture and transmit patient data to third parties without patients' knowledge or consent.

157. The information Plaintiffs and Class Members provide to Unlock Health via HRAs on Unlock Health websites (which is then shared illegally with Google) can be combined with other information in Google's possession, like Plaintiffs' and Class Members' names, dates of birth, and phone numbers, to more effectively target Plaintiffs and Class Members with advertisements or sell their data to third parties.

158. Unlock Health knew that, by embedding Google Analytics—a Google marketing tool—in its HRAs, it was permitting Google to collect, use, and share Plaintiffs' and Class Members' Protected Health Information, including sensitive medical information and personally identifiable data. Unlock Health was also aware that such information would be shared with Google simultaneously in real time with patients' interactions with its online HRAs. Unlock Health chose to barter Plaintiffs' and Class Members' Protected Health Information to Google

because it wanted access to Google Analytics, Google Double Click, and related Google tools. That bargain financially benefited Unlock Health and Google, but it also betrayed patients' fundamental privacy rights.

**G. Unlock Health's Secret Google Source Code Improperly Disclosed Plaintiffs' and Class Members' Protected Health Information to Google Systematically Throughout the Class Period.**

159. The intentional design and operation of Unlock Health's HRAs to permit Unlock Health and its healthcare clients such as Temecula Valley Hospital and Inova Health to surreptitiously disclose Plaintiffs' and Class Members' Protected Health Information to Google and Facebook, as described above and throughout this Complaint, was ongoing, consistent, and systematic throughout the Class Period.

160. Unlock Health's HRAs did in fact operate as described above and throughout this Complaint with respect to the named Plaintiffs in this matter.

161. For example, Unlock and Temecula Valley Hospital encourage patients to fill out Health Risk Assessments that *supposedly* to help patients "discovery important information about your health."


Case 2:26-cv-00289 Document 1-2 Filed 01/12/26 Page 89 of 191 PageID #: 146
Case 2:26-cv-00289 Document 5-1 Filed 03/18/26 Page 48 of 148 PageID #: 456

Southwest HEALTHCARE | TEMECULA VALLEY HOSPITAL

Services Patients &

# Health Risk Assessments

Home > About > Resources > Health Risk Assessments

## Discover Important Information About Your Health



Do you need help determining if you're at risk for certain conditions? Temecula Valley Hospital provides health risk assessments that can help you make important decisions about your health.

Your path to a better quality of life starts now. Take a health risk assessment today!

162. Among the HRAs that Unlock Health and Temecula Valley Hospital make available to the public are a "Heart Health Risk Assessment," a "Lung Cancer Assessment," and a "Stroke Risk Assessment."




163. These online "quizzes" require patients to fill out a series of detailed questions that patients answer as they move through Unlock Health's online forms. After completing the HRAs, patients are provided with what Unlock Health and its clients describe as a "free, detailed risk report with personalized information and offers based on your answers."

164. For example, Plaintiff John Doe is a longtime patient at Temecula Valley Hospital, who filled out an online "Heart Health Risk Assessment." Plaintiff John Doe maintains both a Facebook account and a Google user account that is tied to his Gmail email address.

165. In 2025, Plaintiff John Doe was encouraged to fill out an online Heart Health Risk Assessment by his healthcare provider, Temecula Valley Hospital, in connection with treatment that he was receiving at the hospital. Plaintiff John Doe filled the online Heart Health Risk Assessment from his home in Temecula, California, using his cell phone's web browser to access the Temecula Valley Hospital website that provided access to the HRAs provided by Unlock Health. After clicking on the website link for the HRA provided by Temecula Valley Hospital to access the HRA, Plaintiff John Doe was taken to a website hosted by Unlock Health's servers, which provided the online HRA form.

166. As Plaintiff John Doe navigated through this online HRA "quiz," he was required to submit detailed information and his health condition, age, ethnicity, weight, weekly exercise, stress factors, and medical history:




Heart Health Assessment
Temecula Valley Hospital
x
Minutes of weekly exercise
?
Moderate activity
Vigorous activity
Minutes
Minutes
Stress
None
Slight
Moderate
Extreme
Next ▸


Smoking
Never smoked
Quit smoking (more than 1 year)
Quit smoking (less than 1 year)
Smoked within 30 days
Next ▸




167. The HRA form that Plaintiff John Doe filled out included detailed questions about his health conditions and medical history:





Heart Health Assessment
Temecula Valley Hospital

Indicate any of these medications you are regularly taking.
(check all that apply)

- Blood pressure meds
- Cholesterol meds
- Diabetes meds
- Other
- None of these

Are your cholesterol numbers within the recommended ranges?

- Yes
- No
- I don't know

168. The questions that Plaintiff John Doe was required to answer in the HRA "quiz" included, for example, detailed questions about his systolic and diastolic blood pressure:



Systolic blood pressure
(first/top number)

enter your exact numbers or

- Good - 119 or lower
- Slightly high - 120 to 129
- Moderately high - 130 to 139
- High - 140 to 159
- Very high - 160 or higher
- I don't know




169. The HRA form also asked for Plaintiff John Doe to provide the name of his insurance carrier:



170. The HRA also called for Plaintiff John Doe to provide his contact information, including his name, his zip code, and his phone number:




171. After completing the Heart Health Assessment, Plaintiff John Doe was provided a risk "score" for his heart health and encouraged to make an appointment with a specialist "to learn more about your heart health."



172. The bottom of each page of the HRA form that Plaintiff John Doe filled out provided that the copyright for the HRA form was held by "Medicom Health."

173. Without Plaintiff John Doe's knowledge or consent, Unlock Health and its client had configured and deployed surreptitious tracking technologies on the Heart Health Risk Assessment form. As Plaintiff John Doe filled out the form, the data entered in forms, the buttons he clicked, the pages he viewed, the name of his healthcare provider, his patient status, the date and time he filled out the form, his progress through the forms individual pages, and his name and email address were shared with Google. Unlock and its client also shared a host of prohibited identifiers with Google, including Plaintiff John Doe's IP address, his browser configuration, his user agent data, and cookies that specifically identified his personal, real world identity to Google.

174. Unlock Health touts the ability of its HRAs to deliver "Real-time data and reporting: Dashboards show conversion rates, drop-off points, and appointment outcomes to demonstrate measurable ROI."[33] This is precisely what happened as Plaintiff John Doe filled out Unlock Health's online HRA.

175. At each step of the way, as Plaintiff John Doe navigated through the individual pages of the HRA, Plaintiff John Doe's communications with Temecula Valley Hospital from his home in Temecula, California were intercepted in transit and routed to Google via surreptitious tracking technologies, often before his communications had even arrived at Unlock Health and Temecula Valley Hospital's servers. In "real-time," surreptitious tracking technologies that Unlock and its client deployed and configured collected and shared Plaintiff John Doe's communications with Google, including the buttons he clicked, the pages he viewed, and, ultimately, the health risk assessment "score" that he received.

---

[33] https://unlockhealth.com/capabilities/health-risk-assessments/

176. As a result of Unlock Health's deployment and configuration of Google Analytics on the Heart Health Risk Assessment, Google was able to link Plaintiff John Doe's Protected Health Information with his real-world identity, including by linking this data to his Google user account, and then used and sold his Protected Health Information to other third parties for commercial marketing purposes.

177. After filling out the Heart Health HRA form provided by Unlock Health and its client Temecula Valley Hospital, Plaintiff John Doe was inundated with advertising on his social media accounts, including his Facebook account, that were specifically targeted to the health condition that he had disclosed in the Unlock Health HRA. These targeted advertisements included ads for blood pressure medication, cholesterol medications, heart attack prevention treatments, and stroke prevention treatments.

178. Likewise, Plaintiff Jane Doe is a patient of Inova Health in Virigina who was encouraged to fill out a Heart Disease Risk Assessment by her healthcare provider in connection with ongoing treatment she has been receiving from Inova Health.



179. Inova Health promised Plaintiff Jane Doe that "[t]his quick assessment helps you understand your risk factors and how they may be affecting your heart health."




180. When Plaintiff Jane Doe clicked the "Take the heart disease risk assessment" button, she was taken to a website hosted by Unlock Health, whose URL was https://**profilers.evaliahealth.com**/v3/539794dc-f9f3-4a23-a861-3c402375cc46?c=80560536037590858064274568964601670816

181. Like Plaintiff John Doe, Plaintiff Jane Doe was then asked to fill out a detailed health risk assessment form, in which she was required to provide details such as her full name, city, mailing address, email address, phone number, age, sex, height, weight, her ethnicity, her smoking history, her weekly exercise history, her stress levels, whether she had a primary care physician, whether she had a family history of early heart disease, and the date of her last checkup. As she filled out the various pages of the HRA form, Plaintiff Jane Doe was also asked whether she had diabetes, and whether she had any history of heart or blood vessel disease conditions:

Do you have diabetes?

- ◯ No diabetes
- ◯ Prediabetes
- ◯ Diabetes (Type 1)
- ◯ Diabetes (Type 2)

Indicate if you have had any of these heart or blood vessel disease conditions. ?

(check all that apply)

- ☐ Heart disease
- ☐ Heart attack
- ☐ Heart failure
- ☐ Stroke or mini-stroke (TIA)
- ☐ Angina or chest pain
- ☐ Peripheral artery disease
- ☐ None of these

182. Likewise, Plaintiff Jane Doe was asked to provide health information such as whether she was taking blood pressure medications and whether her cholesterol numbers were within currently recommended ranges:


Indicate any of these medications you are regularly taking.
(check all that apply)

- Blood pressure meds
- Cholesterol meds
- Diabetes meds
- Other
- None of these

Are your cholesterol numbers within the recommended ranges?

?

- Yes
- No
- I don't know

183. Plaintiff Jane Doe was also asked to provide information such as her systolic and diastolic blood pressure numbers.

184. The bottom of each page of the HRA she filled out was copyrighted to "Medicom Health."

185. After completing the Heart Disease Risk Assessment, Plaintiff Jane Doe was provided with a score, including that she was "Low Heart Risk" as illustrated in the example below:




186. Without Plaintiff Jane Doe's knowledge or consent, Unlock Health and its client had configured and deployed surreptitious tracking technologies on the Heart Disease Risk Assessment form. As Plaintiff Jane Doe filled out the form, the data entered in forms, the buttons she clicked, the pages she viewed, the name of her healthcare provider, her patient status, the date and time she filled out the form, her progress through the form's individual pages, and her name and email address were shared with Google. Unlock and its client also shared a host of prohibited identifiers with Google, including Plaintiff Jane Doe's IP address, her browser configuration, her user agent data, and cookies that specifically identified her personal, real world identity to Google.

187. Unlock Health touts the ability of its HRAs to deliver "Real-time data and reporting: Dashboards show conversion rates, drop-off points, and appointment outcomes to demonstrate measurable ROI." This is precisely what happened as Plaintiff Jane Doe filled out Unlock Health's online HRA.

188. At each step of the way, as Plaintiff Jane Doe navigated through the individual pages of the HRA, Plaintiff Jane Doe's communications with Inova Health from her home in Virginia were intercepted in transit and routed to Google via surreptitious tracking technologies , often before her communications had even arrived at Unlock Health and Inova Health's servers. In "real-time," the surreptitious tracking technologies that Unlock and its client deployed and configured collected and shared Plaintiff Jane Doe's communications with Google, including the buttons she clicked, the pages she viewed, and, ultimately, the health risk assessment "score" that she received.

189. As a result of Unlock Health's deployment and configuration of Google Analytics on the Heart Disease Risk Assessment, Google was able to link Plaintiff Jane Doe's Protected Health Information with her real-world identity, including by linking this data to her Google user account, and then used and sold her Protected Health Information to other third parties for commercial marketing purposes.

190. After filling out the Heart Disease Risk Assessment form provided by Unlock Health and its client Inova Health, Plaintiff Jane Doe began receiving advertising on her social media accounts, including her Facebook account, that were specifically targeted to the health condition that she had disclosed in the Unlock Health HRA. These targeted advertisements included ads for blood pressure medications, cholesterol medications, and heart attack and stroke prevention treatments.


Case 3:26-cv-00289 Document 50-1 Filed 03/18/26 Page 104 of 191 PageID# 6561

191. Plaintiff Jack Doe is a longtime patient of Ochsner Health in Louisiana who also has a Google email account. Plaintiff Jack Doe was encouraged by Ochsner Health to fill out a Diabetes Health Risk Assessment that Ochsner Health and Unlock Health make available to the public.

192. When Plaintiff Jack Doe began filling out the Diabetes Health Risk Assessment form he was taken to a website whose server is hosted by Unlock Health:




193. Like Plaintiffs John Doe and Jane Doe, Plaintiff Jack Doe was then asked to fill out a detailed health risk assessment form, in which he was required to provide details such as her full name, city, mailing address, email address, phone number, age, sex, height, weight, his ethnicity, his smoking history, his weekly exercise history, whether he had a primary care physician at

Ochsner Health, he had a family history of diabetes, and whether he had a history of smoking. , As he filled out the various pages of the HRA form, Plaintiff Jack Doe was also asked whether he had been diagnosed with diabetes, whether she had any history of high cholesterol or high blood pressure, whether he took medications to control his blood pressure, and whether his fasting blood sugar was within recommended ranges.

194. After completing the Diabetes Risk Assessment, Plaintiff Jack Doe was provided with a risk assessment evaluation such as the one pictured below and encouraged to contact Ochsner Health.



195. Plaintiff Jack Doe also received an email from Unlock Health inviting him to access the Diabetes Risk Assessment Report he was provided by Ochsner Health.

196. Without Plaintiff Jack Doe's knowledge or consent, Unlock Health and its client had configured and deployed surreptitious tracking technologies on the Diabetes Risk Assessment form. As Plaintiff Jack Doe filled out the form, the data entered in forms, the buttons he clicked, the pages he viewed, the name of his healthcare provider, his patient status, the date and time he filled out the form, his progress through the form's individual pages were shared with Google. Unlock and its client also shared a host of prohibited identifiers with Google, including Plaintiff Jack Doe's IP address, his browser configuration, his user agent data, and cookies that specifically revealed his personal, real-world identity to Google, which linked all this data to his Google user profile.

197. After filling out the Diabetes Health Risk Assessment form that Unlock Health hosted on its servers, Plaintiff Jack Doe began receiving advertisements on his social media accounts related to the information he had entered in the HRA form, including advertisements for high blood pressure medications and advertisements soliciting him to take part in medical studies.

198. Just like Plaintiffs John Doe, Jane Doe, and Jack Doe, every time that Class Members accessed and filled out the online HRAs provided by Unlock Health and its clients, the tracking technologies that Unlock Health configured and deployed on Unlock Health's HRA forms intercepted and shared patients' and prospective patients' Personal Health Information with a host of third parties, including Facebook, Google, and Tik Tok. The Personal Health Information that was shared with these third parties included the names of the HRAs filled out by patients, their health risk assessment "scores," their specific medical conditions, their patient status, their progress through the individual pages of the HRA forms, the buttons that they clicked, and their

personally identifying information such as their names, email addresses, IP addresses, browser fingerprints, user agent data, and Google cookie identifiers revealing additional information such as their specific Google user accounts.

199. Such Protected Health Information, including Plaintiffs' and Class Members' patient status, medical conditions, and when and where they sought treatment are specifically protected by HIPAA against unauthorized disclosure to third parties. E.g., *Hartley v. Univ. of Chicago Med. Ctr.*, No. 22 CV 5891, 2025 WL 2802317, at *4 (N.D. Ill. Oct. 1, 2025).

200. The Google Analytics and Google Double Click technologies that Unlock and its client deployed not only captured and shared Plaintiffs' communications with Google, but once Google obtained these communications it had the ability to exploit them in multiple ways. For example, as discussed, Google used Plaintiff John Doe's PHI to sell targeted advertising to other companies; Google also used Plaintiff John Doe's PHI to train internal AI systems that Google was building. Google also made Plaintiff John Doe's PHI available for purchase to third party data brokers who, in turn, sold and resold Plaintiff John Doe's PHI.

201. While Unlock Health could have sought consent from Plaintiffs and Class Members to intercept, collect, and share their Protected Health Information with Google, Unlock Health chose not to because of the likelihood that the majority of patients would refuse. Instead, Unlock Health and its surreptitiously deployed hidden analytics tracking tools it obtained from Google in an effort to circumvent patients' refusing and/or blocking the exploitation of their Protected Health Information for marketing purposes.

202. Unlock Health intentionally deployed Google Analytics and Google Double Click within its HRA forms. Google Double Click is a set of digital advertising tools for marketing, buying, and selling ads, now primarily integrated into the Google Marketing Platform and Google

Ad Manager. It serves advertisers (buy-side) and publishers (sell-side) by enabling programmatic ad serving, campaign management, behavioral targeting, and real-time bidding for display and video ads.

203. Google describes this technology as follows: "DoubleClick Digital Marketing (DDM) is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns." In other words, the Google Double Click technology is specifically designed to capture and commercially individual's user data from any website on which it is deployed. That included the online HRA forms where Unlock Health deployed this technology alongside Google Analytics.

204. In addition to deploying Google Analytics and Google Double Click on its HRAs, Unlock Health encouraged its clients like Temecula Valley Hospital and Inova Health to deploy their own technologies on Unlock Health HRA forms. The source code that Unlock and its subsidiaries developed was intentionally designed and configured to allow healthcare clients deploy their own tracking technologies on the Unlock Health HRA forms, such as Google Tag Manager, Google Analytics, Google Double Click, and the Facebook Meta Pixel. Unlock Health not only designed its HRA forms for the express purpose of sharing patients' health data with third parties like Facebook and Google, but Unlock Health provided detailed guidance and assistance to place additional tracking technologies on the Unlock Health HRAs—such as Tik Tok and Google Tracking pixels—that were designed to surreptitiously intercept and disclose patients' health data to third parties without patients' knowledge or consent. In this manner, Unlock Health substantially aided its clients in the illegal interception, disclosure, and use of patients' communications.



Case 3:26-cv-00289 Document 1-2 Filed 01/13/26 Page 66 of 148 PageID #: 66

205. Unlock Health shared patients' Protected Health Information with Google in return for access to free marketing tools and aggregated data about how individuals interacted with its Web Services. Unlock Health took the aggregated patient data it received back from Google and used that data to optimize its marketing and product designs, thereby increasing Unlock Health's profitability at the expense of Plaintiffs and Class Members.

206. Each Class Member had his or her interactions with the Unlock Health HRAs intercepted and shared with Google in a manner substantially similar to what occurred with the named Plaintiffs as detailed above, such that named Plaintiffs' claims are typical of those of the proposed Class as a whole.

## H. Third Parties like Google and Facebook Share the Data and Information Collected from Trackers Installed on Defendant's Website with Fourth Parties.

207. In addition to using the data for their own purposes, the third parties that obtain patient data and information from trackers installed on Defendant's website further profit from Defendant's improper sharing practices by selling patients' data to fourth parties.

208. As one study found, "on average, companies that allow external sharing of [] data assets have data that has been exposed to 42 4th-party domains."[34]

209. Consequently, a fourth party that did not have a tracker directly installed on the Defendant's website may obtain and use information collected via third-party trackers to provide direct advertisements to patients on the fourth party's platform.

210. One common recipient of patients' collected data is Google.

[34] Adam Gavish, *Your 3rd Party Collaborators Share Your Company's Data with 4th Parties*, DOCONTROL (Feb. 27, 2025), https://www.docontrol.io/blog/your-3rd-party-collaborators-share-your-company-data-with-4th-parties#:~:text=What%20is%204th%2DParty%20Data,side%20effect%20of%20SaaS%20collaboration.

211. For example, Facebook and Google have engaged in practices that allowed for the sharing or accessibility of user data between their platforms.[35] Because of this, advertisements on Facebook may reflect information collected via a Google tracker, either because of information shared directly or indirectly between the companies.

212. Facebook and Google both act as data brokers, meaning they collect data, compile it into datasets, and sell it to third parties.[36] Two other popular data brokers are Acxiom and Oracle Data Cloud ("Oracle"). Facebook and Google have been known to buy information from, and sell information to, such data brokers.[37]

213. Because of this, one company's tracker (*e.g.*, Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a third-party (*e.g.*, Facebook), which uses the information to advertise for various parties (like other healthcare institutions) on its own platform.[38] Alternatively, one company's tracker (*e.g.*, Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data

---

[35] *See* Steven Musil, *Facebook gave tech giants more access to users data than it said*, CBSNEWS (Dec. 19, 2018), https://www.cbsnews.com/news/facebook-gave-tech-giants-more-access-to-users-data-than-it-said-new-york-times/ (last visited Apr. 24, 2025); Steven Musil, *Facebook acknowledges it shared user data with dozens of companies* (Jul. 1, 2018), https://www.cnet.com/tech/tech-industry/facebook-acknowledges-it-shared-user-data-with-dozens-of-companies/ (last visited Apr. 24. 2025); Paresh Dave and Katie Paul, *Google secretly gave Facebook perks, data in ad deal* (Dec. 17, 2020), https://www.reuters.com/article/technology/google-secretly-gave-facebook-perks-data-in-ad-deal-us-states-allege-idUSKBN28Q37G/ (last visited Apr. 24, 2025).

[36] *See* Jessie G Taft, *Facebook and Google Are the New Data Brokers* (Dec. 18, 2018, updated Jan. 5, 2021), https://dli.tech.cornell.edu/post/facebook-and-google-are-the-new-data-brokers (last visited Apr. 24. 2025).

[37] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/ (last visited Apr. 24. 2025).

[38] *See* Don Marti, *et. al.*, *Who Shares Your Information With Facebook?* at 16 (Jan. 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/01/CR_Who-Shares-Your-Information-With-Facebook.pdf (explaining how Facebook uses aggregated data from external data brokers to target users on its platform).

broker to sell it to a fourth-party advertiser (*e.g.*, another healthcare institution), which uses the information to advertise for on other platforms (*e.g.*, Facebook).[39] Or, one company's tracker (*e.g.*, Google Analytics) may collect information, sell either the raw data or a compiled dataset to a third-party data broker (*e.g.*, Acxiom or Oracle), which third party data broker sells the information to a fourth party (*e.g.*, Facebook), which uses the information for still other parties' targeted advertising.[40] In any event, the basic idea and results are the same. Google Analytics tracks and discloses information to fourth parties that use that data and information to advertise a variety of products on a variety of platforms.

214. The information that data brokers like Acxiom and Oracle buy and compile from trackers (like Facebook's and Google's tackers) is inherently sensitive.

## I. Plaintiffs' Protected Health Information that Unlock Health collected, disclosed, and exploited is Plaintiff's property, has economic value, and its illicit disclosure caused Plaintiffs harm.

215. The value of data that companies like Google and Facebook extract from people who use the Internet is well understood and generally accepted in the e-commerce industry.

216. In 2013, the Financial Times reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[41]

217. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[42] This price is only increasing. According to Facebook's own financial statements,

---

[39] *Id*.
[40] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/.
[41] https://ig.ft.com/how-much-is-your-personal-data-worth/
[42] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[43]

218. In June 2025, Google began soliciting individuals in the United States to purchase their computer and mobile phone internet browsing history for $540 a year per household participant.

219. Personal information is now viewed as a form of currency. Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[44]

220. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third-party data marketing companies because of the strict restrictions on disclosure of such information under state and federal laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[45]

221. Individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[46] and has paid teenagers and

[43] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[44] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57 (2004).
[45] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[46] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app

adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[47]

222. Myriad other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[48]

223. Unlock Health was compensated for its disclosures of Plaintiffs' and Class Members' Protected Health Information by the Protected Health Information's third-party recipients in the form of enhanced analytics and marketing services. Among other things, Unlock Health used the analytics data that it received from Google and Facebook to enhance the HRA products that it marketed and sold to healthcare systems. In turn, Google used the Protected Health Information it received from Unlock Health to sell advertising to other third parties, targeted to the patients who Unlock Health was supposedly serving and protecting from privacy violations. Unlock Health also specifically marketed the HRA technology that it developed, manufactured, and configured as an easy and convenient way for its healthcare clients to intercept and disclose patients' health communications with third-party analytics vendors.

224. Unlock Health did not pay (or offer to pay) Plaintiffs and Class Members for their Protected Health Information before Unlock Health shared this data with Google, Facebook, and other advertisers.

225. Unlock Health profited from Plaintiffs' and Class Members' information without ever intending to compensate Plaintiffs and Class Members or inform them that the disclosures had been made.

---

[47] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[48] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* https://www.monetha.io/blog/rewards/earn-money-from-your-data/




Case 3:26-cv-00289 Document 50-2 Filed 03/18/26 Page 71 of 148 PageID #: 7571

226. Unlock Health was unjustly enriched by its conduct.

227. A data broker is a company that collects and sells personal information about individuals to other businesses. Data brokers gather consumers' personal information from a variety of sources and then compile comprehensive profiles they sell for purposes such as targeted advertising, risk assessment, and background checks. Data brokers' mass collection and sale of personal information raise significant consumer privacy concerns. The personal data that data brokers collect and sell can be used to harm individuals, for example, by influencing insurance rates, loan denials, and unwanted advertising.

228. "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[49] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data." And whereas individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[50]

229. For instance, as a report by NATO found, data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected

---

[49] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

[50] Tehila Minkus *et al.*, *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

and is actual," such as websites visited. Inferred data "is gleaned from observed data by modelling or profiling," meaning what consumers may be expected to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[51]

230. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[52] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[53]

231. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[54]

232. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do

---

[51] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[52] SHERMAN, *supra*, at 1.

[53] *Id.*

[54] *Id.* at 9.

> not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[55]

233. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving consumers of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[56]

---

[55] *Id.*

[56] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.




234. Data brokers are able to compile such vast swaths of information in part by collecting users' IP addresses and other device information, which data brokers use to track users across the Internet.57 Indeed, as McAfee (a data security company) notes, "data brokers [like Defendant] can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[58]

[57] *Id.* at 11.

[58] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, McAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

235. Data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[59]

236. In short, data brokers track consumers across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

237. Both Facebook and Google have a history of sharing the data they receive via analytics technologies with data brokers, which they and the data brokers then monetize as part of their real-time bidding (RTB) auction process for advertising.

238. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[60]

239. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP "work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices

[59] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

[60] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

they put forth."[61] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[62]

240. In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

241. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.
>
> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[63]

---

[61] Geoghegan, *supra*.

[62] *Introduction To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/enus/xandr/industry-reference/introduction-to-ad-serving.

[63] Geoghegan, *supra*; *see also Real-Time Bidding*, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.


Case 3:26-cv-00289 Document 50-1 Filed 03/11/26 Page 120 of 191 PageID #: 7577




242. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about consumers to procure the greatest interest from advertisers and obtain the highest bids for website and app operators' users. But these SSPs and DSPs receive assistance by connecting with Data Management Platforms ("DMPs") or data brokers like Defendant:

> [T]he economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or data broker, like Defendant]. DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[64]

---

[64] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey; see also PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.




243. In other words, before bidding to show a user an advertisement, SSPs and DSPs will attempt to determine what other information about a user may be available. SSPs and DSPs do this by connecting with entities like Google and Facebook, who match a consumer's information from a particular website or mobile application (e.g., their IP address) with any profiles on those users they may have compiled. If there is a match, then advertisers will pay more money to show users an advertisement because the advertisers have more information on which to base their targeting. This naturally enriches website and app operators, as their users are now more valuable. It also enriches SSPs who can offer users to advertisers for more money based on the greater number of traits available, and DSPs who can receive higher bids for the same users. And SSPs and DSPs can continue linking users on a website or mobile application through the Advertising Exchange, which enhances the SSP's and DSP's ability to better identify users in the future and helps the SSP and DSP profit further as well.

244. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> (a) "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as

> possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."
>
> (b) "send[ing] sensitive data across geographic borders."
>
> (c) sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[65]

245. The last point bears additional emphasis, as it means the data Unlock Health provides to Google, Facebook, and data brokers to serve targeted advertisements is even provided to those entities who do not actually serve an advertisement on a consumer. This greatly diminishes the ability of users to control their personal information.

246. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[66]

247. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[67]:

---

[65] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[66] Geoghegan, *supra*.

[67] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).



Case 3:26-cv-00289 Document 50-2 Filed 03/13/26 Page 123 of 191 PageID #: 3580




248. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm that was long recognized by common law and that statutes like the CIPA were enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

249. When advertisers use Google's real-time bidding system (RTB), RTB lets hundreds of companies bid for ad space on individual consumers based on their Google profile, which can include information such as age, sex, and interests. While only one company will win the auction, hundreds of participating companies receive sensitive information about the potential recipient of the ad—device identifiers and cookies, web browsing and location data, IP addresses, and unique

demographic information such as age and gender. Worse, many companies participating in the RTB system are not there to fill ad spaces but instead use RTB to collect users' personal data. Likewise, for users using cell phones or other Android devices that run on a Google operating system, every time they open an app on their Android phone or tablet, Google will timestamp it, and every ad the user is shown will be recorded and associated with their device profile.

250. Facebook is no better. Facebook has historically collaborated with data brokers to gather consumer data and enhance its user profiles for targeting advertising. Facebook itself acts as a first-party data broker, collecting data from user activities on its platform to offer targeted advertising, which is its primary revenue source. Facebook's data ecosystem extends through external partnerships, allowing Facebook to collect data from user interactions on other websites and apps. Companies that pay for ads on Facebook can then direct users to their websites, which embed trackers that collect information such as IP addresses and device IDs from visitors.

251. Facebook also has a history of sharing its customers data with third parties, including most infamously Cambridge Analytica, who gained access to the data of tens of millions of Facebook users. Facebook has also shared its customers data with "partners," such as Acxiom, Oracle, Epsilon, and Experian. Once this data is shared, neither Facebook or its users have control over this data as it is endlessly sold and resold to data brokers around the world.

252. As a consequence of Unlock Health's unauthorized disclosure of patients' PHI to Google, Facebook, and other third parties, Plaintiff and Class Members have further been harmed by their loss of control over their own personal information, which has now been shared with numerous data brokers participating in the online data market.

253. Unlock Health's interception and disclosure of patients' PHI was not the result of accident, mistake, or inadvertence. Unlock Health provides its HRA technology to customers with

the knowledge and expectation that patients' PHI will be shared with third parties every time a patient fills out an HRA.

254. Unlock Health's actions were done for the purpose of violating laws prohibiting the unlawful review and use of Protected Health Information. Unlock Health intended to illegally share patients' PHI with companies like Google at the time it enabled Google Analytics and similar tracking technologies on its online HRAs.

255. The only remedy for patients whose PHI has been shared with Google, Facebook, and other third parties is to use services such as DeleteMe and CyEx Privacy Shield Pro that go out into the online marketplace and "delete" patients' personal data from data broker rolls. These services, however, cost anywhere from $100 to $300 a year on average for consumers to try and regain control over their personal information.

**J. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their Protected Health Information.**

256. As patients using Unlock Health's HRAs, Plaintiffs and Class Members had a reasonable expectation that Unlock Health would not disclose their Protected Health Information or the content of their communications to third parties without their express authorization.

257. Plaintiffs' and Class Members' reasonable expectations of privacy in their Protected Health Information and communications exchanged with Unlock Health are derived from multiple sources, including at least:

- Unlock Health's status as a provider for purposes of Plaintiffs' and Class Members' healthcare;
- Unlock Health's common law obligations to maintain the confidentiality of Protected Health Information and communications;
- State and federal laws and regulations protecting the confidentiality of Protected Health Information;

- State and federal laws protecting the confidentiality of communications and computer data; and

- State laws protecting against unauthorized use of personal means of identification.

258. It was reasonable for Plaintiffs and Class Members to assume that Unlock Health's practices were consistent with Unlock Health's duties to protect the confidentiality of patients' Protected Health Information.

259. Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

260. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

261. For example, a recent study by Consumer Reports showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[68]

262. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[69]

[68] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[69] https://www.wired.co.uk/article/apple-ios14-facebook

263. "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law, 33 Rutgers L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, E-Health Hazards: Provider Liability and Electronic Health Record Systems, 24 Berkley Tech L.J. 1523, 1557 (2009).

264. The concern about sharing Protected Health Information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[70]

265. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook and Google. As those critics have pointed out, having a patient's personal Protected Health Information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against. As a result of Defendant's disclosure of Plaintiff's Protected Health Information to third parties without authorization via

[70] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

tracking technologies on its website, Plaintiff and Class Members have suffered the following injuries:

a. Loss of privacy;

b. Unauthorized disclosure of their Protected Health Information;

c. Unauthorized access of their Protected Health Information by third parties;

d. Defendant benefitted from the use of Plaintiff and Class Members' Protected Health Information without sharing that information with Plaintiff and Class Members;

e. Repeated targeted advertisements from third and fourth parties on social media and other third-party websites, reflecting Plaintiff and Class Members' Protected Health Information that was improperly disclosed and used;

f. Lost benefit of their bargain with Defendant, as Plaintiff and Class Members did not receive the reasonable privacy and data security protections for which they paid;

g. Defendant enriched itself at Plaintiff and Class Members' expense without sharing the revenue and profit attributable to collecting their Protected Health Information without authorization and sharing it with Third Parties (and fourth parties);

h. Defendant profited off of disclosing their Protected Health Information without authorization and sharing it with Third Parties (and fourth parties) through savings in marketing costs;

i. Defendant profited as a result of collecting their Protected Health Information without authorization and sharing it with Third Parties (and fourth parties) through its revenues and profits attributable to serving and monetizing advertisements directed to Plaintiff and Class Members;

j. Plaintiff and Class Members lost their ability to keep their Protected Health Information private or allow Defendant to track their data;

k. Plaintiff and Class Members cannot remediate the privacy harms they have suffered without many hours of work and spending hundreds of dollars a year to pay for third-party services to scrub their Protected Health Information from data broker rolls;

l. Embarrassment, humiliation, frustration, and emotional distress;

m. Decreased value of their Protected Health Information;

n. Increased risk of future harm resulting from future use and disclosure of their Protected Health Information; and

o. Statutory damages.

**K. Plaintiffs' and Class Members' Protected Health Information is protected against unauthorized disclosure by both state and federal law.**

266. The confidentiality of Plaintiffs' and Class Members' Protected Health Information is specifically protected by law. E.g., Cal. Civ. Code § 56.101; 45 C.F.R. § 164.514. The prohibitions against disclosing Protected Health Information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes. E.g., 45 C.F.R. § 164.51. Both state and federal law also restrict the use of Plaintiffs' and Class Members' Protected Health Information, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

267. Unlock Health does not have a legal right to share Plaintiffs' and Class Members' Protected Health Information with third parties without their written consent because this information is protected from such disclosure by law. Cal. Civ. Code § 56.101; 45 C.F.R. § 164.508. Nor is Unlock Health permitted to disclose Plaintiffs' and Class Members' Protected Health Information to advertising and marketing companies like Google without express written authorization from patients. E.g., 45 C.F.R. § 164.502(a)(5)(ii).

268. Indeed, as discussed above, the United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting Health Information via tracking technology like Google Analytics or the Meta Pixel without a patient's authorization and other protections like a business associate agreement with the recipient of the Health Information. Among other things, HHS warned health care providers and their technology vendors that "[r]egulated entities are not permitted to use tracking technologies in a manner that

would result in impermissible disclosures of Health Information to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of Health Information to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[71]

269. Unlock Health failed to obtain a valid written authorization from Plaintiffs or Class Members to allow the capture and exploitation of their Protected Health Information and the contents of their communications for marketing purposes.

270. Plaintiffs' and Class Members' Protected Health Information is protected by federal law under HIPAA and its implementing regulations, which are promulgated by HHS.

271. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[72]

272. Business associates like Unlock Health also must also comply with the privacy obligations imposed by HIPAA.[73]

273. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. §160.103; see n.1, supra.

---

[71] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

[72] Department of Health and Human Services, *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[73] 78 Fed. Reg. 5568 (2013) (extending certain HIPAA Privacy and Security Rules, like those described here, to business associates).

274. In relevant part, PHI is defined as "individually identifiable health information . . . transmitted by electronic media [or] maintained in electronic media."

275. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. §160.103.

276. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

A. Names;

. . .

H. Medical records numbers;

. . .

J. Account numbers;

. . .

M. Device identifiers and serial numbers;

N. Web Universal Resource Locators (URLs);

O. Internet Protocol (IP) address numbers; … and

> R. Any other unique identifying number, characteristics, or code…; and"
>
> the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

277. The HIPAA Privacy rule requires covered entities and business associates to maintain appropriate safeguards to protect the privacy of Protected Health Information and sets limits and conditions on the uses and disclosures that may be made of Protected Health Information without authorization. 45 C.F.R. §§ 160.103, 164.502.

278. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

279. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

280. Courts have recognized that patient status is protected by HIPAA. E.g., *In re Meta Pixel Healthcare Lit*., Case No. 3:22-cv-03580-WHO, Dkt. 159 at 12 (N.D. Cal. Dec. 22, 2022)

("I agree that the information at issue here appears to show patient status and thus constitutes protected health information under HIPAA."); id. at 15 ("[T]he Pixel captures information that connects a particular user to a particular health care provider – i.e., patient status – which falls within the ambit of information protected under HIPAA.").

281. Guidance from HHS confirms that patient status is protected by HIPAA:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … **If such information was listed with health condition, health care provision** or payment data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI.[74]

282. In December 2022, HHS issued a Bulletin "to highlight the obligations" of health care providers and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" such as the "Meta Pixel," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."75

283. In the Bulletin, which was amended in June 2024, HHS explained that tracking technologies on password-protected patient portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

[74] Office for Civil Rights, Department of Health and Human Services, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5 (emphasis added) (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf .

[75] Office of Civil Rights, Department of Health and Human Services, HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. **Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal**. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to **only** use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[76]

284. The HHS Guidance further explained that tracking technology vendors like Google are considered business associates under HIPAA and that entities who use their services must obtain a business associate agreement ("BAA") before utilizing their services:[77]

> [T]racking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and

---

[76] Office of Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last reviewed June 26, 2024) (emphasis added).

[77] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

> the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[78]

285. HHS reiterated that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of HIPAA Rules."[79]

286. As HHS explained, an "impermissible disclosure" of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms:

287. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[80]

## L. Unlock Health was unjustly enriched by bartering Plaintiffs' and Class Members' Protected Health Information to Facebook and Google.

288. In exchange for disclosing Personal Health Information about its patients and users, Defendant is compensated by Facebook and Google with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

289. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

---

[78] *Id.*
[79] *Id.*
[80] *Id.*

290. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

291. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

292. Defendants knew or should have known that Facebook and Google could not be trusted with patients' sensitive medical information. Due to their ability to target individuals based on granular data, Facebook's and Google's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

293. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose." Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did

nothing to protect patients and users from egregious intrusions into patient privacy, choosing instead to benefit at those patients' and users' expense.

294. Despite knowing that the source code embedded in its websites was sending patients' PHI to Facebook and the Google, Defendants did nothing to protect patients and users from egregious intrusions into patient privacy, choosing instead to benefit at those patients' and users' expense.

295. Defendants' decision to hide their use of the Meta Pixel and Google Analytics from its patients and its refusal to remove such technologies from its websites after learning that its patients' Personal Health Information was being routinely collected, transmitted, and exploited by Facebook is malicious, oppressive, and in reckless disregard of Plaintiffs' and Class Members' rights. Defendant's conduct in intentionally concealing its use of tracking technologies from patients was knowing, willful, and malicious.

296. Defendants were aware that installing the Meta Pixel and Google Analytics would result in the unauthorized disclosure of its patients' Personal Health Information to Facebook and Google. Defendants were also aware that doing so was facially illegal under HIPAA. Defendants nevertheless chose to install these technologies on its HRAs, while leading patients to believe that their privacy rights would be respected. Defendants' decision to conceal these unauthorized disclosures from patients was fraudulent and oppressive. Despite its many obligations to protect patients against the unauthorized disclosure of their PHI, Defendant routinely bartered patients' Personal Health Information to Facebook and Google in return for advertising benefits.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

297. The applicable statutes of limitation have been tolled because of Unlock Health's knowing and active concealment and denial of the facts alleged herein.




Case 3:26-cv-00289 Document 50-2 Filed 03/18/26 Page 138 of 191 PageID #: 9595

298. Unlock Health seamlessly incorporated trackers into its HRAs, providing no indication to Plaintiffs and Class Members that their Protected Health Information was being disclosed and that they were being tracked for marketing purposes. As a business associate of Plaintiffs' and Class Members' health care providers, Unlock Health owed Plaintiffs and Class Members fiduciary duties, including duties to protect their Protected Health Information from unauthorized disclosure. Unlock Health had knowledge that its HRAs incorporated tracking technologies yet failed to disclose that by interacting with the HRAs, Plaintiffs' and Class Members' Protected Health Information would be intercepted, collected, used by, and disclosed to Google. Unlock Health's fraudulent concealment of its efforts to share Protected Health Information with Google (including information that specifically identified patients' real-world identities) violated the duties that Unlock Health owed Plaintiffs and Class Members, tolling the statute of limitations.

299. Under the circumstances, Unlock Health was under a duty to disclose the true nature of its health risk assessments to patients. Unlock Health is therefore estopped from relying on any statute of limitations.

300. Plaintiffs and Class Members could not, with due diligence, discover the full scope of Unlock Health's conduct, because there were no disclosures or other indication that they were interacting with Web Services and a Mobile Application that employed Google Analytics and other tracking technologies.

301. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Additionally, Unlock Health was under a duty to disclose the nature and significance of its data collection practices but did not do so. Unlock Health is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

302. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

303. Plaintiffs bring this action as a nationwide class action pursuant to Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class:

> **The Nationwide Class:** During the fullest period allowable by law, all patients in the United States who had data from Unlock Health HRAs they filled out shared with Google.
>
> **The California Class:** During the fullest period allowable by law, all California citizens who had data from Unlock Health HRAs they filled out shared with Google.

304. Excluded from the Class are Unlock Health and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

305. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

306. Numerosity—Federal Rule of Civil Procedure 23(a)(1) – Class Members are so numerous that their individual joinder is impracticable. The precise number of Class Members and their identities are unknown to Plaintiffs at this time but will be determined through discovery through the records of Unlock Health.

307. Commonality and Predominance—Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3) – Common questions of law and fact exist and predominate over questions affecting only individual Class Members. These common legal and factual questions include the following:

a. Whether Unlock Health's practices relating to disclosures of Plaintiffs' and Class Members' Protected Health Information to third parties were intentional;

b. Whether Unlock Health profited from disclosures to the third parties;

c. Whether Unlock Health's conduct violates the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* and 18 U.S.C. § 2701, *et seq.*;

d. Whether Unlock Health's practices constitute an unauthorized intrusion upon seclusion;

e. Whether Unlock Health's practices constitute a violation of 42 U.S.C. § 1320d-6;

f. Whether Unlock Health's practices constitute identity theft;

g. Whether Unlock Health's practices constitute a breach of fiduciary duty;

h. Whether Unlock Health's practices constitute tampering with computer data;

i. Whether Unlock Health's practices constitute unjust enrichment;

j. Whether placement of the Google cookies disguised as belonging to Unlock Health on Plaintiffs' and Class Members' computing devices is a highly offensive intrusion upon seclusion;

k. Whether Unlock Health's conduct harmed and continues to harm Plaintiffs and Class Members, and if so, the extent of the injury;

l. Whether and to what extent Plaintiffs and Class Members are entitled to damages and other monetary relief;

m. Whether and to what extent Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

n. Whether and to what extent Plaintiffs and Class Members are entitled to attorneys' fees and costs.

308. Typicality—Federal Rule of Civil Procedure 23(a)(3) – Plaintiff's claims are typical of the claims of the Class and Plaintiffs has substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other Class Members. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients who used the Unlock Health HRAs and are victims of Unlock Health's unauthorized disclosures to third parties.


Case 3:26-cv-00289 Document 50-1 Filed 03/18/26 Page 141 of 191 PageID #:9598

All Plaintiffs' and Class Members' claims are based on Unlock Health's wrongful conduct and unauthorized disclosures.

309. Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4) – Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained competent counsel experienced in complex class action privacy litigation and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

310. Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2) – Unlock Health acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and/or declaratory relief, as described below.

311. Superiority—Federal Rule of Civil Procedure 23(b)(3) – A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Unlock Health. It would thus be virtually impossible for the Class Members, on an individual basis, to obtain effective redress for the wrongs done them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and

comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

312. Additionally, the Class may be certified under Rule 23(b)(1) or (b)(2) because:

a. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Unlock Health;

b. The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Unlock Health has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

**COUNT I**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511(1) et seq.**
**Unauthorized Interception, Use, and Disclosure**
**(On behalf of Plaintiffs and the Nationwide Class Members)**

313. Plaintiffs, individually and on behalf of the Nationwide Class Members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

314. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class Members.

315. Title I of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, also known as the Wiretap Act, provides a private cause of action against any person who intercepts an electronic communication.

316. The ECPA protects individuals against eavesdropping committed with an improper purpose.

317. A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

318. Plaintiffs' and Class Members' communications via HRAs, including their communications with their treating physicians, are covered communications under the ECPA.

319. The ECPA protects both the sending and receipt of electronic communications.

320. The ECPA provides a private right of action to any person whose electronic communications are "intercepted, disclosed, or intentionally used" in violation of the ECPA.

321. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photo-electronic or photo-optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

322. The transmissions of data between Plaintiffs and Class Members, on the one hand, and their healthcare providers via Unlock Health HRAs, on the other, qualify as communications under the ECPA. Unlock Health was not a "party" to the communications between patients and their healthcare providers. Plaintiffs and Class Members believed that the HRAs they filled out were being provided by their individual healthcare providers. Plaintiffs and Class Members were given no notice that their communications with their healthcare providers, such as Temecula

Valley Hospital, were being secretly intercepted, recorded, shared, and commercially exploited for marketing purposes by Unlock Health.

323. "Intercept" under the ECPA means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

324. "Contents" includes "*any* information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8) (emphasis added).

325. The "contents" of Plaintiffs' and Class Members' electronic communications included at least:

a. the parties to the communications;

b. personally identifiable information such as their IP addresses, Google IDs, browser fingerprints, and other unique identifiers;

c. The health risk assessment "scores" that patients received;

d. The specific pages that Plaintiffs and Class Members requested to view inside the HRAs;

e. Plaintiffs' and Class Members' progress through each page of the HRAs;

f. the precise text of their communications about specific medical conditions;

g. the precise text of their communications about specific treatments;

h. the precise text of their communications about their current patient status;

i. the precise text of specific buttons on Unlock Health's HRAs that they clicked to exchange communications;

j. the precise dates and times when they filled out HRAs on Unlock Health's websites;

k. information that is a general summary or informs third parties of the general subject of communications that patients made to Unlock Health and its clients in response to requests for information about specific conditions, treatments, and other information; and

l. any other content that Unlock Health has aided third parties in scraping from webpages or communication forms in its HRAs.

326. Plaintiffs' and Class Members' communications with their healthcare providers via Unlock Health HRAs constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Plaintiffs and Class Members' mobile applications;

e. Google Analytics;

f. Internet cookies;

g. Unlock Health's computer servers; and

h. Third-party source code used by Unlock Health.

327. Whenever Plaintiffs and Class Members interacted with Unlock HRAs, Unlock Health, through the source code it embedded and ran on its HRAs, intentionally intercepted and divulged the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google and Facebook.

328. Without Plaintiffs' and Class Members' knowledge or consent, Unlock Health acquired the content of Plaintiffs' and Class Members' communications while they were still exchanging communications with their healthcare providers via the online HRAs. Unlock Health then caused these same communications to be disclosed to Google, Facebook, and other third parties in return for marketing and advertising benefits.

329. In violation of 42 U.S.C. § 1320d-6, Unlock Health knowingly disclosed "individually identifiable health information to another person"—*i.e.*, Google and other third parties. As set forth more fully throughout this Complaint, Unlock Health's disclosures of patients' Protected Health Information were "knowing" because, among other things:

a. Unlock Health deliberately chose to deploy tracking technologies on its HRAs knowing they contained PHI.

b. Unlock Health knew that by deploying tracking technologies on its online HRAS that it was permitting third parties to collect, use, and share Plaintiffs' and the Class Members' PHI, including sensitive medical information and personally identifiable data.

c. Google warns web developers that Google Analytics is not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should be used by advertisers to target ads to users or promote advertisers' products or services. Unlock Health either knew or should have known of these warnings from Google, and despite the warnings deployed Google Analytics in its HRAs.

d. Unlock Health intentionally concealed its use of tracking technologies from the public, suggesting Unlock Health knew what it was doing was illegal.

e. Unlock Health accessed, obtained, and disclosed Plaintiffs' and Class Members' Protected Health Information for the purpose of committing the crimes and torts described in detail in this complaint.

330. Unlock Health further violated 42 U.S.C. § 1320d-6 by intentionally disclosing Plaintiffs' and Class Members' Protected Health Information to Google for the purpose of obtaining "commercial advantage" over its rivals in the marketplace. Specifically, Unlock Health shared Plaintiffs' and Class Members' Protected Health Information with Google, Facebook, and other third parties in return for free advertising and marketing tools, along with aggregated patient data, that Unlock Health used to optimize its HRAs and marketing campaigns, so that Unlock Health could increase its profitability. By exploiting Plaintiffs' and Class Members' Protected Health Information in this manner, Unlock Health hoped to take market share away from its business rivals in the online healthcare services market.

331. Google, Facebook, and other third parties, in turn, used the Protected Health Information it received from Unlock Health to sell targeted advertising to other third parties. While that bargain may have enriched Google, Facebook, the other third parties, and Unlock Health, it came at the expense of Plaintiffs and Class Members.

332. When a patient fills out an Unlock Health HRA to exchange communications with his or her health care provider, a "TLS handshake" occurs that opens a line between the patient's communications device and Unlock Health's servers. The line remains open and communications continue to flow back and forth from the patient's communications device and Unlock Health's servers. The patient's communications with his or her healthcare provider flow through this open line. At the same time that the line is open and communications remain "in transit" between the patient's communications device and Unlock Health's servers, Unlock Health has also placed the


Case 3:26-cv-00289 Document 1-2 Filed 03/18/26 Page 148 of 191 PageID #: 165

content of the communication in temporary electronic storage and long-term storage, rendering a communication in transit, electronic storage, and storage all at the same time.

333. Unlock Health was not a party to the communications that it intercepted and disclosed. When Plaintiffs and Class Members filled out HRAs they were communicating with their healthcare providers—not with Unlock Health. Further, Plaintiffs and Class Members were communicating directly with their doctors without any knowledge that Unlock Health was secretly intercepting and recording and then disclosing them to Google, Facebook, and other third parties.

334. Unlock used the data that it intercepted from patients via Google Analytics to improve its own products and to market its services to new clients. Unlock also used the patient data it intercepted for the purpose of illegally bartering it to Google in return for access to "free" Google advertising and marketing benefits, including access to aggregated analytics data that Google sent back to Unlock Health summarizing the activities of patients who filled out Unlock Health HRAs.

335. Unlock Health's conduct occurred through the use of "devices" within the meaning of the ECPA, 18 U.S.C. § 2510(5), including:

a. Cookies, including the Google cookies disguised as Unlock Health's cookies;

b. Healthcare providers' web servers;

c. Google's web servers;

d. The Unlock Health Mobile Application;

e. Unlock Health's web servers; and

f. The Google source code described herein.

336. The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

337. Neither Unlock Health nor Google were parties to Plaintiffs' and Class Members' communications with their healthcare providers.

338. But even if Unlock Health was a party to the communications, Unlock Health is still liable under the ECPA because it acted with the purpose of committing criminal and tortious acts in violation of federal and state laws, including but not limited to:

a. A criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health data; and

b. A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offense punishable by fine or imprisonment with increased penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain."

c. A knowing breach of Unlock Health's common law and fiduciary duties to Plaintiffs and Class Members.

339. Unlock Health violated 42 U.S.C. § 1320d-6 by intentionally disclosing Plaintiffs' and Class Members' Protected Health Information to Google for the purpose of obtaining "commercial advantage" over its rivals in the marketplace. Specifically, Unlock Health shared Plaintiffs' and Class Members' Protected Health Information with Google and other third parties in return for free advertising and marketing tools, along with aggregated patient data, that Unlock Health used to optimize its HRAs and marketing campaigns, so that Unlock Health could increase its profitability. By exploiting Plaintiffs' and Class Members' Protected Health Information in


Case 3:26-cv-00289 Document 51-2 Filed 03/11/26 Page 150 of 191 PageID #: 1607

this manner, Unlock Health hoped to take market share away from its business rivals in the online healthcare services market.

340. While it is not necessary for purposes of establishing liability under the statute, a jury could easily conclude from the facts alleged that Unlock Health had knowingly and intentionally intended to violate HIPAA when it deployed surreptitious Tracking Technologies on its HRA forms.

341. For example, Unlock Health was specifically warned by the Department of Health and Human Services that "disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures." But, despite this warning, Unlock Health never sought written authorization from its patients to share their data with Facebook and Google and did not discontinue its illegal practices even after being warned by HHS to do so.

342. Likewise, Google has long warned web developers and health-related companies like Unlock Health that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should never be used by advertisers to target ads to users or promote advertisers' products or services. But despite these warnings, Unlock Health nevertheless placed Google Analytics on every page of its HRAs.

343. What is more, Unlock Health intentionally concealed its use of Tracking Technologies from the public, which a reasonable juror could conclude was evidence that Unlock Health knew what it was doing was illegal.

344. So too, on information and belief, Unlock Health's own internal, written policies acknowledge that it would be illegal for Unlock Health to use or disclosure protected health

information for marketing purposes without patients' written permission. Yet, contrary to these polices, Unlock Health secretly deployed Tracking Technologies that routinely shared Protected Health Information with Facebook and Google when patients filled out health risk assessment forms.

345. Worse, not only was Unlock Health aware that HIPAA expressly forbids sharing patients' Protected Health Information with third parties at the time that it deployed the Google Analytics and Facebook Meta Pixel technologies on its HRAs, but Unlock Health also knew—at the time it deployed those technologies—that embedding Google Analytics and the Facebook Meta Pixel on its HRAs would result in vast quantities of patients' health data being shared with Facebook and Google because that is what those technologies are specifically designed to do.

346. Given the above facts, a jury could therefore reasonably conclude that Unlock Health intercepted Plaintiffs' and Class Members' communications for the purpose of committing the criminal and tortious acts described in this complaint, including the violation of 42 U.S.C. § 1320d-6, the violation of California's CIPA and CMIA statutes, invasion of privacy, breach of fiduciary duty, and fraud.

347. Unlock Health intercepted Plaintiffs' and Class Members' communications so it could share those communications with Google, Facebook, and other third parties in return for advertising and marketing benefits. This intended and intentional disclosure violated both federal and state laws as set out above. Unlock Health would not have been able to obtain these advertising or marketing services if it had complied with those laws. Moreover, Unlock Health knew that its conduct was illegal under HIPAA. Unlock Health's own internal (*i.e.*, non-public) policies expressly recognized and acknowledged that it violates HIPAA to disclose patient health information to third parties in conjunction with identifiers such as IP addresses, URLs, medical

record numbers, and other identifiers. Despite these internal policies, Unlock Health nevertheless shared such information with Google and Facebook via analytics technologies for the purpose of surreptitiously violating HIPAA without patients' knowledge or consent.

348. Unlock Health acted without Plaintiffs' or Class Members' consent.

349. Unlock Health was not an authorized party to the communications between patients and their doctors because patients believed they were communicating directly with their healthcare providers when they filled out HRAs. Nor did patients have any idea that Unlock Health was routinely sharing the PHI with Google and other third parties.

350. Unlock Health acted without the consent of Plaintiffs' or Class Members' healthcare providers.

351. Although Plaintiffs and Class Members consented to Unlock Health acquiring their Protected Health Information for purposes of facilitating their medical care, Plaintiffs and Class Members did not consent to Unlock Health acquiring their Protected Health Information for purposes of re-directing it to Google, Facebook, and other third parties, or for purposes of exploiting it for marketing purposes.

352. As such, Defendant cannot viably claim any exception to ECPA liability.

353. As a direct and proximate result of Unlock Health's violation of the ECPA, Plaintiffs and Class Members were damaged by Unlock Health's conduct:

a. Unlock Health harmed Plaintiffs' and Class Members' interest in privacy;

b. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is private no longer;

c. Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their PHI from data broker rolls;

d. Unlock Health eroded the essential confidential nature of the provider-patient relationship;

e. Unlock Health took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit;

f. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included their healthcare providers' duty to maintain confidentiality; and

g. Unlock Health's actions diminished the value of Plaintiffs and Class Members' Protected Health Information.

354. In violating the ECPA, Unlock Health's conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiff, and a recklessly negligent or callous indifference to Plaintiffs' and Class Members' protected rights under both state and federal law. Indeed, Unlock Health not only intentionally harmed Plaintiffs and Class Members without just cause but also acted with a deliberate and flagrant disregard for their safety and privacy. Specifically:

a. Unlock Health knew it had a duty to safeguard and keep confidential Plaintiffs' and Class Members' Protected Health Information under HIPAA;

b. Unlock Health knew that Plaintiffs and Class Members reasonably expected their communications with their healthcare providers to remain private;

c. Unlock Health knew that Plaintiffs' and Class Members' communications involved private and sensitive matters concerning Plaintiffs' and Class Members' healthcare;

d. Unlock Health knew it was prohibited by law from intercepting and disclosing Plaintiffs' and Class Members' communications;

e. Unlock Health knew that it is was obligated to sign a Business Associate Agreement ("BAA") with any third-party vendor with whom it shared patient information. Unlock Health knew that Google would not sign Business Associate Agreements with healthcare providers and their vendors like Unlock Health and knew that no such BAA had ever been signed with Google for use of Google Analytics on its websites and HRAs. Defendant nevertheless began sharing patient data with Google without a BAA, despite knowing that sharing such data was a criminal violation of HIPAA;

f. Unlock Health knew that Google, Facebook, and other third parties used the patient data that they were receiving for marketing purposes;

g. Unlock Health knew that its use of the tracking technology at issue violated its duties under HIPAA, among other things as set forth in the December 2022 HHS Bulletin;

h. Unlock Health nonetheless knowingly and deliberately intercepted and disclosed to third-party advertisers Plaintiffs' and Class Members' Protected Health Information without Plaintiff's or Class Members' consent, in a knowing violation of HIPAA and the ECPA;

i. Worse, Unlock Health intentionally concealed the fact that there were Google tracking and advertising technologies on its websites and HRAs from the public;

j. Unlock Health also concealed that it routinely shared patients' names, the names of their treating physicians, the names of the HRAs that patients filled out, and the HRA "scores" with Google;

k. Unlock Health carried out its unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' and Class Members' private Protected Health Information at Plaintiffs' and Class Members' expense and for Unlock Health's own financial gain; and

l. Unlock Health's conduct was particularly egregious and reprehensible because it acquired Plaintiffs' and Class Members' Protected Health Information under the guise of offering healthcare services to Plaintiffs and Class Members.

355. While not an element of Plaintiffs' and Class Members' wiretap claim, based on the facts specifically identified the above paragraph, as well as the factual allegations contained elsewhere in this Complaint, a jury could reasonably conclude that Unlock Health intentionally

and purposefully set out to violate HIPAA when it decided to deploy surreptitious tracking technologies on its website, patient portals, and mobile applications.

356. The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

357. The harm being suffered by Plaintiffs and Class Members is ongoing because—as of the time of the filing of this complaint—Unlock Health continues to encourage and facilitate the illegal wiretapping of patients by its clients via the tracking technologies described in this complaint.

358. Plaintiffs, individually, on behalf of the Class Members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code §§ 630, *et seq*.**
**(On behalf of Plaintiff John Doe and the California Class Members)**

359. Plaintiffs re-allege and incorporate all preceding paragraphs.

360. Plaintiffs bring this claim on behalf of themselves and the California Class Members.

361. The California Legislature enacted the California Invasion of Privacy Act, CAL. PENAL CODE §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630.



Case 3:26-cv-00289 Document 51-2 Filed 03/11/26 Page 156 of 191 PageID #: 1613

362. The intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

363. California Penal Code § 631(a) generally prohibits individuals, businesses, and other legal entities from "aid[ing], agree[ing] with, employ[ing], or conspir[ing] with" a third party to read, attempt to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or to use, or attempt to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

364. More specifically, Section 631 of the California Penal Code makes punishable anyone who, "by means of any machine, instrument, or contrivance, or in any other manner," does any of four things:

(1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system";

(2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state";

(3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained"; or

(4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

365. As the allegations above demonstrate, Unlock Health violated all four sections of California Penal Code § 631 by (a) intentionally deploying surreptitious tracking technologies on its online HRA forms; (b) willfully learning the contents and meaning of patients' communications in "real time" as those communications were being sent from and received at locations within California, including from Plaintiff John Doe's home in Temecula, California; (c) using the communications it intercepted to sell advertising, trade and/or sell them to Google in return for Google Analytics and marketing technologies; and use those communications to improve its own products; and (d) aid its healthcare clients with deploying their own surreptitious tracking technologies on Unlock Health's HRAs, despite multiple warnings from Google and the Department of Health and Human Services that such conduct facially violated HIPAA.

366. California Penal Code § 637.2 provides a civil cause of action for damages or an injunction to anyone "injured by a violation of this chapter…against the person who committed the violation."

367. Likewise, California Penal Code § 632(a) generally prohibits individuals, businesses, and other legal entities from recording confidential communications without consent of all parties to the communications.

368. All alleged communications between Plaintiffs or Class Members and Unlock Health qualify as protected communications under CIPA because each communication is made using personal computing devices (*e.g.*, computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

369. Unlock Health used a recording device to record the confidential communications without the consent of Plaintiffs or Class members and then transmitted such information to others, such as Facebook and Google.

370. At all relevant times, Unlock Health's aiding Facebook and Google to learn the contents of communications and Unlock Health's recording of confidential communications was without authorization and consent.

371. Plaintiffs and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with their healthcare providers via the HRAs provided by Unlock Health. Unlock and its clients did not tell any patient, for example, that filling out the Unlock Health HRAs would result in patients' health risk "scores" being shared with Google and Facebook.

372. Nor did Unlock Health ever receive express written consent from any patient to share their PHI with Facebook and Google for marketing purposes.

373. Nor could Unlock Health have received consent from Plaintiffs and Class Members because Unlock Health never sought to, or did, obtain Plaintiffs' and Class Members' consent to transmit their Protected Health Information to Facebook, Google, and other third parties.

374. Unlock Health engaged in and continues to engage in interception by aiding others (including Facebook and Google) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

375. The intercepting devices used in this case include, but are not limited to:

(a) Plaintiffs and Class Members' personal computing devices;

(b) Plaintiffs and Class Members' web browsers;

(c) Plaintiffs and Class Members' browser-managed files;

(d) Facebook's Meta Pixel;

(e) The Google Analytics Pixel;

(f) Google Firebase Code;

(g) Internet cookies;

(h) Unlock Health's computer servers;

(i) Third-party source code utilized by Unlock Health; and

(j) Computer servers of third parties (including Facebook and Google) to which Plaintiffs and Class Members' communications were disclosed.

376. Unlock Health aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Unlock Health that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

377. Unlock Health aided in the interception of "contents" in at least the following forms:

(a) The parties to the communications;

(b) The names of patients' healthcare providers;

(c) The names of the specific medical conditions that Plaintiffs and Class Members sought information regarding;

(d) The health risk assessment "scores" that patients received;

(e) The specific pages that Plaintiffs and Class Members requested to view inside the HRAs;

(f) Plaintiffs' and Class Members' progress through each page of the HRAs;

(g) Personally identifying information such as patients' names, email addresses, IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

(h) The precise text of patient communications about specific medical conditions;

(i) The precise text of patient communications about specific treatments;

(j) The precise text of specific buttons on HRA forms that patients clicked to exchange communications;

(k) The precise dates and times when patients clicked to access HRA forms;

(l) Information that is a general summary or informs third parties of the general subject of communications that Defendant send back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, and other information; and

(m) Any other content that Defendant has aided third parties in scraping from webpages or communication forms at its websites.

378. Plaintiffs and Class Members reasonably expected that their Protected Health Information was not being intercepted, recorded, and disclosed to third parties like Facebook and Google.

379. No legitimate purpose was served by Unlock Health's willful and intentional disclosure of Plaintiffs' and Class Members' Protected Health Information to Facebook, Google, and other third parties. Neither Plaintiffs nor Class Members consented to the disclosure of their Protected Health Information by Unlock Health to Facebook, Google, and other third parties. Nor could they have consented, given that Unlock Health never sought Plaintiffs' or Class Members' consent, or even told visitors to its website that their every interaction was being recorded and transmitted to third parties via tracking technologies.

380. Unlock Health gave substantial assistance to both its clients, Facebook, and Google in violating the privacy rights of Plaintiffs and Class Members, despite the fact that Unlock Health's conduct constituted a breach of the duties of confidentiality that medical providers and their business associates owe patients. Unlock Health knew that the installation of tracking technologies on its HRA forms would result in the unauthorized disclosure of its patients'

communications to Facebook, Google, and other third parties. Indeed, the only purpose of deploying such tracking technologies was to share patient data with Facebook and Google. Yet nevertheless did so anyway.

381. Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Protected Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

382. Plaintiffs and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

383. In addition to statutory damages, Unlock Health's breach caused Plaintiffs and Class Members, at minimum, the following damages:

(a) Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

(b) Defendant eroded the essential confidential nature of the doctor-patient relationship;

(c) Plaintiff and Class Members cannot remediate the privacy harms they have suffered without expending many hours and spending hundreds of dollars a year to pay for third-party services to scrub their Protected Health Information from data broker rolls;

(d) Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(e) Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

(f) Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

384. Plaintiffs and Class Members have also suffered irreparable injury from Unlock Health's unauthorized acts of disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Unlock Health, Facebook, Google, and other third parties without their consent and has not been destroyed. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiffs continue to desire to use Unlock Health's HRAs to communicate with their healthcare providers and book appointments. Plaintiffs will continue to suffer harm if the HRAs are not redesigned. If the HRAs were redesigned to comply with applicable laws, Plaintiffs would use the HRAs in the future. Due to the continuing threat of injury, Plaintiffs and Class Members have no adequate remedy at law, and Plaintiffs and Class Members are therefore entitled to injunctive relief.

385. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Violation of California Confidentiality of Medical Information Act ("CMIA")**
**Civil Code Section 56.06**
**(On behalf of Plaintiff John Doe the California Class Members)**

386. Plaintiffs re-allege and incorporate all preceding paragraphs.

387. Plaintiffs bring this claim on behalf of themselves and all California Class Members.

388. Unlock Health is a provider of health care under CAL. CIVIL CODE. § 56.06, subdivision (a) and (b), because it maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing their users to manage their information or for the diagnosis, treatment, or management of a medical condition.

389. Unlock Health is a business that is organized for the purpose of providing diagnosis and treatment information to individual patients and is therefore "deemed a provider of healthcare subject to the requirements" of the CMIA.

390. Unlock Health is therefore subject to the requirements of the CMIA and obligated under subdivision (d) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information disclosed to it.

391. Information such as a patients' health risk assessment "score" for their current heart health is a textbook example of "medical information." When Unlock Health shared Plaintiff John Doe's health risk assessment "score" with Google, it therefore violated Civil Code section 56.06 because it did not maintain the confidentiality of his medical information.

392. Instead, Unlock Health disclosed Plaintiffs' and Class Members' medical information to Facebook, Google, and other third parties without consent. This information was intentionally shared with these third parties, whose business is to sell advertisements based on the data that they collect about individuals, including the data Plaintiffs and the Class Members shared with Unlock Health.

393. It is undisputed that Google accessed, read, and analyzed the Protected Health Information that Unlock Health shared with Google. Google regularly sent Unlock Health reports summarizing the patient health data that *Google* had analyzed. Those reports were available to Unlock Health via Unlock Health's Google Analytics account, and Unlock Health's marketing team regularly accessed those reports, including aggregated data reports prepared by Google, for their own business purposes.

394. Unlock Health knowingly and willfully, or negligently, disclosed medical information without consent to Facebook, Google, and other third parties for financial gain.

Unlock Health's acts were knowing and willful as Unlock Health was aware that these third parties would collect data while patients were using its Web Properties and Mobile Applications, yet intentionally embedded tracking technologies anyway. Unlock Health's decision to affirmatively share and communicate its patients' Protected Health Information with Facebook, Google, and other third parties resulted in one or more unauthorized persons improperly accessing and reviewing Plaintiffs and the Class Members' Protected Health Information.

395. Unlock Health knowingly and willfully, or negligently, disclosed medical information without consent to Facebook, Google, and other third parties for financial gain. Unlock Health's conduct was knowing and willful as it was aware that Facebook, Google, and other third parties would collect data while patients were using its Web Properties and Mobile Application, yet intentionally embedded tracking technologies anyway.

396. Accordingly, Plaintiffs and Class Members are entitled to: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); and (4) reasonable attorney's fees and other litigation costs reasonably incurred.

397. In addition to statutory damages, Unlock Health's breach caused Plaintiffs and Class Members, at minimum, the following damages:

(a) Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

(b) Defendant eroded the essential confidential nature of the doctor-patient relationship;

(c) Plaintiff and Class Members cannot remediate the privacy harms they have suffered without expending many hours and spending hundreds of dollars a year to pay for third-party services to scrub their Protected Health Information from data broker rolls;

(d) Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(e) Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

(f) Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

398. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT IV**
**Violation of CMIA Civil Code § 56.101**
**(On behalf of Plaintiff John Doe and the California Class Members)**

399. Plaintiffs re-allege and incorporate all preceding paragraphs.

400. Plaintiffs bring this claim on behalf of themselves and all Class Members.

401. Civil Code § 56.101, subdivision (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

402. Any health care provider who "negligently creates, maintains, preservers, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36."

403. Unlock Health failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed to Facebook, Google, and other third parties Plaintiffs' and Class Members' sensitive medical information without consent, including information concerning their health status, medical diagnoses, treatment, and appointment information, as well as personally identifiable information.

404. Unlock Health's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at the least, negligent and violates Civil Code § 56.36 subdivisions (b) and (c).


Case 3:26-cv-00289 Document 1-2 Filed 03/11/26 Page 123 of 148 PageID #: 162
Case 3:26-cv-00289 Document 50-2 Filed 03/18/26 Page 166 of 191 PageID #: 1823

405. Accordingly, Plaintiffs and Class Members may recover: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); and (4) reasonable attorney's fees and other litigation costs reasonably incurred.

406. In addition to statutory damages, Unlock Health's breach caused Plaintiffs and Class Members, at minimum, the following damages:

(a) Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

(b) Defendant eroded the essential confidential nature of the doctor-patient relationship;

(c) Plaintiff and Class Members cannot remediate the privacy harms they have suffered without expending many hours and spending hundreds of dollars a year to pay for third-party services to scrub their Protected Health Information from data broker rolls;

(d) Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(e) Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

(f) Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

407. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT V**
**Violation of CMIA Civil Code § 56.10**
**(On behalf of Plaintiff John Doe and the California Class Members)**

408. Plaintiffs re-allege and incorporate all preceding paragraphs.

409. Plaintiffs bring this claim on behalf of themselves and all California Class Members.

410. Civil Code § 56.10, subdivision (a), prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

411. Unlock Health disclosed medical information without first obtaining authorization when it disclosed Plaintiffs' and Class Members' sensitive medical information to Facebook, Google, and other third parties without consent, including information concerning their health status, medical diagnoses, treatment, and appointment information, as well as personally identifiable information. No statutory exception applies. As a result, Unlock Health violated Civil Code § 56.10, subdivision (a).

412. Unlock Health knowingly and willfully, or negligently, disclosed medical information without consent to Facebook, Google, and other third parties for financial gain.

413. Accordingly, Plaintiffs and Class Members may recover: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); (4) punitive damages pursuant to 56.35; and (5) reasonable attorney's fees and other litigation costs reasonably incurred.

414. In addition to statutory damages, Unlock Health's breach caused Plaintiffs and Class Members, at minimum, the following damages:

(a) Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

(b) Defendant eroded the essential confidential nature of the doctor-patient relationship;

(c) Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(d) Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

(e) Defendant's actions diminished the value of Plaintiffs and Class Members' personal information; and

(f) Plaintiffs and Class Members can only regain their privacy by spending hundreds of dollars a year on services such as Delete Me to remove their PHI from data broker rolls.

415. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT VI**
**Invasion of Privacy and Violation of the California Constitution, Art. 1, § 1**
**(On behalf of Plaintiff John Doe and the California Class Members)**

416. Plaintiffs re-allege and incorporate all preceding paragraphs.

417. Plaintiffs bring this claim on behalf of themselves and the California Class Members.

418. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

419. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

420. The right to privacy in California's constitution creates a right of action against private and government entities.

421. Plaintiffs and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and user data pursuant to Article I, Section I of the California Constitution.

422. Plaintiffs and Class Members had a reasonable expectation of privacy under the circumstances, including that: (i) the data collected, used, and disclosed by Unlock Health included personal, sensitive medical information, decisions, and medical diagnoses; and (ii) Plaintiffs and Class Members did not consent or otherwise authorize Unlock Health to disclose this information to others or to collect and use this private information for their own monetary gain.

423. Given the nature of the Protected Health Information that Unlock Health disclosed to Facebook, Google, and other third parties, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (*e.g.*, "weight loss"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

424. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs' and Class Members' rights to privacy.

425. Plaintiffs and Class Members did not consent to, authorize, or know about Unlock Health's disclosure of their Protected Health Information to Facebook, Google, and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook, Google, and other third parties.

426. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiffs continue to desire to search for health information on Unlock Health's HRAs. They will continue to suffer harm if the HRAs are not


Case 3:26-cv-00289 Document 51-2 Filed 03/11/26 Page 170 of 191 PageID #: 1627

redesigned. If the HRAs were redesigned to comply with applicable laws, Plaintiffs would use them to search for health information in the future.

427. Plaintiffs and Class Members therefore seek injunctive relief to prevent Unlock Health from continuing to collect, use, and sell Protected Health Information without consent.

428. Plaintiffs and Class Members have been damaged as a direct and proximate result of Unlock Health's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

429. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Unlock Health as a result of their intrusions on Plaintiffs and Class Members' privacy.

430. Unlock Health's breach caused Plaintiffs and Class Members, at minimum, the following damages:

(a) Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

(b) Defendant eroded the essential confidential nature of the doctor-patient relationship;

(c) Plaintiff and Class Members cannot remediate the privacy harms they have suffered without expending many hours and spending hundreds of dollars a year to pay for third-party services to scrub their Protected Health Information from data broker rolls;

(d) Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(e) Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;


Case 3:26-cv-00289 Document 51-2 Filed 03/11/26 Page 128 of 148 PageID #: 1228

(f) Defendant's actions diminished the value of Plaintiffs and Class Members' personal information; and

(g) Plaintiffs and Class Members will be required to spend hundreds of dollars a year on services such as Delete Me to regain their privacy by removing their PHI from data broker rolls.

431. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Unlock Health's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Unlock Health from engaging in such conduct in the future.

432. Plaintiffs and Class Members seek attorney's fees in accordance with CAL. CIV. PROC. CODE § 1021.5.

433. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT VII**
**Violations of Cal. Civil Code §§ 1709 & 1710**
**(On behalf of Plaintiff John Doe and the California Class Members)**

434. Plaintiffs re-allege and incorporate all preceding paragraphs.

435. Plaintiffs bring this claim on behalf of themselves and the California Class Members.

436. California Civil Code § 1709 provides that "[o]ne who willfully deceives another with intend to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

437. California Civil Code § 1710 defines "deceit" as (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts

which are likely to mislead for want of communication of that fact; or (4) a promise, made without any intention of performing it.

438. Nothing on the online HRAs provided by Unlock Health informed patients that Unlock Health would share the results of their HRAs, their names, and their email addresses with Google for marketing purposes. Plaintiffs and Class Members reasonably believed that their communications with their treating physicians via HRAs would be kept confidential.

439. Unlock Health's conduct in declining to inform patients that filling a Unlock Health HRA form would result in their communications and health risk scores being shared with Google is a text example of a fraudulent omission under California law, sufficient to satisfy the standard set forth in California Civil Code § 1710.

440. Had Plaintiffs and Class Members known that Unlock Health would share their PHI with Google they would not have filled out the online HRAs.

441. Throughout the class period, Unlock Health engaged in deceit by intentionally concealing and failing to disclose the true nature of its HRAs and conduct to patients and prospective patients. Unlock Health was under both common law, state law, and federal law duties to disclose to patients (and obtain their express written authorization) before disclosing their PHI to third parties for marketing purposes.

442. Unlock Health owed a duty to Plaintiffs and Class Members to provide them material information about its acquisition and use of the Protected Health Information that Unlock Health invited them to share through its HRAs. Unlock Health's omissions and nondisclosures described herein were likely to deceive reasonable consumers and have deceived Plaintiffs and Class Members.

443. Unlock Health's omissions and nondisclosures were pervasive. Plaintiffs and Class Members reasonably relied on the material omissions and nondisclosures by Unlock Health.

444. Unlock Health's misconduct alleged herein was intentional, deliberate, and willful, and was perpetrated with the intent to, inter alia, cause Plaintiffs and Class Members unknowingly to divulge Protected Health Information of Plaintiffs and California Class members with the intent to induce them to alter their position to their injury or risk under CAL. CIV. CODE § 1709.

445. Plaintiffs seek recovery of their and the Class Members' resulting damages, including economic damages, restitution, and disgorgement, as well as punitive damages.

**COUNT VIII**
**Violation of the CIPA, Cal. Penal Code § 638.51**
**(On behalf of Plaintiff John Doe and the California Class Members)**

446. Plaintiffs re-allege and incorporate all preceding paragraphs.

447. Plaintiffs bring this claim on behalf of themselves and the California Class Members.

448. Plaintiffs assert this claim in the alternative to their claim under Cal. Penal Code § 631.

449. Unlock Health installed and used pen registers and/or trap and trace devices on its websites, patient portals, and mobile applications without a court order in violation of Cal. Penal Code § 638.51. Specifically, Unlock Health deployed the Facebook Meta Pixel and Google Analytics on its HRA forms, which recorded and captured Plaintiffs' and Class Members IP addresses, first and third-party cookie data, and device and browser configuration, including geo-location information, when Plaintiffs and Class Members used Unlock Health's HRAs.

450. The software code on the Google Analytics pixel that Unlock Health deployed contains a small library of functions, with an array of programable capabilities, which allow companies like Defendants to do a variety of things. For example, one function of the Google

Analytics Pixel is designed to capture data such as HTTP Headers and IP addresses, while a different function of the Google Analytics' Pixel is designed to capture button clicks and other patient communications with websites. These various functionalities perform independently of each other within the Google Analytics Pixel, operating as separate devices, which allow companies like Defendants to capture and share vast amounts of data about patients' activities and communications on its website, including such data as patients' communications, their geolocations, and their dialing, routing, addressing, and signaling information.

451. The trackers that Unlock Health deployed are a "device" or "process" as defined by CIPA. The role of these surreptitious trackers in collecting and transmitting IP addresses and other "addressing" information go well beyond the routine receipt of an IP address for loading a website, because the Google and Facebook trackers actually intercept, record, and transmit the IP addresses for purposes beyond their basic use related to a simple internet function. Instead, the IP addresses and other addressing data are shared with Facebook and Google so that that those companies can identify individual patients, link their PHI to user accounts, and commercially exploit their PHI by selling targeted advertising.

452. The further transmission of Plaintiffs' and Class Members' IP addresses and other addressing information to third parties without their knowledge or consent (or a court order as required by § 683.51) constitutes an independent violation of CIPA.

453. Plaintiffs and Class Members did not consent to Unlock Health's deployment or use of pen registers, including the Facebook Meta Pixel, Google Analytics, and Google Firebase Code on Unlock Health's HRAs.

**COUNT IX**
**Unjust Enrichment**
**(On Behalf of Plaintiff John Doe and the California Class Members)**

454. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

455. Plaintiffs bring this claim on behalf of themselves and all members of the California Class.

456. Unlock Health wrongfully and unlawfully used and/or sold Plaintiffs' and Class Members' PHI without their consent and has benefited financially from doing so.

457. California law recognizes that individuals like Plaintiffs and Class Members have a right to disgorgement, even if an individual has suffered *no* corresponding economic loss. *Gabrielli v. Haleon US Inc*., No. 25-CV-02555-WHO, 2025 WL 2494368, at *14 (N.D. Cal. Aug. 29, 2025) (citing *Cty. of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542, 69 Cal.Rptr.3d 848 (2007) (noting that where "a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss, or in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust ... [t]he defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched" (quoting Rest., Restitution, § 1, com. e))

458. Here, Plaintiffs and Class Members conferred a benefit on Unlock Health in the form of valuable sensitive medical information that Unlock Health collected from Plaintiffs and Class Members under the guise of keeping this information private, and Unlock Health appreciated this benefit. Unlock Health exploited Plaintiffs and Class Members' PHI by bartering it to Google in return for advertising and marketing benefits, including "free" access to Google's Analytics and Advertising technologies.

459. Unlock Health gained access to the Protected Health Information provided by Plaintiffs and Class Members by (1) knowingly concealing its use of pixel tracking technologies

from the public; (2) failing to provide industry standard privacy safeguards for its patients' Protected Health Information; (3) intentionally disregarding years of warnings from the United States Department of Health and Human Services that it was obligated to protect its patients' Protected Health Information from unauthorized disclosures to third parties; and (4) intentionally violating California law.

460. Unlock Health benefited from the use of Plaintiffs' and Class Members' private communications and Protected Health Information and unjustly retained those benefits at their expense.

461. Unlock Health collected, used, and disclosed this information for its own gain, including (1) to optimize its websites and HRA forms and (2) to sell and/or trade patients' PHI for valuable services from third parties. Specifically, Unlock Health bartered Plaintiffs' and Class Members' Protected Health Information to Google and other third parties in return for both advertising benefits and "free" website analytics information. What is more, by sharing patients' Protected Health Information with Google, Unlock Health gained the ability to utilize Google's customized audiences and targeted advertising features, which saved Unlock Health substantial revenues by making advertising far less expensive than it would have been otherwise. Unlock Health also gained access to free website analytics data, which it otherwise would have had to spend substantial amounts of money to provide for itself.

462. Plaintiffs and Class Members would not have used Unlock Health's services if they had known that Unlock Health would collect, use, and disclose this information to third parties like Google.

463. Unlock Health exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Unlock Health with economic, intangible, and other benefits, including substantial monetary compensation.

464. Google is not a charity. Google was willing to provide Unlock Health with "free" analytics benefits only because the patient health data that Unlock Health surreptitiously shared with those companies has an economic value many times in excess of the analytics services that Google and Google provided Unlock Health.

465. Unlock Health's decision to intentionally mislead Plaintiffs and Class Members about its use of pixel tracking technologies for its own financial benefit is a textbook example of an "unjust" enrichment.

466. Unlock Health unjustly retained those benefits at the expense of Plaintiffs and Class Members because Unlock Health's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

467. Plaintiffs were aware of the economic value of their Protected Health Information and reasonably expected to be compensated by any party who shared or accessed their Protected Health Information to sell advertising. Plaintiffs and Class Members did not consent to Unlock Health giving their health information away for free.

468. By engaging in the acts and failures to act described in this Complaint, Unlock Health have been knowingly enriched by the savings in costs that should have been reasonably expended to protect the PII and PHI of the Plaintiffs and the Class. Unlock Health was on notice that patients' Protected Health Information was protected by law; that patients' Protected Health Information had substantial monetary value; that cyber criminals and advertising companies were highly desirous of obtaining access to its patients' Protected Health Information, yet failed to take

reasonable steps to pay for the level of data security and privacy training that would have presented the unauthorized disclosure of patients' Protected Health Information to Google and other third parties.

469. The benefits that Unlock Health derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Unlock Health to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

470. Unlock Health should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Unlock Health received, and such other relief as the Court may deem just and proper.

**COUNT X**
**Violation of the Federal Wiretap Act, 18 U.S.C. § 2512**
**(On Behalf of Plaintiffs and the Nationwide Class)**

471. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

472. Plaintiffs bring this claim on behalf of themselves and all members of the Nationwide Class.

473. 18 U.S.C. § 2512, in pertinent part, makes liable "any person" who intentionally sends through the mail, or sends or carries in interstate or foreign commerce, any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications." 18 U.S.C. § 2512(1)(a).

474. The statute likewise makes liable "any person" who intentionally manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the

surreptitious interception of wire, oral, or electronic communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce." 18 U.S.C. § 2512(1)(b).

475. The technology at issue in this case is an "electronic, mechanical, or other device" as defined by 18 U.S.C. § 2510(5) and is primarily useful for the purpose of the surreptitious interception of electronic communications.

476. Defendant manufactured, marketed, and sold access to its technology with knowledge that it would be primarily used to illegally intercept electronic communications.

477. Defendant not only manufactured, marketed, and sold access to a technology designed to surreptitiously intercept patients' electronic communications but it also actively encouraged its clients to use the technology for the purpose of intercepting patients' electronic communications and sharing them with a host of internet marketing and advertising companies, including Facebook, Google, and Tik Tok. Indeed, Defendant's HRA technology is specifically designed to enable the surreptitious interception and disclosure of patients' Protected Health Information every time a patient fills out a HRA form on one of Defendants' hundreds of websites offering HRAs to the patients around the United States in conjunction with Defendant's healthcare clients.

478. Defendant's conduct violated 18 U.S.C. § 2512 and therefore gives rise to a claim under 18 U.S.C. § 2520.

479. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members are entitled to the greater of actual damages or statutory damages or not less than $100 a day for each day of violation or $10,000, whichever is greater.

**COUNT XI**
**Negligence**
**(On Behalf of Plaintiff John Doe and the California Class Members)**

480. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

481. Plaintiffs bring this claim on behalf of themselves and all members of the California Class.

482. Upon accepting, storing, and controlling the Protected Health Information of Plaintiffs and Class Members, Unlock Health owed a duty to Plaintiffs and Class Members to exercise reasonable care to secure, safeguard, and protect their highly sensitive Protected Health Information.

483. Unlock Health breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' Protected Health Information from unauthorized disclosure.

484. It was reasonably foreseeable that Unlock Health's failures to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' Protected Health Information through their tracking technologies would result in unauthorized third parties gaining access to such Protected Health Information for no lawful purpose.

485. Unlock Health's duty of care to use reasonable measures to secure and safeguard Plaintiffs' and Class Members' Protected Health Information arose due to the special relationship between Unlock Health and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

486. In addition, Unlock Health had a duty under state and federal privacy laws, which the state legislature and Congress enacted to protect the confidentiality of patients' healthcare

information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

487. Unlock Health's conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their Protected Health Information. Unlock Health's misconduct included the failure to (i) secure Plaintiffs and Class Members' Protected Health Information; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

488. Unlock Health's wrongful actions and/ or inactions and the resulting unauthorized disclosure of Plaintiffs' and Class Members' Protected Health Information constituted negligence at common law.

489. Accordingly, Plaintiffs, individually and on behalf all Class Members, seek compensatory damages (including damages to compensate for the injuries above), plus costs and attorneys' fees.

**COUNT XII—VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET. SEQ. (On Behalf of Plaintiff John Doe and the California Class Members)**

490. Plaintiffs re-allege and incorporate all preceding paragraphs.

491. Plaintiffs bring this claim on behalf of themselves and all members of the California Class.

492. Plaintiffs, Class Members, and Defendant are each a "person" under Cal. Bus. & Prof. Code § 17201.

493. California Business and Professions Code §§ 17201, *et seq.* prohibits acts of unfair competition, which includes unlawful business practices.


Case 3:26-cv-00289 Document 1-2 Filed 01/12/26 Page 139 of 148 PageID #: 139
Case 3:26-cv-00289 Document 50-1 Filed 03/18/26 Page 182 of 191 PageID #: 1639

494. Unlock Health's business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. Seq.* (the "UCL") because, as alleged above, Unlock Health violated California common law, the California Constitution, and other statutes and causes of action alleged herein.

495. Unlock Health engaged in unlawful acts and practices by deploying tracking technology on its websites, patient portal, and mobile application, which track, record, and transmit Plaintiffs' and Class Members' Personal Health Information they disclose to Unlock Health in confidence to third parties without Plaintiffs' and Class Members' knowledge and/or consent, in violation of 42 U.S.C. § 1320d-6; 18 U.S.C. § 2511(1) et seq.; the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, et seq.; the California Confidentiality of Medical Information Act ("CMIA"), and Cal. Civil Code §§ 56.06, 56.10, 56.101.

496. By offering health risk assessment forms to patients, Unlock Health and its clients impliedly promised to abide by the norms of the healthcare profession, including the Hippocratic Oath, AMA ethics opinions, and federal and state laws regulating the privacy of health information. Plaintiffs relied on these implied promises in deciding to purchase healthcare services from Unlock Health.

497. Inconsistent with its role as a healthcare provider, Unlock Health disclosed Plaintiffs' and Class Members' Personal Health Information to third parties without their consent and for marketing purposes.

498. Because Unlock Health breached its implied promise to abide by the norms of the healthcare profession, Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Unlock Health's duty to maintain confidentiality.

499. Plaintiffs and the Class Members would not have used the Unlock Health's services if they had known that Unlock Health would collect, use, and disclose this information to Facebook, Google, and other third parties. The services that Plaintiffs and Class Members ultimately received were worth quantifiably less than the services that Unlock Health promised to provide, which included Plaintiffs' reasonable expectation that any patient communications with Unlock Health would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

500. Plaintiffs and Class Members were reasonable to assume, and did assume, that Unlock Health would take appropriate measures to keep their Personal Health Information secure and not share it with third parties without their express consent. Unlock Health also had a duty to disclose that it was sharing patients' Personal Health Information with third parties. However, Unlock Health did not disclose at any time that it was sharing this Protected Health Information with third parties via the Tracking Technologies.

501. Had Plaintiffs and Class Members known that Unlock Health would intercept, collect, and transmit their Protected Health Information to Facebook and other third parties, Plaintiffs and Class Members would not have used Unlock Health's services.

502. Plaintiffs and Class Members have a property interest in their Protected Health Information. By surreptitiously collecting and otherwise misusing Plaintiffs' and Class Members' Protected Health Information, Unlock Health has taken property from Plaintiffs and Class Members without providing just (or indeed *any*) compensation.

503. By deceptively collecting, using, and sharing Plaintiffs' and Class Members' Protected Health Information with Facebook, Google, and other third parties, Unlock Health has

taken money or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Class.

504. Unlock Health's business acts and practices also meet the unfairness prong of California's Unfair Competition Law ("UCL") according to all three theories of unfairness.

505. First, Unlock Health's business acts and practices are "unfair" under the UCL pursuant to the three-part test articulated in *Camacho v. Automobile Club of Southern California* (2006) 142 Cal. App. 4th 1394, 1403: (a) Plaintiffs and Class Members suffered substantial injury due to Unlock Health's disclosure of their Protected Health Information; (b) Unlock Health's disclosure of Plaintiffs' and Class Members' Protected Health Information provides no benefit to consumers, let alone any countervailing benefit that could justify Unlock Health's disclosure of Protected Health Information without consent for marketing purposes or other pecuniary gain; and (c) Plaintiffs and Class Members could not have readily avoided this injury because they had no way of knowing that Unlock Health was implementing the tracking technologies. Thus, Plaintiffs and Class Members did not know to ask Unlock Health to stop the practice of disclosing their Protected Health Information and did not know that they should stop using Unlock Health's services to avoid disclosing their Protected Health Information.

506. Second, Unlock Health's business acts and practices are "unfair" under the UCL because they are "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to Plaintiffs and Class Members, and "the utility of [Unlock Health's] conduct," if any, does not "outweigh the gravity of the harm" to Plaintiffs and Class Members. *Drum v. San Fernando Valley Bar Ass'n*, (2010) 182 Cal. App. 4th 247, 257. Unlock Health secretly collected, disclosed, and otherwise misused Plaintiffs' and Class Members' Protected Health Information by bartering it to Facebook, Google, and other third parties in return for access to the Tracking Technologies. This

surreptitious, willful, and undisclosed conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious. Moreover, no benefit inheres in this conduct, the gravity of which is significant.

507. Third, Unlock Health's business acts and practices are "unfair" under the UCL because they run afoul of "specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal. App. 4th at 256 (internal quotation marks and citations omitted). California has a strong public policy of protecting consumers' privacy interests, including consumers' and patients' Protected Health Information and other confidential data. This public policy is codified in California's Constitution in Article I, section 1; the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq*.; and the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civil Code §§ 56.06, 56.10, 56.101, among other statutes. Unlock Health violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise exploiting Plaintiffs' and Class Members' Protected Health Information by sharing that information with Facebook, Google, and other third parties via the Tracking Technologies without Plaintiffs' and/or Class Members' consent.

508. Unlock Health's business acts and practices are also "unfair" under the UCL because they violate multiple federal laws, including 42 U.S.C. 1320d-6.

509. Had Plaintiffs and Class Members known Unlock Health would intercept, collect, and transmit their Protected Health Information to Facebook, Google, and other third parties, Plaintiffs and Class Members would not have used Unlock Health's services.

510. Plaintiffs and Class Members were reasonable to assume, and did assume, that Unlock Health would take appropriate measures to keep their Protected Health Information secure and not share it with third parties without their express consent. Unlock Health had a duty to

disclose the material information that Patient Plaintiffs' and Class Members' Protected Health Information would be shared with third parties via Tracking Technologies. Unlock Health did not disclose at any time that it was sharing this Protected Health Information with third parties via the Tracking Technologies.

511. Plaintiffs and Class Members have a property interest in their Protected Health Information. By surreptitiously collecting and otherwise misusing Plaintiffs' and Class Members' Protected Health Information, Unlock Health has taken property from Plaintiffs and Class Members without providing just (or indeed *any*) compensation.

512. Plaintiffs and Class Members have lost money and property due to Unlock Health's conduct in violation of the UCL. Protected Health Information such as the Protected Health Information Unlock Health collected and transmitted to third parties has objective monetary value. Companies are willing to pay for Protected Health Information, like the information Unlock Health unlawfully collected and transmitted to third parties, such as Facebook and Google. For example, Pfizer annually pays approximately $12 million to purchase health data from various sources.[81]

513. Consumers also value their Protected health data. According to the annual Financial Trust Index Survey conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent of survey participants would not share their health data with a digital platform for free. Half of the survey participants would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[82]

---

81 https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/

82 https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html

514. By deceptively collecting, using, and sharing Plaintiffs' and Class Members' Protected Health Information with Google and other third parties, Unlock Health has taken money or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Class.

515. Plaintiffs and the Class Members also face a real and immediate threat of future injury to the confidentiality of their Protected Health information both because such information remains within Unlock Health's control and because anytime that Plaintiffs and/or Class Members interact with its HRA forms, submit information about their medical conditions, search for doctors, or otherwise seek assistance with their medical conditions, Plaintiffs and Class Members risk further disclosure of their Protected Health Information. Plaintiffs also continue to use HRA and will continue to suffer harm if Unlock Health's websites are not redesigned. If the HRAs were redesigned to comply with applicable laws, Plaintiffs and Class Members would use them to search for health information in the future. Plaintiffs and Class Members are therefore also entitled to injunctive relief requiring Unlock Health to cease all website operations that allow for the third-party capture of Protected Health Information.

516. As a direct and proximate result of Unlock Health's unfair and unlawful methods and practices of competition, Plaintiffs and Class Members suffered actual damages, including, but not limited to, the loss of the value of their Private Health Information.

517. As a direct and proximate result of its unfair and unlawful business practices, Unlock Health has been unjustly enriched and should be required to make restitution to Plaintiffs and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Unlock Health because of its unlawful and unfair

business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

## DEMAND FOR JURY TRIAL

518. Plaintiffs hereby demand a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully request relief against Unlock Health as set forth below:

a. Certifying the Class and appointing Plaintiffs as the Class's representative;

b. Finding that Unlock Health's conduct as alleged herein was unlawful;

c. Awarding such injunctive and other equitable relief as the Court deems just and proper, including, but not limited to, enjoining Unlock Health from making any further disclosure of Plaintiffs and Class Members' communications to third parties without the Plaintiffs and Class Members' express, informed, and written consent; requiring Unlock Health to implement adequate procedures for ensuring the confidentiality of patients' Protected Health Information; mandating that Unlock Health hire third-party monitors for a period of at least three years to ensure that the these steps have been taken; and mandating that Unlock Health provide written verifications on a quarterly basis to the court and counsel for Plaintiffs and Class Members in the form of a declaration under oath that the above steps;

d. Awarding statutory damages of $5,000 per violation for Unlock Health's violation of the Electronic Communications Privacy Act;

e. Imposing a constructive trust against Defendants through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendants;

f. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

g. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

h. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

i. Awarding costs of suit; and

j. Such other and further relief to which Plaintiffs and Class Members may be entitled.

Dated: March 11, 2026

Respectfully submitted,


*<u>/s/ J. Gerard Stranch, IV</u>*
J. Gerard Stranch (TN BPR 02045)
Grayson Wells (TN BPR 039658)
Michael Tackeff (TN BPR 036953)
**STRANCH, JENNINGS, & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
gstranch@stranchlaw.com
gwells@stranchlaw.com
mtackeff@stranchlaw.com

Foster C. Johnson*
Joseph Ahmad*
Mark Holden*
**AHMAD, ZAVITSANOS, & MENSING, PLLC**
1221 McKinney Street, Suite 3460
Houston TX 77010
(713) 655-1101
fjohnson@azalaw.com
ahmad@azalaw.com
mholden@azalaw.com

Lynn A. Toops*
**COHEN & MALAD, LLP**

One Indiana Square, #1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenandmalad.com

***Pro hac vice forthcoming***

***Counsel for Plaintiffs and the Proposed Class***


Case 3:26-cv-00289 Document 1 Filed 03/11/26 Page 148 of 148 PageID #: 148