# **Exhibit A**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

---

JOHN DOE, JANE DOE, and JACK DOE, Individually and on behalf of all others similarly situated,

Plaintiffs,

v.

UNLOCK HEALTH, INC., MEDICOM DIGITAL, INC. d/b/a MEDICOM HEALTH INTERACTIVE and MEDICOM HEALTH,

Defendants.

Case No. 3:26-cv-00289

---

**DECLARATION OF ZUBAIR SHAFIQ IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF LAW REGARDING GOOGLE ANALYTICS DATA REQUESTS**

---

I, Zubair Shafiq, under penalty of perjury, hereby state as follows:

1. I am over the age of eighteen, of sound mind, and competent to testify to the matters stated herein.

2. I make this Declaration based on my own personal knowledge. If called as a witness, I could and would competently testify to the matters stated herein.

3. I am a Professor of Computer Science at the University of California-Davis, where my lab focuses on online privacy, security, and safety.

4. My lab's research aims to uncover personal data collection, sharing, and usage in the online advertising ecosystem.

5. In addition to my research, I regularly teach undergraduate and graduate courses on computer networks and computer security, including special topics courses covering emerging trends in online advertising and tracking.

6. I have received various awards and distinctions for my research. I am a recipient of the Caspar Bowden Award - Runner-up for Outstanding Research in Privacy Enhancing Technologies (2024), Chancellor's Fellowship (2022-2023), Dean's Scholar Award (2020), National Science Foundation CAREER Award (2018), and Fitch-Beach Outstanding Graduate Research Award (2013).

7. I have co-authored more than 100 peer-reviewed research papers. I received the Distinguished Artifact Award at the 2024 ACM Conference on Computer and Communication Security for my research on detecting advertising and tracking JavaScript. I also received the Best Paper Award at the 2023 ACM Internet Measurement Conference for my research on studying tracking, profiling, and ad targeting in the Amazon Alexa ecosystem. I also received the 2018 Andreas Pfitzmann Award at the Privacy Enhancing Technologies Symposium for my research on detecting advertising and tracking data flows in mobile apps. I also received the Best Paper Award at the 2017 ACM Internet Measurement Conference for my research on identifying and investigating the abuse of a security vulnerability in Facebook Graph API's implementation of third-party apps. I also received the Best Paper Award at the 2012 IEEE International Conference on Network Protocols for my research on reverse-engineering proprietary network protocols through network traffic analysis.

8. I was the editor-in-chief of the Proceedings on Privacy Enhancing Technologies (PoPETs 2024 and 2025). I am currently a member of the PoPETs advisory board. I am on the steering committee of the Workshop on Measurements, Attacks, and Defenses for the Web

(MADWeb). In the past, I have served as the general chair of the Workshop on Technology and Consumer Protection (ConPro 2024), and the program chair for the Workshop on Technology and Consumer Protection (ConPro 2022 and 2023) and the Workshop on Measurements, Attacks, and Defenses for the Web (MADWeb 2022 and 2023).

9. I am being compensated at the rate of $500 per hour for my time. Neither my compensation nor my analysis is contingent upon my findings, the testimony I may give, or the outcome of this case.

10. I have reviewed Plaintiffs' Complaint (ECF 1) and Plaintiffs' subpoena to Oschner Health and the attached exhibits (ECF 50-2). Based on my review of these documents, I understand that Plaintiffs are seeking documents and data collected by Oschner Health and similar third parties from Evalia Health, Medicom, or Unlock Health HRA forms and stored in the third parties' Google Analytics accounts. My opinions below are based on my reviewed of the documents and my experience working with Google Analytics data.

11. Plaintiffs' Third Request for Production (ECF 50-2 at 11) requests two types of information: (1) Google Analytics data maintained in Google BigQuery, and (2) Google Analytics reports. Both are routine ways to review the information that is collected by Google Analytics tracking technologies, including those described in Plaintiffs' complaint.

12. Any entity that deploys Google Analytics tracking technologies does so using a Google Analytics account.[1] The entity gains access to Google's tracking technologies when it signs up for the account. The entity can then deploy the tracking technologies on any website under its control where it wants to gather user data, then view the tracked data in its Google Analytics

---

[1] Historically, prior to the release of Google Analytics 4 (GA4), entities deployed these same tracking technologies using Google Universal Analytics (UA).

account. Indeed, this is the primary benefit of using Google Analytics—being able to access tracked user data for marketing insights and advertising.

13. Exhibit 1 to the Ochsner subpoena provides steps for exporting Google Analytics data from BigQuery, Google's database platform.[2] Any Google Analytics account can be configured to automatically export data to BigQuery. The steps instruct the subpoena recipient to first determine if their Google Analytics account is connected with BigQuery, and if it is, to run a query of the data stored in the database.

14. This querying process is the typical way that Google Analytics account holders access data from BigQuery. Retrieving data by this method does not require the user to develop new software, write a new application, or create a custom computer program. Instead, the user runs a query that selects the retrieved results by specifying various parameters.

15. The Exhibit 1 instructions provide the exact query to run in order to view the data that Plaintiffs are requesting. The query is written in SQL, the standard language used to retrieve records from a database.[3] It is simply an instruction that tells BigQuery which records and fields to retrieve from its database.

16. Exhibit 1 to the subpoena provides the SQL queries needed to retrieve the requested information, with certain fields left for the subpoena recipient to fill in. The fields left open are the website domain belonging to the subpoena recipient, the Google Cloud project name, and the BigQuery dataset name—each of which is unique to the Google Analytics account holder running the query. Each entity simply needs to substitute its unique names into the SQL query where

---

[2] https://cloud.google.com/bigquery

[3] "SQL is a standard language for accessing and manipulating databases." https://www.w3schools.com/sql/sql_intro.asp

indicated. Once the SQL query is entered, Google's BigQuery interface allows the user to execute it by clicking Run. The resulting data can then be downloaded using the "Save results" function.

17. None of the above requires the party producing the query results to generate new data. It only requires the entity to export existing Google Analytics data from BigQuery in a routine way.

18. Exhibit 2 to the Ochsner subpoena provides steps for exporting Google Analytics data directly from a Google Analytics account as a report. Generating reports is one of the basic functions of Google Analytics and a routine way to view data that is stored in the Google database associated with the account.[4] Google Analytics provides a graphical interface through which users select the information they want to view and then export the resulting report.

19. The user does not need to write a SQL query to generate a Google Analytics report. The user makes selections within the interface using menus, buttons, and filters. Certain filters permit the user to enter text into a text field. For instance, "Step 19" in Exhibit 2 to the Ochsner subpoena instructs the recipient to enter a specific expression into a text box. (ECF 50-2 at 42). This simply narrows the search results.

20. Once the filters are applied, Google provides a built-in Download File function that allows a Google Analytics report containing all the search results to be downloaded as CSV or PDF files or exported to Google Sheets.

21. These functions are designed for ordinary Google Analytics users, including marketing and analytics personnel, and do not require technical expertise. Generating a Google Analytics report does not involve generating new data, altering the contents of the database, or writing a new program. It merely exports Google Analytics data in a routine way.

[4] https://support.google.com/analytics/answer/9212670?hl=en

22. Neither method of exporting Google Analytics data described in the subpoena is time consuming, complicated, or expensive. Exporting data is a standard feature of Google Analytics accounts and does not involve any additional cost beyond the account subscription. The entire process up until exporting the data—whether done through BigQuery or Google Analytics report—takes a competent user less than ten minutes.

23. I have provided expert testimony in multiple class-action cases involving Google Analytics data. In many of these cases, I am aware that similar requests for production of database query results have been issued and responded to. Without disclosing any of the information provided, I am aware that Hoag Memorial Hospital Presbyterian—who I understand is a third party recipient in this case—responded to an identical request for production in *Doe v. Hoag Memorial Hospital Presbyterian*, No. 30-2023-01302765-CU-NP-CXC (Cal. Super. Ct.).

24. Identifying which entities have provided HRA forms with embedded Google Analytics tracking technologies is feasible using only public information. In the course of providing expert services for similar cases, I regularly identify the use of Google Analytics tracking technologies using public website archive services such as the Internet Archive's Wayback Machine.[5,6] The Wayback Machine archives a snapshot of a webpage—such as an online HRA page offered on a hospital's website—at a specific moment in time, including the source code associated with the page.[7] Archived HRA webpages contain configuration information (e.g.,

[5] https://web.archive.org/
[6] Ghani, A., Vekaria, Y. and Shafiq, Z., 2026, October. Pixelconfig: Longitudinal measurement and reverse-engineering of meta pixel configurations. In Proceedings of the 2026 ACM Internet Measurement Conference (pp. 944-962).
[7] Bahrami, P.N., Iqbal, U. and Shafiq, Z., 2022. FP-radar: Longitudinal measurement and early detection of browser fingerprinting. Privacy Enhancing Technologies Symposium (PETS).

Google Analytics values assigned to specific variables) identifying Google Analytics properties—installed directly or via a tag manager such as Google Tag Manager or Tealium.[8]

25. Thus, any hospital with an Unlock Health HRA page with Google Analytics installed and configured would transmit information to Google. That information would be stored in the Google Analytics account of the entity and can be retrieved using the aforementioned two ways: (1) Google Analytics data maintained in Google BigQuery, and (2) Google Analytics reports.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 14, 2026

Zubair Shafiq, PhD

[8] Jazlan, M., Nabeel, E. and Shafiq, Z., 2026, October. Poster: GTM-Config-Reverse Engineering Google Tag Manager in the Wild. In Proceedings of the 2026 ACM Internet Measurement Conference (pp. 1229-1230).