**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| JOHN DOE, JANE DOE, and JACK DOE, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>UNLOCK HEALTH, INC., MEDICOM DIGITAL, INC. d/b/a MEDICOM HEALTH INTERACTIVE and MEDICOM HEALTH,<br><br>Defendants | Case No. 3:26-cv-00289<br>District Judge Crenshaw<br>Magistrate Judge Hill<br><br>**CLASS ACTION**<br>**JURY DEMANDED** |

**JOINT RULE 26(f) DISCOVERY PLAN: PHASE 1**

Pursuant to the Second Case Management Order (ECF 59), the Parties submit this Joint Discovery Plan for the first phase of discovery limited to merits-based discovery of the named plaintiffs (hereafter "Phase 1").

1. **Definitions.**

    a. "Plaintiffs" refers to the plaintiffs whose identities will be disclosed on or after October 27, 2026 so that Phase 1 can proceed.

    b. "Defendant" refers to the named defendant in this action, Unlock Health, Inc.[1]

[1] Unlock Health, Inc. has since confirmed that the entities identified as "Medicom Digital, Inc. d/b/a Medicom Health Interactive" and "Medicom Health" (the "Other Medicom Entities") were erroneously identified. Neither entity is, or ever were, affiliated with or owned/managed by Unlock Health, Inc. Unlock Health, Inc. acquired another entity called "Medicom Health, LLC" on or after April 2023 but that entity does not operate or conduct business on its own. Unlock Health, Inc. intends to withdraw its appearance on behalf of the Other Medicom Entities.

c. The "Parties" refers collectively to both Plaintiffs and Defendant.

d. Each "Side" refers to all Plaintiffs, on the one hand, and Defendant, on the other.

2. **Commencement of Written Discovery.** The Parties may exchange written Phase 1 discovery requests beginning on **November 12, 2026**.

3. **Scope of Written Discovery.**

   a. Requests for Production of Documents. Each Side may propound up to 30 requests for the production of documents or electronically stored information, pursuant to Fed. R. Civ. P. 34, during Phase 1.

   b. Interrogatories. Each Side may propound up to 25 interrogatories, including discrete subparts, pursuant to Fed. R. Civ. P. 33, during Phase 1. The Parties will meet and confer if supplemental interrogatories beyond the initial 25 are necessary for any individual Plaintiff to account for individualized distinctions.

   c. Requests for Admission. Each Side may propound up to 30 requests for admission, pursuant to Fed. R. Civ. P. 36, during Phase 1.

4. **Initial Disclosures.** The Parties exchanged initial disclosures on September 16, 2026.

5. **Rule 30(b)(6) Depositions.**

   a. Any corporate entity in this action may be required to sit for a deposition, pursuant to Fed. R. Civ. P. 30(b)(6).

   b. Each Rule 30(b)(6) deposition shall be limited to a maximum of 7 hours, unless extended by written agreement of the Parties. If any Defendant designates more than one corporate representative deponent, the Parties will meet and confer regarding any additional time necessary.

   c. **Parties' Current Positions Regarding Relevant 30(b)(6) Deposition Topics to Be Addressed During Phase 1 30(b)(6) Deposition(s).** The Parties exchanged lists reflecting their respective proposals as to as appropriate Phase 1 30(b)(6) deposition topics in consideration of the Court's Second Case Management Order (ECF 59). The Parties currently disagree on what that scope is, specifically with respect to the topics on which Plaintiffs may examine Defendant that are related to their claims. However, the Parties are mindful that these issues do not need to be finalized in this Rule 26(f) Discovery

Plan and can be clarified once Plaintiffs formally serve their 30(b)(6) notice(s) upon which Defendants can serve their objections. The Parties set forth their respective positions as to appropriate topics below, with Plaintiff's Position set forth on Page 3 immediately below and Defendant's Position set forth on Page 11.

a. **Plaintiff's Position**. Defendant should be able to prepare a witness on topics related to the merits of Plaintiffs' individual claims. This includes Defendant's conduct in implementing (and using) the tracking technologies at issue in this case, any benefits it derived therefrom, and its communications with third parties to whom the embedded tracking technologies disclosed Plaintiffs' private information. Tentatively, the topics of examination of Unlock Health, Inc., likely include:

1. Defendant's[2] decision to use, and Defendant's use of, all Tracking Technologies[3] on the Webpages[4] during the Relevant Time Period,[5] including:

   i. the dates that those Tracking Technologies were first Deployed[6] on the Webpages, the dates those technologies were removed from the Webpages, and why those decisions were made;

---

[2] "Defendant," "You" and "Your" shall mean the entity to which these Requests are directed, or any predecessor or successor companies in existence during the proposed class period, and all employees, agents, or other persons acting on Defendant's behalf.
[3] "Tracking Technology" or "Tracking Technologies" means any third-party data-sharing tool, mechanism, source code, web beacon, cookie, tag, or system that collects, transmits, or enables the collection or transmission of data derived from user interactions with a website to any third party. This term includes, without limitation, tracking pixels, JavaScript, analytics tools, source code implementing data-collection functions, web beacons, cookies, advertising or marketing technologies, data-collection scripts, Conversion APIs, and any server-to-server data-sharing functionality.
[4] "The Webpages" means all website pages or mobile application interfaces that host a Health Risk Assessment form that was created, sold, or promulgated by Defendant.
[5] "Relevant Time Period" means the time beginning on the first date Defendant Deployed Tracking Technologies on its Web Properties and continues through the present. For purposes of Phase 1 of discovery, "Relevant Time Period" means the time beginning on the first date which any named Plaintiff completed a Health Risk Assessment and continues through the present.
[6] "Deploy" shall mean to place, use, or inject source code at any of Defendant's Web Properties either directly or indirectly (such as through a tag manager or other similar service).

ii. Deployment, configuration, and changes made to the Tracking Technologies;

iii. all fields of User Data[7] collected or transmitted via the Tracking Technologies and the manner in which User Data is collected, processed, or hashed, prior to transmission;

iv. differences between server-side tracking and browser-based tracking (such as pixels, cookies, or client-side tags);

v. policies, procedures, or internal Communications[8] concerning the decision to initially Deploy the Tracking Technologies and any changes in settings, configurations, or vendors over time;

vi. any reports, audits, or evaluations prepared by or for Defendant relating to the effectiveness, accuracy, or privacy compliance of the Tracking Technologies.

vii. The name of each third party company (e.g., Google) whose Tracking Technologies were Deployed on the Webpages;

---

[7] "User Data" means information regarding individuals who take actions on the Webpages, including (but not limited to) searches; page views; filling out electronic forms; reviewing or submitting health information; names; IP addresses; browser identifiers; device identifiers; advertising IDs; geolocation information; home addresses; e-mail addresses; user names; location; city; state; zip code; telephone number; gender; age; ethnicity; income; payment information; religion; parental status; search terms entered on the Webpages; URLs of website pages viewed; selecting physicians; Facebook IDs; video materials viewed and/or obtained; health conditions reviewed or communicated (e.g., addiction, Alzheimer's disease, and heart disease); diagnoses; procedures; test results; treating physicians; medications; unique identifying codes; HTTP Headers; Pixel IDs, and/or any other sensitive information created or received about patients' and potential patients' health conditions and identifiers.

[8] "Communication" means any oral, written or electronic transmission of information or intelligence of any nature including, but not limited to, meetings, discussions, conversations, and telephone calls, as well as documentation thereof, and telegrams, memoranda, letters, e-mails, telecopies, messages, or notes.

viii. the transmission of internet protocol (IP) addresses to third parties;

ix. the transmission of web universal resource locators (URLs) to third parties;

x. the transmission of cookies and cookie values to third parties;

xi. the transmission of device identifiers and Browser Fingerprints[9] to third parties; and

xii. the transmission of User Data to third parties derived from Users'[10] interactions with the Webpages.

2. For the Relevant Time Period, Your use of server-side technologies that resulted in User Data from the Webpages being transmitted from Your servers, website platforms, apps, or customer relationship management (CRM) technology to third parties such as Google, including but not limited to:

   i. the kinds of User Data transmitted to third parties (such as website events, app events, and offline events);

   ii. the operative dates that You transmitted User Data to third parties via server-side technologies; and

   iii. the specific server-side technologies that You used or Deployed that resulted in the transmission of User Data to third parties.

3. The limitations that Defendant placed on the use of any data collected or shared with third parties through the Tracking Technologies.

---

[9] "Browser Fingerprint" means data about users' web browsers that is collected when users visit a website, including (but not limited to) such data as the specific browser, the installed languages, graphics drivers, software versions, browser location, graphics card, the users' GPU, the operating system, plugins, browser time zone, system fonts, OS language, keyboard layout, screen resolutions, user agent, HTTP header attributes, and web browser extensions.

[10] "User" means an individual who visits a Webpage. For purposes of Phase 1 of discovery, "User" means the named Plaintiffs.

4. Defendant's understanding of how any data received by third parties from the Tracking Technologies can be used by third parties, and efforts Defendant took to ensure data received by third parties would not be shared with fourth parties.

5. All money, efficiencies, consideration, or benefits that Defendant received from use of the Tracking Technologies during the Relevant Time Period, and any return on investment ("ROI") analysis done by Defendant or on Defendant's behalf.

6. All money, consideration, or benefits Defendant paid to Users (including Plaintiffs) for the collection or transmission of their information via the Tracking Technologies.

7. Defendant's relationships and Communications with any third party from whom it Deployed Tracking Technologies during the Relevant Time Period, including but not limited:

   i. the total amount of money You were paid by third-party whose Tracking Technologies were installed on the Webpages;

   ii. the total amount of money You paid to any third-party whose Tracking Technologies were installed on the Webpages;

   iii. all benefits (including advertising and analytics benefits) You acquired through the use of the third-party source code or Tracking Technologies;

   iv. all Communications between you and the third party, including its employees, agents, or assigns;

   v. all contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and the third party; and

   vi. any non-disclosure, confidentiality, or business associate agreements relating to the third parties and the Webpages, including the effective time periods for those agreements.

8. Defendant's use of Google Ads and Google Ad Words.

9. Defendant's use of Google Remarketing Campaigns, Google Dynamic Remarketing Campaigns, and Google Segments to run advertising campaigns.

10. Defendant's use of Google Analytics to measure the effectiveness of advertising campaigns.

11. Defendant's understanding of the functionality provided by first-party cookies[11] and third-party cookies,[12] cookie values, cookie-synching,[13] and any sharing of cookie identifiers with any third party on the Webpages.

12. Defendant's privacy policies during the Relevant Time Period, including both internal privacy policies and the privacy policies made available to Users.

13. Any effort made by Defendant to disclose the use of Tracking Technologies, obtain consent for use of Tracking Technologies, or allow the blocking of data collection and transmission.

14. The advertising campaigns that You have run with Google during the Relevant Time Period, including the different types of campaigns and the total spend with Google on advertising during the Relevant Time Period.

15. The financial records, memoranda, and reports that You maintained, created or received related to your return on investment from marketing and advertising, including any cost savings analysis, cost-benefit analysis, income analysis, profit generated, revenue generated, or new patient conversion analysis during the Relevant Time Period involving the Tracking Technologies.

---

[11] "First-party cookie" means a cookie that is created and stored by the website a party is visiting, which allows website owners to collect customer analytics data.

[12] "Third-party cookie" means a cookie that is placed on a user's device (such as a computer, cellphone, or tablet) by a website from a domain other than the website that a user is visiting, for the purpose of tracking a user's browser history and activities.

[13] "Cookie synching" means any practice permitting cooperating web sites to share cookie identifiers for the same user. A cookie identifier is a unique identifier called a cookie ID. The cookie ID is a string of characters that websites and servers associate with the browser on which the cookie is stored.

16. Your efforts to comply with Your obligations under 45 C.F.R. 170.315, including (but not limited to) Your obligations under 45 C.F.R. 170.315(e) ("Patient engagement") to maintain an "Activity history log" that is "recorded and made accessible" to each patient.

17. Your efforts to comply with Your obligations under 45 C.F.R. 170.210, including (but not limited to) Your obligation to maintain an "audit log" for actions that users take related to their electronic health information inside the Webpages, including the maintenance of system-level audit trials that "capture successful or unsuccessful log-on attempts, log-on ID/username, date and time of each log-on/off attempt, devices used to log-on, and the application the user successfully or unsuccessfully accessed," as described by the Office for Civil Rights of the United States Department of Health and Human Services in the January 2017 guidance entitled "Understanding the Importance of Audit Controls" found at https://www.hhs.gov/sites/default/files/january-2017-cyber-newsletter.pdf?language=es.

18. Your efforts to comply with Your obligations under 45 C.F.R. 164.312 including (but not limited to) Your obligation to "[a]ssign a unique name and/or number for identifying and tracking user identity" for any "electronic information systems that maintain electronic protected health information."

19. The server logs related to the Webpages, including (1) the location of the servers for the Webpages, (2) Your access to the sever logs, (3) Your retention and backup of the sever logs, (4) Your efforts to preserve sever logs since this case was filed, and (5) the precise time periods during the Relevant Time Period for which sever logs are available.

20. Your access to online dashboards and portal accounts for Your Google Analytics account and Your Google Ad account, including (1) the existence of those accounts, (2) Your access to those accounts, and (3) the reports and data that can be exported from those accounts.

21. Any written consent that You have received from Users (including Plaintiffs) during the Relevant Time Period authorizing You to share with Google or other third parties their Data regarding their interactions with the Webpages.

22. Defendant's data protection measures, including the actions that Defendant took to ensure that the Protected Health Information[14] and the Individually Identifiable Health Information[15] of Users (as defined by HIPAA) received from their interactions with the Webpages were not disclosed to third parties via Tracking Technologies (such as the Google Analytics pixel), including Defendant's compliance with applicable industry standards and HIPAA regulations for safeguarding individuals' Protected Health Information.

23. Your legal and ethical obligations to protect the privacy of protected health information from unauthorized disclosure to third parties.

24. Defendant's relationships and Communications with and/or regarding the Plaintiffs during the Relevant Time Period.

25. Defendant's collection or disclosure of information from Plaintiffs' interactions with the Webpages through the Tracking Technologies.

---

[14] "Protected Health Information" means "Protected Health Information" as that term is defined in 45 C.F.R. § 160.103, to wit: "individually identifiable health information: (1) Except as provided in paragraph (2) of this definition, that is: (i) Transmitted by electronic media; (ii) Maintained in electronic media; or (iii) Transmitted or maintained in any other form or medium. (2) Protected health information excludes individually identifiable health information: (i) In education records covered by the Family Educational Rights and Privacy Act, as amended, 20 U.S.C. 1232g; (ii) In records described at 20 U.S.C. 1232g(a)(4)(B)(iv); (iii) In employment records held by a covered entity in its role as employer; and (iv) Regarding a person who has been deceased for more than 50 years."

[15] "Individually Identifiable Health Information" means "Individually Identifiable Health Information" as that term is defined in 45 C.F.R. § 160.103, to wit: "information that is a subset of health information, including demographic information collected from an individual, and: (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and (i) That identifies the individual; or (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual."

26. The terms, negotiation, and execution of all contracts between You and any Customer[16] to whom you provided Web Properties[17] on which Tracking Technologies where Deployed, including without limitation any Business Associate Agreement(s) ("BAAs"). This topic includes, without limitation, (1) all non-privileged internal discussions and decision-making regarding whether and how to address the topic of Tracking Technologies in any BAAs, and (2) all Communications between You and Customers regarding the topic of Tracking Technologies in relation to the negotiation or execution of any BAAs.

27. All Communications with Customers related to the Tracking Technologies, including but not limited to: (1) the use or Deployment of Tracking Technologies in Your Web Properties, including but not limited to all Communications related to any legal, compliance, or other concerns regarding the use or Deployment of Tracking Technologies in any of the Webpages; (2) all notices from You to any Customer regarding the Deployment of Tracking Technologies in any Webpages and the dates in which said notices were given; (3) all Communications between You and any Customer regarding a Customer request to remove Tracking Technologies from any Webpages; (4) all Communications between You and any Customer regarding a Customer request to Deploy Tracking Technologies in any Webpages; (5) all guides and instruction manuals that You provided to Your Customers explaining how they could Deploy their own Tracking Technologies inside Your Web Properties; (6) whether You offered the Customer the option of Deploying their own Tracking Technologies inside their Web Properties.

28. Defendant's responses to Plaintiffs' Interrogatories, Requests for Production, and Requests for Admission ("Plaintiffs' Discovery Requests"), including, without limitation, the information, Documents, and ESI responsive to Plaintiffs' Discovery Requests, and all efforts You made or that were

---

[16] "Customer" means a client or customer of Defendant that has purchased, implemented, or used a Health Risk Assessment created or promulgated by Defendant.

[17] "Web Property" or "Web Properties" means Defendant's software, code, or algorithm used to host Defendant's Health Risk Assessment(s) that is shared or sold to Customers.

made on Your behalf to identify, locate, inquire about, review, redact, withhold, and/or produce information, Documents, or ESI responsive to Plaintiffs' Discovery Requests.

29. Defendant's corporate structure and hierarchy, including the key individuals, job positions, departments, and organizations responsible for or performing work related to Defendant's Web Properties.

30. The factual bases for Defendant's affirmative defenses and its denials of factual allegations in its Answer.

31. Any insurance agreement under which an insurance company may be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse for payments made to satisfy the judgment in this action or to pay the cost of the defense of this action, including all policies and insurance companies for which You provided notice that a potential claim may exist in connection with this action.

32. Defendant's financial condition, including its ability to satisfy a possible judgment in this action.

d. **Defendant's Position**. Defendant believes that Plaintiffs' proposed Phase 1 30(b)(6) deposition topics exceed the scope of the Court's Second Case Management Order which, to Defendant's understanding, "must be limited to merits-based discovery of the putative class representatives." *See* ECF 59, p. 2. Below, Defendant identifies its proposed topics and any related proposed definitions.

1. Defendant's knowledge of the Tracking Technologies used on Defendant's Webpages when Plaintiffs submitted their respective health risk assessments giving rise to their respective claims; with respect to Defendant's clients use of the same technology, Defendant's knowledge may be limited to identifying the third-party vendors' names but may not include details of its clients proprietary alterations or licensing arrangements with said third-party vendors.[18]

[18] The term "Tracking Technology" or "Tracking Technologies" means any third-party data-sharing tool, mechanism, source code, web beacon, cookie(s), tag, or system that collects, transmits, or enables the collection or transmission of data derived from user interactions with a website to any third party. These terms

2. Defendant's knowledge of any reports detailing Plaintiffs' submission of health risk assessment submissions which can be generated through Defendant's own Tracking Technologies in use on Defendant's own Webpages.

3. Defendant's knowledge of its clients' configuration settings for the use of data analytics and Tracking Technologies, and those settings' impact on Plaintiffs' data accessible or available to Defendant; Defendant's knowledge includes the extent to which any audits or reports related to Plaintiffs' health risk assessments are or are not available to Defendant.

4. Defendant's knowledge of the types of Plaintiffs' User Data, if any, transmitted from Defendant's Webpage to Defendants' clients as a result of Plaintiffs' health risk assessment submissions.[19]

5. Defendant's understanding of the functionality provided by first- and third-party cookies, cookie values, cookie-synching, and any sharing of cookie identifiers with any third party which were activated during Plaintiffs' health risk assessment submissions.

---

include tracking pixels, JavaScript, analytics tools, web beacons, and cookies. For the avoidance of doubt, the term "cookie(s)" include cookies that are created and stored by the website a party is visiting, which allows website owners to collect analytics data ("first-party cookies") and cookies that are placed on a user's device (such as a computer, cellphone, or tablet) by a website from a domain other than the website that a user is visiting, for the purpose of tracking a user's browser history and activities.

The term "Webpages" means Defendants' website pages or mobile application interfaces that were created, sold, or promulgated by Defendant which hosted the versions of Defendant's Health Risk Assessment form which Plaintiffs utilized.

[19] The term "User Data" means data derived and/or generated from Plaintiffs' activity while completing and submitting their respective health risk assessments through Defendant's Webpages, including searches; page views; names; IP addresses; browser identifiers; device identifiers; advertising IDs; geolocation information; and similar information which resulted from Plaintiffs' use of Defendant's Webpages to submit their health risk assessment forms.

6. Defendant’s privacy policies and privacy compliance procedures in effect when Plaintiffs submitted their respective health risk assessments.

7. Defendant's server logs related to data generated by Plaintiffs during Plaintiffs' respective health risk assessment submissions, including, generally, (1) where Defendant's relevant servers are located, (2) Defendant's access to those server logs, (3) Defendant's retention and backup policies for those server logs; and (4) Defendant's preservation efforts over said server logs.

8. Defendant's access to online dashboards and portal accounts for Defendant's Google Analytics account and Defendant's Google Ad account if operational during the time period in which Plaintiffs submitted their respective health risk assessments, if any, including (1) the existence of those accounts, (2) Defendant's access to those accounts, (3) the reports and data that can be exported from those accounts, and (4) Defendant's own configurations and control over any such third-party vendor's data processing methodology

9. Any written consent that Defendants received from Plaintiffs authorizing Defendant to share with Google or other third parties data reflecting Plaintiffs' interactions with Defendant's Webpages.

10. Defendant’s data protection measures, including the actions that Defendant took to ensure that Plaintiffs' data and Personal Health Information (as that term is defined under HIPAA) received from Plaintiffs while Plaintiffs interacted with Defendant's Webpages were not disclosed to third parties via Tracking Technologies.

11. Defendant’s relationships and communications with the Plaintiffs, including any communications between Defendant and Plaintiffs, either individually or through Plaintiff's undersigned counsel, related to requests to remove Plaintiffs' data from Defendant's Webpages.

12. Defendant’s collection or disclosure of information from Plaintiffs’ interactions with Defendant's Webpages.

13. Defendant’s responses to Plaintiffs’ Interrogatories, Requests for Production, and Requests for Admission

("Plaintiffs' Discovery Requests"), including, without limitation, the information, Documents, and ESI responsive to Plaintiffs' Discovery Requests related to Plaintiffs' respective claims, and Defendant's efforts to identify, locate, inquire about, review, redact, withhold, and/or produce information, documents, or ESI responsive to Plaintiffs' Discovery Requests, specifically Plaintiffs' respective claims.

14. Defendant's corporate structure and hierarchy, including the key individuals, job positions, departments, and organizations responsible for or performing work related to Defendant's Webpages for the time period in which Plaintiffs submitted their respective health risk assessments.

e. Tentatively, Defendant may designate up to three (3) designees depending on which topics Plaintiffs' pursue past issuance of their Rule 30(b)(6) notice, the resolution of Defendant's potential objections, and whether specific technical testimony is required to address Plaintiffs' proposed topics. The Parties will address the time frame needed to complete depositions past the first designee in good faith pursuant to 5(b).

**6. Fact-Witness Depositions.**

a. Each Side may take up to 7 fact-witness depositions during Phase 1. Each fact-witness deposition shall be limited to a maximum of 7 hours, unless extended by written agreement of the Parties.

b. Fact witnesses are likely to include:

1. John/Jane Doe Plaintiff 1
2. John/Jane Doe Plaintiff 2
3. John/Jane Doe Plaintiff 3
4. Tami Weigold
5. Michael Rodgers
6. Tracy Cobb
7. Tony Huth
8. Melissa Placzkowski

9. Corey Maul

10. Alan Harker

**7. Third-Party Discovery.**

a. All third-party discovery during Phase 1 shall be limited to the individual claims of the named Plaintiffs.

**8. Expert Discovery.** No expert discovery shall be conducted during Phase 1.


*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch (State Bar No. 02045)
Grayson Wells (State Bar No. 039658)
John C. Roberts (State Bar No. 042673)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
gstranch@stranchlaw.com
gwells@stranchlaw.com
jroberts@stranchlaw.com

Foster C. Johnson (admitted *pro hac vice*)
Joseph Ahmad (*pro hac vice* forthcoming)
Mark Holden (*pro hac vice* forthcoming)
Hannah Price (*pro hac vice* forthcoming)
Sean Healey (*pro hac vice* pending)
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney Street, Suite 2500
Houston TX 77010
Telephone: (713) 655-1101
fjohnson@azalaw.com
ahmad@azalaw.com
mholden@azalaw.com
hprice@azalaw.com

By: */s/ Christopher J. Seusing*
Christopher J. Seusing, Esq. (Admitted Pro Hac Vice)
William J. Roe, Esq.
Alesandra Greco, Esq. (Admitted *pro hac vice* )
**WOOD, SMITH, HENNING & BERMAN, LLP**
800 S. Gay Street, Ste. 700
Knoxville, TN 37929
Tel.: 865-267-8050
Fax.: 865-267-8051
wroe@wshblaw.com
cseusing@wshblaw.com
*Counsel for Defendants Unlock Health, Inc. Medicom Digital, Inc. d/b/a Medicom Health Interactive And Medicom Health*

shealey@azalaw.com

Lynn A. Toops (admitted *pro hac vice*)
Lisa M. LaFornara (admitted *pro hac vice*)
**COHEN MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenandmalad.com
llafornara@cohenmalad.com

*Counsel for Plaintiffs and the Proposed Class*