Docusign Envelope ID: 6898309B-C7D1-81A0-83C9-A3A966139E1A

**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)**

| | |
|---|---|
| JOHN DOE, et al., individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNLOCK HEALTH, INC. MEDICOM DIGITAL, INC. d/b/a MEDICOM HEALTH INTERACTIVE and MEDICOM HEALTH,<br><br>*Defendants.* | Case No. 3:26-cv-00289<br><br>Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Lynda M. Hill |

**DECLARATION OF COURTNEY MAUL IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR ENTRY OF A PROTECTIVE ORDER**

I, Courtney Maul, declare as follows:

## I. Background and Basis of Knowledge

1. I am over 18 years of age and am authorized to make this Declaration on behalf of Defendants Unlock Health, Inc., Medicom Digital, Inc. d/b/a Medicom Health Interactive, and Medicom Health (collectively, "Defendants" or "Unlock Health"). I have personal knowledge of the facts stated in this Declaration and, if called as a witness, I could and would testify competently to them.

2. I was previously employed by Unlock Health as Chief Technology Officer. I held that position for over 5 years. My responsibilities included day-to-day oversight of Unlock Health's technology development, operations, and compliance. Currently, I have entered into an independent contractor relationship with the organization as of late October to assist with AI strategy and training and to provide historical knowledge and context for various matters within the organization.

3. I am familiar with Unlock Health's Master Services Agreements ("MSAs") and Statements of Work ("SOWs") with its healthcare clients, including the client relationship described in Part III below.

4. I submit this Declaration in support of Defendants' Renewed Motion for Entry of a Protective Order. When I signed my prior Declaration (ECF No. 32-1) in July 2026, I was Unlock Health's Chief Technology Officer and discovery in this case had just begun. Since then, my relationship with Unlock Health has changed: I left Unlock Health as an employee on September 18, 2026, and I now work with the organization as an independent contractor, as described in Paragraph 2. The posture of this case has changed as well. Plaintiffs' subpoenas are now directed to twenty-one of Unlock Health's current or former clients, and Defendants are renewing their request for a protective order at the Court's direction. Drawing on my more than five years overseeing Unlock Health's technology, operations, and compliance, and on my continuing work with the organization, this Declaration explains how Unlock Health's client relationships are structured, how its clients respond to litigation involving patient data, and why the harm that compelled compliance with the subpoenas would cause cannot be undone after the fact. The harm Unlock Health has already suffered in connection with one subpoenaed client is described separately in the Second Declaration of Alan Harker, which also accompanies the Renewed Motion.

## II. Unlock Health's Client Relationships

5. Unlock Health provides its Health Risk Assessment ("HRA") platform to hospitals and health systems under MSAs and associated SOWs. Under Unlock Health's standard agreement terms, HRA services are provided on a subscription basis. The subscription fees for the subscription term are non-cancellable and non-refundable.

6. Unlock Health's clients are healthcare organizations that operate in a heavily regulated environment and are highly sensitive to any suggestion that their patients' information is at issue in litigation. Unlock Health's business depends on these clients' continued trust in the platform and in Unlock Health's discretion as a vendor.

7. The non-party subpoenas at issue are directed to twenty-one of Unlock Health's current or former clients. A significant share of those subpoenas is concentrated within a single client health system, as described in the Second Harker Declaration that also accompanies Defendants' Renewed Motion for Entry of a Protective Order.

8. In connection with the discovery sought in this action, responsive materials are likely to include confidential and sensitive information across multiple categories maintained by Unlock Health in confidence. These categories include, without limitation, the list of Unlock Health's clients, specific implementations, tagging strategies, and other commercially sensitive details. Sharing this information could quickly place Unlock Health at a competitive disadvantage by exposing which clients it has worked hard to build trusted, confidential relationships with.

9. Unlock Health's client list and the details of how certain projects were implemented show exactly how it competes in the market. If that information becomes public, competitors could go straight after those clients and use the details to figure out how Unlock Health positions itself.

10. If Plaintiffs' requested information is disclosed—especially if it leads to subpoenas going out to Unlock Health's clients or other third parties—it could cause real and predicable harm to Unlock Health. Contacting non-parties at such an early stage in the litigation could strain important client relationships, create confusion or concern, and increase the risk that clients decide not to renew or take their business elsewhere. That in turn, could mean lost revenue, missed business opportunities and more pressure on pricing. In my experience communicating with

Docusign Envelope ID: 6898309B-C7D1-81A0-83C9-A3A966139E1A

Unlock Health's clients, they respond to litigation risk involving patient data by pausing vendor services, requesting concessions, delaying renewals, and reevaluating vendor relationships.

11. Enforcement of the subpoenas would require each subpoenaed client to devote staff, information-technology, and legal resources to this case and to confront, through formal legal process, Plaintiffs' allegations about a vendor it selected. I expect that process would lead additional clients to pause services, seek refunds or credits, decline to renew, or move to competing vendors.

12. Unlock Health cannot readily replace these relationships. Over 15 years, Unlock Health has invested substantial resources in building its client base, including sales personnel, developing targeted marketing campaigns, and drafting responses to requests for proposals. Hospitals and health systems select vendors through lengthy procurement processes, often 6 months or longer, followed by additional implementation work. The market for digital patient-engagement and health-risk-assessment services is extremely competitive, and competitors actively solicit Unlock Health's clients. In my experience, a healthcare client that leaves a vendor over privacy or litigation concerns rarely returns, and the investment Unlock Health made to win and serve that client is lost.

13. These harms cannot be undone after the fact. Once a client has been drawn into compelled discovery and loses confidence in Unlock Health, a later ruling in Unlock Health's favor will not restore the relationship, recover forgone fees, or recapture business that has moved to a competitor. An Attorneys' Eyes Only designation would not prevent this harm, because it flows from the act of compelling clients to respond and not only from who later reviews the responses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Docusign Envelope ID: 6898309B-C7D1-81A0-83C9-A3A966139E1A

Executed on this 19th day of November, 2026, in Tennessee.

Signed by:
Courtney Maul
A24EB8738A2B436...

Courtney Maul