**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

---

JOHN DOE, JANE DOE, and JACK DOE,

Plaintiffs,

v.

UNLOCK HEALTH, INC., MEDICOM DIGITAL, INC. d/b/a MEDICOM HEALTH INTERACTIVE and MEDICOM HEALTH,

Defendants.

Case No. 3:26-cv-00289
Judge Waverly D. Crenshaw, Jr.
Magistrate Judge Lynda M. Hill

---

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' RENEWED MOTION FOR ENTRY OF A PROTECTIVE ORDER**

Pursuant to Rule 26(c) and the Court's inherent authority to manage discovery, Defendants Unlock Health, Inc. and Medicom Digital, Inc. d/b/a Medicom Health Interactive and Medicom Health (collectively, "Defendants") move for a protective order (i) barring service and enforcement of the subpoenas directed to twenty-one of Defendants' non-party clients; (ii) protecting Defendants and those non-party clients from the financial and reputational harm of disclosing confidential, competitively valuable business information; and (iii) preventing harassment and undue burden on non-parties with no connection to this litigation. The subpoenas are an improper fishing expedition designed to pressure Defendants to settle and to scout litigation against other non-parties. Good cause exists to safeguard proprietary information, preserve the confidentiality of client identities, and prevent abuse of the discovery process.

Defendants renew this Motion pursuant to Paragraph 4 of the Court's Third Case Management Order. ECF No. 73 ¶ 4. Since Defendants originally filed that motion in July 2026, shortly after the subpoenas were issued, the grounds for this protective order have only strengthened. In fact, the harm Defendants originally feared has begun to materialize, as set forth

in the Second Declaration of Alan Harker ("Second Harker Decl.") and the Second Declaration of Courtney Maul ("Second Maul Decl."). In light of the ongoing and impending harm, Unlock Health respectfully renews its request for judicial intervention. In further support of this motion, Defendants incorporate the arguments in their two responses to Plaintiffs' memoranda of law (ECF Nos. 68 and 69), which show that the subpoenaed material is improper, disproportionate, and unduly burdensome on non-parties.

Below, Unlock Health further addresses why these subpoenas should be stricken as improperly overbroad and unduly burdensome with respect to the privacy and proprietary rights at issue. But as an alternative, Unlock Health proposes four less burdensome options which preserve those privacy interests though the imposition of undue costs on third parties is still disproportionate to the needs of this case and the merits of Plaintiffs' claims.

## I. INTRODUCTION

Plaintiffs filed a putative class action against Defendants alleging improper collection of personal data through Health Risk Assessments ("HRAs") deployed on healthcare entities' websites. Defendants have moved to dismiss, including on Article III standing grounds, and that threshold motion remains undecided. Rather than await resolution of that dispositive motion, Plaintiffs have used this litigation as a springboard to serve burdensome and harassing subpoenas—each roughly 190 pages—on twenty-one non-party healthcare entities that are current or former clients of Unlock Health, threatening substantial financial and reputational harm to Defendants by disrupting confidential client relationships and forcing non-parties into premature, expansive discovery.

In its Second Case Management Order, the Court stayed all discovery—including third-party discovery—pending approval of a Rule 26(f) plan, directed that the plan be limited to merits-

based discovery of the putative class representatives, and prohibited Plaintiffs from issuing new or revised subpoenas to the non-parties already served. ECF No. 59 ¶¶ 2–6. The Court also directed the parties to brief Plaintiffs' entitlement to HIPAA-protected data and to custom-generated analytics reports. Defendants' responses on those issues (ECF Nos. 68 and 69) establish that the very material the subpoenas demand is not properly discoverable from these non-parties—a conclusion that independently supports the protective order Defendants seek.

At the October 1, 2026 hearing, the Court itself questioned the propriety of the demands at the heart of the subpoenas. Examining Plaintiffs' extraction instructions, the Court found "a little bit of custom coding in here" and that "this [was] not an off-the-shelf query." Oct. 1, 2026 Hr'g Tr. 33:19–23. The Court further observed that this case is not "like a data breach case" and questioned whether it is "necessary that you actually extract" all of the personal health information Plaintiffs demand. *Id.* 36:2–3; 64:10–16. [Confirm quotations against certified transcript.] Those observations reinforce the relief sought here.

The need for protection is more acute now than ever. On November 13, 2026, Plaintiffs served their First Set of Requests for Production and First Set of Interrogatories on Defendants. Those requests demand Defendants identify every website on which any HRA was hosted "and the HEALTHCARE CLIENT associated with each," identify "each HEALTHCARE CLIENT who deployed DATA TECHNOLOGIES" on any HRA, and identify "each of the '1,300 influential hospitals'" referenced in Unlock Health's marketing, all for a period reaching back to August 2013. Pls.' First Set of RFPs Nos. 6, 11–12; Pls.' First Set of Interrogs. Nos. 3–4, 7 & Definition No. 40. They further demand "[a]ll AGREEMENTS" and "[a]ll COMMUNICATIONS" between Defendants and any healthcare client concerning the HRAs and tracking technology. RFP Nos. 11–12. Plaintiffs thus now seek, through party discovery, the complete client roster and

confidential client agreements whose protection is the subject of this Motion, while the twenty-one non-party subpoenas remain pending. At the same time, the same requests confirm that the information Plaintiffs actually need is available from parties to this case: Plaintiffs have asked Defendants for all records of each named Plaintiff's own HRA sessions, including "analytics records" and records of any transmission of that Plaintiff's data to a third party. RFP No. 17. Absent a protective order now, Plaintiffs will pursue the same confidential client information on two fronts at once, and the non-party subpoenas will subject Unlock Health's clients to undue burden and expense without adding necessary information that is not already available from Unlock Health.

## II. ARGUMENT

### A. Legal Standard

The scope of discovery extends to nonprivileged matter that is relevant to any party's claim or defense and "proportional to the needs of the case," measured by (1) the importance of the issues at stake, (2) the amount in controversy, (3) the parties' relative access to relevant information, (4) the parties' resources, (5) the importance of the discovery in resolving the issues, and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(1). A motion for a protective order is available to "a party or any person from whom discovery is sought," and the court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Good cause is established with "specific facts showing clearly defined and serious injury resulting from the discovery sought," not "merely conclusory statements." *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001) (quoting *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987)).

The Sixth Circuit has repeatedly upheld protective orders where, as here, the movant supported its request with concrete evidence of harm. In *In re Ohio Execution Protocol Litigation*,

the court affirmed an order shielding the identities of non-party suppliers upon a showing of particularized harm, and it rejected the request that the information instead be produced "attorney's eyes only" because, "[t]aken to an extreme, all protective orders could be circumvented by requesting that otherwise undiscoverable information be made available for use by counsel only." 845 F.3d 231, 239 (6th Cir. 2016). Rule 26(c) "merely requires the district court to weigh evidence against the movant's burden"; it does not impose a summary-judgment standard of proof. *Id.* at 238. Likewise, in *Knoll v. American Telephone & Telegraph Co.*, the Sixth Circuit affirmed a protective order limiting access to non-party personnel files, explaining that such orders "are commonly granted . . . as a means of protecting the privacy interests of nonparties while yet serving the needs of litigation," and that once the movant showed a valid confidentiality interest, the burden shifted to the requesting party to show that the order "would substantially harm his ability to collect the evidence necessary for prosecution of his case." 176 F.3d 359, 365 (6th Cir. 1999). And in *In re Modern Plastics Corp.*, the court affirmed sanctions against a party whose overbroad non-party subpoenas imposed undue burden, emphasizing that courts must "balance the need for discovery against the burden imposed on the person ordered to produce documents," and that "the status of that person as a non-party is a factor." 890 F.3d 244, 250–52 (6th Cir. 2018) (citation omitted).

Tennessee federal courts apply these principles to protect exactly the type of information at stake here: client identities whose disclosure would cause competitive and relationship harm. In *Westgate Resorts, Ltd. v. Wesley Financial Group, LLC*, this Court protected the identities of a company's current customers on findings that disclosure "will independently cause competitive injury" to the company "(because it will lose those customers and their fees)" and "other injury" to third parties. No. 3:20-cv-00599, 2020 WL 12990976, at *2 (M.D. Tenn. Dec. 1, 2020), *objections overruled*, 2021 WL 679292, at *2 (M.D. Tenn. Feb. 22, 2021). *See also Diamond*

*Resorts U.S. Collection Dev., LLC v. Wesley Fin. Grp., LLC*, No. 3:20-CV-251-DCLC-DCP, 2021 WL 8443797, at *[9] (E.D. Tenn. July 20, 2021) (finding that current-customer information was "extremely sensitive commercial information" whose disclosure "would cause a serious competitive injury to Defendants—both in their business model and the loss of clients and fees"); *Steede v. Gen. Motors, LLC*, No. 11-2351-STA-dkv, 2012 WL 2089761, at *3 (W.D. Tenn. June 8, 2012) (affirming protective order where the magistrate judge found that the defendant "would suffer serious economic injury if the information was obtained by competitors"); *Pictsweet Co. v. R.D. Offutt Co.*, No. 3:19-cv-0722, 2020 WL 12968432, at *3 (M.D. Tenn. Apr. 23, 2020) (granting Rule 26(c) motion directed to a third-party subpoena and holding that "the requested documents need not be produced," without prejudice to a renewed subpoena); *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, No. 3:18-CV-00988, 2024 WL 1342567, at *6 (M.D. Tenn. Mar. 28, 2024) (denying non-party discovery where the relevance theory was "too attenuated to justify the burden").

**B. Good Cause Exists Under Rule 26(c) Because the Subpoenas Would Inflict Serious, Concrete, and Irreparable Harm on Unlock Health.**

Unlock Health operates in a highly specialized segment of the U.S. healthcare marketing and communications sector and derives competitive value from the confidentiality of its client base, the stability of those relationships, and its client-specific HRA implementations. *See* Declaration of Courtney Maul, ECF No. 32-1 ("Maul Decl.") ¶ 4. Its entire business model depends on being a trusted platform provider. *Id.* Unlock Health's clients independently configure and control their own HRA environments, and Unlock Health "neither collects, accesses, nor retransmits individual HRA results or personally identifiable information to any third party." Declaration of Alan Harker, ECF Nos. 68-1 & 69-1 ("Harker Decl.") ¶ 13. The subpoenas would turn that trusted relationship against Unlock Health, exposing the identities of its clients and the

technical details of their deployments, and inflicting at least four distinct and serious harms—none speculative, each the kind of "clearly defined and serious injury" that establishes good cause under Rule 26(c). *See supra*, Part II.A. That harm is no longer only prospective. As detailed in the Second Harker Declaration, it has already occurred. Second Harker Decl. ¶¶ 6–12.

**1. Loss of Competitively Valuable Client Identities and Technical Implementations.**

Client identities and the details of the services Unlock Health provides are core, competitively sensitive information that competitors can—and do—use to poach business, undercut pricing, and infer strategy. Courts routinely recognize that customer lists, client identities, and related commercially sensitive data constitute commercial information warranting protection under Rule 26(c). *See supra*, Part II.A. As served, Plaintiffs' subpoenas to Unlock Health's clients seek Google Analytics and related technical materials that would necessarily expose the identities of Unlock Health's clients and reveal specific implementations, tagging strategies, and other commercially sensitive details. Maul Decl. ¶ 4. Those client identities and implementation details are a blueprint of Unlock Health's competitive strategy; if disclosed, competitors could directly target those relationships and reverse-engineer Unlock Health's market positioning. *Id.* ¶ 5. The subpoenas, by design, would compel disclosure of precisely the information competitors value most—who Unlock Health's clients are and how Unlock Health executes on their behalf.

**2. Immediate and Prospective Financial Harm.**

The foreseeable financial consequences of that disclosure are concrete and compounding. They include (1) the loss of renewal cycles and immediate revenue loss as existing clients—healthcare entities sensitive to being drawn into litigation and to the exposure of their vendor relationships—reconsider their engagements; (2) the loss of prospective business as competitors use the disclosed client roster to target Unlock Health's pipeline; and (3) pricing pressure as

competitors armed with Unlock Health's client and implementation information undercut its proposals. Maul Decl. ¶ 6. Those consequences have now begun. One multi-facility health system, referred to as "Client A," accounts for at least ten of the subpoenaed non-parties. Second Harker Decl. ¶ 6. In fact, Client A asked Unlock Health to pause its HRAs, and they have remained dark since March 27, 2026, even though Client A's subscriptions have remained available for its use throughout the pause and the pause was not the result of any problem with Unlock Health's platform. *Id.* ¶¶ 7–8. At the time of the pause, Client A indicated that it might seek a refund for its current subscription term depending on how long its HRAs remained out of service, although its agreements provide that the services are non-cancellable and non-refundable. *Id.* ¶ 9. To resolve that refund request and preserve the relationship, Unlock Health agreed to forgive the $114,000 Client A owes under its agreements, a direct and quantifiable loss. *Id.* ¶¶ 10–11. Compelling Client A to comply with multiple roughly 190-page subpoenas requiring each facility to run queries and produce analytics data "would materially deepen that harm." *Id.* ¶ 12. Unlock Health's clients respond to litigation risk involving any patient data, even if limited to the behavioral site analytic data at issue in this case rather than protected health information, by pausing services, requesting concessions, delaying renewals, and reevaluating vendors, and enforcement would likely lead additional clients to do the same. Second Maul Decl. ¶¶ 10–11. Because hospitals select vendors through lengthy procurement processes and a client that leaves over privacy or litigation concerns rarely returns, those relationships cannot readily be replaced. *Id.* ¶ 12. Those relationship injuries are irreparable: since these harms flow from the one-time, irreversible disclosure of confidential information—even if merely alleged and unproven—no later remedy can restore the confidentiality or the client relationships once lost. And because the harm flows from the act of compelling clients to respond, not only from who later reviews the responses, a later ruling in

Unlock Health's favor will not restore those relationships. *Id.* Compelling Unlock Health and its clients to extract and produce client-held datasets through litigation would publicly entangle Unlock Health and its clients in Plaintiffs' unproven allegations of improper data collection, undermining the very reputation for privacy and security on which Unlock Health's standing in a regulated market depends.

**3. Disruption of Confidential Client Relationships and Unlock Health's Platform Role.**

The subpoenas would also damage the confidential client relationships that are the foundation of Unlock Health's business. Unlock Health is a platform provider: its clients "independently configure[] and control[]" their HRA environments, choose whether and how to deploy any analytics or tracking tools, and retain sole control over the resulting data, which Unlock Health "does not access . . . as a matter of routine and cannot [access] without explicit authorization from the client." Harker Decl. ¶¶ 6–10, 13. Forcing compliance with the subpoenas would require Unlock Health to reach into—or to pressure its clients to open—environments and data that belong to and are controlled by those clients, and would conscript twenty-one non-party healthcare entities into burdensome discovery over configurations they alone control. That is precisely the kind of avoidable, relationship-destroying burden the discovery rules guard against, and it would inflict reputational and commercial harm on Unlock Health that no protective designation applied after the fact could undo. Second Maul Decl. ¶ 13.

**4. The Burden and Harm Are Disproportionate to Any Benefit.**

Proportionality and burden weigh decisively in favor of protection. First, Plaintiffs can and should obtain relevant information through party discovery—including from the named Plaintiffs' own data—in a tailored manner that avoids broadcasting client identities. Second, any technical inquiry can be conducted through anonymized, aggregated, or sampled data that removes client-

identifying information. Third, any incremental relevance of naming specific clients is substantially outweighed by the competitive, financial, reputational, and relationship harms described above. The Court's current posture reinforces this conclusion: Phase 1 party discovery is now underway, while enforcement of the non-party subpoenas remains stayed and Plaintiffs may not issue new, revised, or updated subpoenas to those non-parties. ECF No. 73 ¶¶ 1, 5.

### C. The Subpoenas Seek De-Identified Analytics Data That Is Not PHI, and Absent-Class-Member PHI Discovery Is Premature and Disproportionate.

The protective order is further warranted because the subpoenas rest on a flawed premise—the data at issue is the protected health information ("PHI") of Plaintiffs or the putative class. As Defendants explain in their Amended Response to Plaintiffs' Memorandum of Law Regarding Production of HIPAA-Protected Information (ECF No. 68), which Defendants incorporate herein, the data Unlock Health transmits is not PHI at all. HIPAA protects only "protected health information"—the subset of "individually identifiable health information" that both relates to an individual's health and identifies, or could reasonably identify, that individual. 45 C.F.R. § 160.103. Information "must satisfy both the 'relates to' clause and the 'identifies' clause" to qualify. *Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780, 801 (N.D. Tex. 2024). The data actually at issue—a fixed set of website-navigation event fields such as "full-disclaimer-view," "start-page-viewed," and "contact-page-viewed"—satisfies neither prong [and is "inherently de-identified"]. *See id.* at 803–04; Harker Decl. ¶ 12.

Even if the data were PHI, HIPAA would not make it discoverable. Section 164.512(e) allows a party to disclose PHI in litigation but does not require it, and it does not broaden what is discoverable. The agreed qualified protective order governs how produced information is kept confidential; it does not decide whether that information is relevant. 45 C.F.R. § 164.512(e); ECF No. 68. HIPAA creates no privilege, and PHI is discoverable only if relevant and proportional

under Rule 26(b)(1). *Wade v. Vabnick-Wener*, 922 F. Supp. 2d 679, 691 (W.D. Tenn. 2010); *Shabazz v. Centurion*, No. 117CV01051JDTCGC, 2020 WL 1442976, at *2, *6 (W.D. Tenn. Mar. 24, 2020). Where, as here, the records implicate non-parties' privacy, they "should not be ordered produced except upon a compelling showing of relevance." *Miller v. Fed. Express Corp.*, 186 F.R.D. 376, 384–85 (W.D. Tenn. 1999). Those protections carry particular force in this forum, because "the laws of Tennessee are more stringent than HIPAA" in protecting non-party patient health information. *Wade*, 922 F. Supp. 2d at 686–87, 691–92.

The demand for absent class members' PHI is also premature. No class certification motion is pending, Defendants' Article III standing challenge remains undecided, and although Phase 1 party discovery is underway, enforcement of the non-party subpoenas remains stayed pending resolution of this Motion. ECF No. 73 ¶¶ 1, 5. Precertification discovery from absent class members requires a particularized showing of need and leave of court, which Plaintiffs have not attempted. *In re Skelaxin (Metaxalone) Antitrust Litig.*, 292 F.R.D. 544, 549–50 (E.D. Tenn. 2013); *accord Stephenson v. Fam. Sols. of Ohio, Inc.*, No. 1:18cv2017, 2022 WL 597261, at *6 (N.D. Ohio Feb. 28, 2022). Defendants' legal brief at ECF No. 68 establishes, in full, why Plaintiffs are not entitled—at this stage—to the PHI of absent class members, and that reasoning applies with equal force to the subpoenas this Motion addresses.[1]

[1] Defendants' response at ECF No. 68 develops five additional points. First, Plaintiffs, as the parties seeking discovery, bear the burden of showing that the data they seek is protected health information at all; website-navigation events show at most that an identifiable person viewed a page, not why. ECF No. 68 at 3. Second, a HIPAA-qualified protective order governs only how protected health information is handled once produced; it does not replace the Court's independent determination of relevance and proportionality under Rule 26(b)(1). *Id.* at 4–5; *see* 45 C.F.R. § 164.512(e)(1). Third, discovery from absent members of a putative class requires a particularized showing of need and leave of court; Plaintiffs have made neither, and they seek individualized merits information. ECF No. 68 at 6–7; *In re Skelaxin*, 292 F.R.D. at 549–50. Fourth, Plaintiffs' authorities do not support production here. *Rose v. Matrixx Initiatives, Inc.*, No. CV 07-2404-ML/P, 2008 WL 11153079 (W.D. Tenn. July 7, 2008), is an agreed qualified protective order, not

### D. Plaintiffs Cannot Compel Defendants or Non-Parties to Build Custom Reports That Do Not Exist, and Binding Sixth Circuit Authority Protects These Non-Parties.

The subpoenas are independently improper because they would force non-parties to create new records. As Defendants explain in their Response to Plaintiffs' Memorandum of Law Regarding Google Analytics Data Requests (ECF No. 69), which Defendants incorporate herein, the reports Plaintiffs demand do not exist: each recipient would have to take Plaintiffs' prewritten SQL query, substitute account-specific values, and run it, or construct a Google Analytics 4 "Explore" report to Plaintiffs' specifications and enter a prewritten expression into a text field. The Court itself recognized that this is "custom coding" and "not an off-the-shelf query." Oct. 1, 2026 Hr'g Tr. 33:19–23. Rule 34 "imposes no duty to create documents just to respond to discovery requests," and Rule 45 does not "contemplate that a non-party will be forced to create documents that do not exist." *Shapira v. Rare Character Whiskey Co., LLC*, No. 3:23-CV-00602-RGJ, 2025 WL 4055407, at *5 (W.D. Ky. Oct. 14, 2025); *Gipson Mech. Contractors, Inc. v. U.A. Loc. 572*, No. 3:18-CV-00768, 2020 WL 8254820, at *4 (M.D. Tenn. Apr. 10, 2020) (Rule 34 "only requires a party to produce documents that are already in existence").

---

a ruling that non-party health information was relevant or proportional. *Bagley v. N.Y. State Dep't of Health*, No. 15 CV 4845 (FB) (CLP), 2017 WL 11922423, at [pincite] (E.D.N.Y. Dec. 7, 2017), ordered production because the information was "indispensable to the class certification inquiry" in a case seeking only injunctive relief, where the usual concern about precertification discovery "has significantly less force." Neither circumstance is present here: no certification motion is pending, Plaintiffs seek damages, including statutory damages, and the subpoenas seek merits data about every absent class member. ECF No. 68 at 8–9. Fifth, less intrusive means should come first, *see* Part II.E, and Tennessee law affords non-party patient information protections that are, in some respects, more stringent than HIPAA. ECF No. 68 at 9–10; *cf. Wade v. Vabnick-Wener*, 922 F. Supp. 2d 679, 691–92 (W.D. Tenn. 2010). Unlock Health has proposed less intrusive means; Plaintiffs have proposed no alternatives that would protect either absent putative class members' privacy or Unlock Health's clients' proprietary and confidential records and systems.

Binding Sixth Circuit authority independently protects these non-party clients. The serving party must "take reasonable steps to avoid imposing undue burden or expense" on a non-party, the court "must enforce this duty," and in weighing the burden "the status of [the] person as a non-party is a factor." *In re Mod. Plastics Corp.*, 890 F.3d 244, 250–52 (6th Cir. 2018). Courts in this District and Circuit regularly quash or deny such overbroad non-party discovery. *See Billiards & Brews, LLC v. City of Knoxville*, No. 3:23-CV-181-CLC-DCP, 2026 WL 1330951, at *4–5 (E.D. Tenn. May 13, 2026); *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, No. 3:18-CV-00988, 2024 WL 1342567, at *6 (M.D. Tenn. Mar. 28, 2024).

Four inter-related points show that Plaintiffs do not need the client-held datasets in any event and why the data is not within Unlock Health's possession, custody, or control. First, as noted *supra* in Section C on Page 8, the subpoenas seek PHI data which was not breached and was not transmitted. Second, Plaintiffs can develop their theory through Phase 1 party discovery, ECF No. 73 ¶ 1, and from configuration information, publicly available Wayback Machine snapshots showing when tracking technology was active, and the named Plaintiffs' own HRA submissions. That makes the subpoenas' third request, which seeks the analytics data itself, cumulative and disproportionate. Fed. R. Civ. P. 26(b)(1), (b)(2)(C)(i); ECF No. 69. Third, Unlock Health cannot produce what it does not control: the data is encrypted, inaccessible to Unlock Health without client authorization, and held by the non-party clients, whose accounts Unlock Health may not reach consistent with its business-associate obligations. Harker Decl. ¶¶ 10–11. Fourth, Plaintiffs' asserted risk of data deletion does not justify production. Enforcement of the served subpoenas remains stayed pending resolution of this Motion, and the Court has directed counsel "to continue their good faith efforts to reach data preservation agreements with the third parties to whom

subpoenas have been issued." ECF No. 73 ¶¶ 5–6. Preservation, not production, is the answer Plaintiffs' own urgency argument calls for.

### E. Reasonable, Less Intrusive Alternatives Exist and Should Be Ordered Before Any Non-Party Client Disclosure.

Reasonable, less intrusive alternatives exist and should be ordered before any non-party client disclosure is contemplated. In order of priority, they are: (1) party discovery first; (2) anonymization and redaction of client identities; (3) Attorneys' Eyes Only treatment; and (4) targeted sampling across a defined time frame. *See John B. v. Goetz*, 531 F.3d 448, 461 (6th Cir. 2008).

*First*, party discovery should proceed. The Court has confined the current phase of discovery to merits-based discovery of the three putative class representatives. ECF No. 59 ¶¶ 3, 5. Plaintiffs have already requested from Defendants every record of the named Plaintiffs' own HRA sessions. RFP No. 17. Where a party can supply the information sought, or the information does not exist at all, courts in this Circuit refuse to make a non-party carry the burden of producing confidential commercial information. *Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, 294 F.R.D. 87, 95–96 (S.D. Ohio 2013); *Curran v. Fronabarger*, No. 1:23-cv-010604-STA-jay, 2024 WL 6447160, at *2 (W.D. Tenn. June 21, 2024).

*Second*, any technical information can be produced with each client assigned a neutral code (for example, "Client A") and with names, domains, account identifiers, and other client-identifying fields redacted. Plaintiffs' theory concerns how tracking technology functioned on HRA pages, not which hospital deployed it. *See Daycab Co., Inc. v. Praire Tech., LLC*, No. 3:20-CV-63-TRM-DCP, 2021 WL 6275628, at *4 (E.D. Tenn. Dec. 21, 2021) (ordering that the parties "shall redact all information identifying customers, including name, city, state, and street address"); *Moore v. CHSI EMP LLC*, No. 1:25-CV-238, 2026 WL 817298 (N.D. Ohio Mar. 25,

2026) (non-parties' privacy interests adequately addressed by generic identifiers); *accord Westgate Resorts*, 2020 WL 12990976, at *5. Anonymization addresses the core harms identified in the Maul Declaration. Maul Decl. ¶¶ 4–6.

*Third*, whatever survives should be produced Attorneys' Eyes Only. *Stout v. Remetronix, Inc.*, 298 F.R.D. 531, 535–36 (S.D. Ohio 2014); *Spring Hill Beechcroft Rd. I LLC v. Magna Seating of Am., Inc.*, No. 1:22-CV-00049, 2024 WL 469635, at *4 (M.D. Tenn. Jan. 3, 2024) (directing that non-party subpoena productions "must be maintained for attorneys' eyes only"). But the parties' agreed protective order, *see* ECF No. 61 at 7 (citing ECF No. 53-1), is a floor, not a substitute for proportionality. *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 238–40 (6th Cir. 2016) ("[t]aken to an extreme, all protective orders could be circumvented by requesting that otherwise undiscoverable information be made available for use by counsel only."). AEO treatment governs who sees information after production; it does nothing to reduce the burden on twenty-one non-party healthcare entities or to undo the relationship harm that occurs when clients are compelled to respond. Second Maul Decl. ¶ 13. It is necessary but not sufficient.

*Fourth*, any non-party data production should be limited to a targeted sample across a defined period, such as the periods when the named Plaintiffs used an HRA. *Solo v. United Parcel Serv. Co.*, No. 14-12719, 2017 WL 85832, at *2 (E.D. Mich. Jan. 10, 2017); *Moore v. Westgate Resorts*, No. 3:18-CV-410-DCLC-HBG, 2020 WL 113352, at *6–7 (E.D. Tenn. Jan. 9, 2020) (denying pre-certification discovery of records for "over 73,000 timeshare owners during the proposed class period" where summary data had been produced). The Court has questioned whether it is "necessary that you actually extract all of" the information Plaintiffs demand. Oct. 1, 2026 Hr'g Tr. 64:10–16. Like the plaintiffs in *Moore*, Plaintiffs here seek every record for every putative class member before any certification motion; representative data from a defined period

is enough at this stage. Sampling also fits the preservation agreements the Court has directed the parties to pursue, ECF No. 59 ¶ 8, and preserved data remains available if Plaintiffs later make a particularized showing that more is needed.

## III. CONCLUSION

Plaintiffs' subpoenas would force twenty-one non-party healthcare clients to build custom reports that do not exist and to hand over data about their patients. They would do so while Defendants' Article III standing challenge remains undecided and before Plaintiffs have pursued the party discovery the Court has already authorized. The cost of that premature, sweeping discovery would fall on Unlock Health and its clients, in the form of exposed client identities, lost business, and damaged client relationships, and no later remedy could undo it. Rule 26(c) and Rule 45 exist to prevent exactly this harm, and Sixth Circuit authority requires the Court to protect non-parties from it. Unlock Health therefore respectfully requests that the Court grant this Motion and enter a protective order barring service and enforcement of the subpoenas. In the alternative, it requests that any future non-party discovery wait until party discovery is complete and proceed only with anonymization, redaction, Attorneys' Eyes Only treatment, and targeted sampling.

Respectfully Submitted,

Dated: Knoxville, Tennessee
November 19, 2026

**WOOD, SMITH, HENNING & BERMAN, LLP**

By: *<u>/s/ Christopher J. Seusing</u>*

Christopher J. Seusing, Esq. (Admitted Pro Hac Vice)
William J. Roe, Esq.
Drew T. Moore, Esq. (Admitted Pro Hac Vice)
Alesandra Greco, Esq. (Admitted Pro Hac Vice)
800 S. Gay Street, Ste. 700
Knoxville, TN 37929
Tel.: 865-267-8050
Fax.: 865-267-8051
wroe@wshblaw.com
cseusing@wshblaw.com
dmoore@wshblaw.com

wroe@wshblaw.com
agreco@wshblaw.com

*Counsel for Defendants Unlock Health, Inc. Medicom Digital, Inc. d/b/a Medicom Health Interactive And Medicom Health*

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2026, a copy of the MEMORANDUM IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR ENTRY OF A PROTECTIVE ORDER was filed through the Court's CM/ECF system, which will send notification to all counsel of record registered to receive electronic service.

/s/ *Christopher J. Seusing*
Christopher J. Seusing, Esq.